# UNITED STATES DISTRICT COURT

### for the
### Western District of
### North Carolina
### Charlotte Division

Case No: 3:24-cv-950-FDW

<u>No</u> Jury Trial Requested

Debra Ann Cauthen (*pro se*)

**Plaintiff**

-v-

State of North Carolina, USA
NC Department of Justice

NC Golf Homes of Locust Valley IV,
LLC aka Senior Villages LLC
*Jointly*
Travelers Insurance Group Holdings, Inc.

City of Charlotte (municipal government) in
Mecklenburg County

Mecklenburg County in
State of North Carolina

**Defendants**

# COMPLAINT

# COMPLAINT FOR A CIVIL CASE

## I.   The Parties to This Complaint

### A. The Plaintiff

Debra Ann Cauthen
505 Laurel Court
Lancaster, SC 29720
dcau1@yahoo.com

## B. The Defendants

Defendant No. 1
State of North Carolina in the United States
of America Attorney General Mr. Josh Stein
114 W. Edenton Street
Raleigh, NC 27603
TEL: 919-716-

NCAGO@NCDOJ.gov

Joint Defendants No. 2
NC Golf Homes of Locust Valley IV, LLC aka
Senior Villages LLC
Attorney Mr.Stephen Koehler

112 South Tryon/Tryon Plaza Suite 1100
Charlotte, NC 28284
TEL: 980-219-5200

stephen.koehler@bridgehouse.law

Joint Defendant No. 2
Travelers Insurance Group Holdings, Inc.
Registered Agent
Corporation Service Company
Goodwin Square 225 Asylum Street 20th Floor
Hartford, CT 06103
TEL: 800-927-9800

compliancemail@csglobal.com

Defendant No. 3
City of Charlotte in Mecklenburg County
City Attorney Mr. Patrick Baker
600 4th Street 15th Floor
Charlotte, NC 28202
TEL: 704-336-2651

Defendant No. 4
Mecklenburg County of North Carolina
County Attorney Mr. Tyrone Wade
600 4th Street 11th Floor
Charlotte, NC 28202

TEL: 980-314-7424

# TABLE OF CONTENTS

Basis for Jurisdiction     Page 5

     Request for Federal Jurisdiction     Page 6- 7

     Summarization for Jurisdiction     Page 7- 13

Statement of Claim (Facts Alleged)

     Summary of Injury Complaint     Page 4- 40

     Duty of Care and Breach Defendant #1     Page 41-

     Duty of Care and Breach Joint Defendants #2     Page-

     Duty of Care and Breach Defendants #3 & #4     Page-

     Causation     Page 70- 89

Summary of Claims for Relief     Page 90- 91

Prayer for Relief     Page 91- 93

Certification and Closing     Page 94

Appendix Listing of Attachments     Page 95- 481

# LISTING OF TABLES

Table 1.    Symptom Characterizations From Mold Exposure

Table 2.    Areas of Mold Sickness - Allergies #24

Table 3.    Areas of Mold Sickness -Invasive Infections #24

Table 4.    Areas of Mold Sickness- Allergic Reactions

Table 5.    Microscopic Examination of Fungal Spores

Table 6.    Other Types of Fungi Detected

Table 7.    Medical Diagnoses and Conditions Ruled Out for PLAINTIFF

Table 8.    Medical Diagnoses and Conditions Ruled Out

Table 9.    Robinhood Integrative Health Diagnosis Summary

Table 10.   Robinhood Integrative Health Diagnosis Summary Addition

Table 11.   Mycotoxin Tests

Table 12.   Mycotoxins Found in Plaintiff's Urine Test Results

Table 13.   Type of Fungi Detected in Environment Apartment #7

Table 14.   Emergency Room Treatment for Mycotoxicosis "Flare-Ups"

Table 15.   Summary of Bodily Function Area and Symptoms

## GRAPH

Graph 1.    Income to Expense Ratio Chart 2020- 2024

## PICTURES

Picture 1.   Gastrointestinal Tract Tumor Location

Picture 2.   Tumor Depiction

## II.    Basis for Jurisdiction

What is the basis for federal court jurisdiction?

Federal Question under § 28 USC  1331

A. List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution:

24 C.F.R. § 203.673 – Habitability.

The  Code of Federal Habitability " – 12 C.F.R. § 203.673  "States that the property shall be structurally sound, reasonably durable, and free from hazards that may adversely affect the health and safety of the occupants or may impair the customary use and enjoyment by the occupants. Unacceptable hazards include, but are not limited to, subsidence, erosion, flood, exposure to the elements, asbestos and lead-based paints, unsafe electrical wiring, or an accumulation of minor hazards, such as broken stairs."

24  C.F.R. § 982 401 " Housing Quality Standards" (HQS)

HUD's minimum quality standards, 24 C.F.R. § 982 4011, for tenant- based (occupied) programs are to ensure "safe, decent and sanitary" for its properties, both initially and during the term of the lease.

The HUD HQS incorporate mold as an intolerable condition in the living environment of its premises, as reflected in their standardized inspections and the inclusion for the training of their inspectors.

An inherent objective to develop minimum housing standards is not only for the protection of the tenant but also to prevent deterioration of housing quality (American Public Health Association and the Center for Disease Control- Recommended Minimum Housing Standards (1986); and to a limited degree,

Title VIII of the 1968 Civil Rights Act: Amendment creating the "Fair Housing Act" and Amended in 1995 creating the  "Housing for Older Persons Act".

The Plaintiff meets the age requirement of 55 years and older, Senior Villages Apartments (Apartments) can be termed a "qualified multifamily dwelling (4 or more units in the same building), and the Apartments are marketed and leased specifically to seniors as a retirement community operated for profit.

Request for Federal Jurisdiction

The *pro sec* Plaintiff commences this civil action after Mecklenburg County- District Court Case 22CVM22137 on October 18, 2022, adjudicated that the Defendant, Plaintiff in this case, prevailed on her counterclaim in a "Complaint for Summary Ejectment" initiated by Golf Homes of Locust Valley IV, LLC aka Senior Villages LLC, the owner of Senior Villages Apartments, the Plaintiff, had breached its landlord tenant obligation to the Plaintiff in this civil action. See Attachment #1.

Simply stated, the Magistrate's judgment stated that there were "dangerous" molds in the apartment unit to warrant relocation and need for remediation of Apartment #7 when Plaintiff had followed the terms of the lease in reporting mold in her apartment. Photographs from the apartment were included in the case file.

The Magistrate notated that Plaintiff (Senior Villages, LLC) had not proven its case; dismissed the case with prejudice describing in her notation that the default notice, against the tenant, terminating the leasing agreement, was in response to tenant's written notification to the management that Apartment #7 was infested with mold.

Since the mold infestation was deemed significant to the degree that the Plaintiff had to exit the apartment, the landlord had also breached the "implied warranty of habitability"( § 42-42) and "duty of care" to this Plaintiff as this apartment was not fit for occupancy.

Senior Villages never acknowledged that mold existed in Apartment #7 which the law requires for repairs. The Magistrate made the determination.

As Plaintiff is not an attorney, but a researcher, this civil action can only be summarized in lay terms for the purpose to merit jurisdiction of this civil complaint in Federal Court.

Federal regulations do not warrant habitability for dwellings. The states provide a basis for an "implied warranty of habitability" that dwellings- to include rental properties- are safe for occupancy.

Safety is being defined as "The condition off being reasonably ffree ffrom danger and hazards that may cause unintentional injury of disease". "APHA-CDC recommended Minimum Housing Standards 1986)" American Public HHealth Association, p. 13.

Federal laws and regulations such as "Codes of Federal Regulations" (CFR) 24CFR § 203.673 – Habitability and C.F.R. § 982 401 " Housing Quality Standards" (HQS) can serve as a template for which states can build upon to assure decent (fit), safe and sanitary in its dwellings.

The Journal of Urban and Contemporary Law Volume 38:205, p. 222, "Urban Law Annual 1990 stated "state and local housing standards provide the criteria for decent, safe and sanitary condition" for its residents; and low wealth individuals are sometime enticed, by landlords offering low rents, to accept substandard habitation.

Each state can establish their own housing standards for the purpose of establishing the "minimum" criteria of health and safety for all its residents while the ensuing local codes set minimum standards for safety and health of people living in the dwelling.

Each state can also establish their own building codes to address maintenance and building construction.

Plaintiff alleges that these standards as set forth in North Carolina's (NC) Residential Rental Agreement Act (Act), Chapter 5 of the General Statues §§42-38 to 49, specifically §42-42 ('implied warranty of habitability) is substantively deficient (a)(2), (a)(3) and (a)(8) and NC General Statutes § 160D-1201 Authorization for "Minimum Housing Codes" specifically §160D-1201 (6) b are too lenient and §160D-1205 is the Standard, building code specifically to address repairs, for a fit and safe dwelling.

Summarization for Jurisdiction in Federal Court under § 28 USC 1331 follows:

1. It has been stated, pertaining to North Carolina's Residential Rental Agreement Act of 1977, that Plaintiff should have been protected from harm since this Act was enacted as a "catch-all requirement" ensuring that the landlord could not rent an unsafe or uninhabitable residence due to some "loophole" in the specific requirements of local codes and state law.

2. Plaintiff alleges that there are still "loopholes, which Plaintiff refers to as deficiencies, in the current Act, that merit the attention of state legislators.

3. Plaintiff alleges that the deficiencies in the Act are insufficient or dated laws or too lenient, without landlord accountability an unclear enforcement mechanisms for toxic mold in private rental dwellings.

4. Seniors are usually most at-risk given health complexities of the aging process often affecting their physical condition and compromise their immune systems, as in this case.

5. North Carolina does not have a general statue requiring landlords to disclose mold infestation, high concentreations, to perspective tenants prior to leasing their rental dwellings.

6. Plaintiff alleges that some form of disclosure should have been made available to prospective tenants when the building has a history of flooding, evidenced by water damage, such is the case in Building "C", which was acknowledged by the maintenance supervisor under oath in Case 22CVM22137.

7. NC Residential Rental Act, is substantively deficient and predicated on the faulty assumption that harm to the tenant can only start when visible mold is present which imperials the NC's landlords obligation to assure an "implied warranty of habitability" as a right to tenants.

8. Since water damage is pervasive in aging buildings, NC General Statues 42 makes no provisions for premises that are deemed not fit, safe or habitable due to toxic mold infestation at the time of renting the dwelling.

8. Substantive deficiency has occurred because the Act appears dated and does not recognize the problems associated with the increasing prevalence of water-damaged buildings, nature of mold, moisture control, mold cleanup, repair and the danger posed by hidden molds.

9. As far back as 2005, NC's Department of Health and Human Services (NC DHHS) Occupational and Environmental Epidemiology Division of Public Health, " Mold and Human Health" Section I page 2, 2005) knew then the seriousness of indoor mold to humans.

10. In this article titled "Mold and Human Health" is stated humans may experience toxic effects, when toxins from the mold cells, called mycotoxins, poison the body at high exposure levels.

11. It is the immune system which dictate allergic reactions, fungal infections ("Mold Exposure Symptoms and Mold Sickness- Mold Test Company ); and the impact of mold toxicity, when left untreated, can lead to lowered and compromised immune system.

12. The article by NC DHHS states further that "the buildings envelope (walls, windows, floors, roof, etc.) must be well-maintained to prevent water from coming in, both to prevent mold growth and to maintain the structural integrity of the building which is crucial after water intrusion- flooding being the most catastrophic of source of such intrusion.

13. Also, the article referenced water vapor (relative humidity), condensation and the importance of identifying and correcting the sources of moisture before the cleanup and removal process occur.

14. Another crucial point, as stated in the article, is that improper corrections for moisture problems, then proceeding with any mold cleanup and removal, will potentially be short-term- and the mold growth may recur.

15. It is hard to phantom that the availability of this critical information has escaped legislators for 19 years- 2005 until 2024.

16. The information is so critical, in that, over 1,000 species of mold (Mold Test Company; " Mold Exposure Symptoms and Mold Sickness" page 1) can grow in water-damage dwellings which are increasing monumentally in this country.

17. Most of the mold spores found in these dwellings are known pathogens and carcinogens (cancer producing) according to both the Centers for Disease Control (CDC) and the Environmental Protection Agency (EPA).

18. North Carolina's Residential Rental Agreement Act does not account for the fact that hidden mold may appear before visible mold and may even surround visible mold.

19. Consequential to all this valuable information, is that this information has, quite obviously, has not trickled down to the landlords.

20. North Carolina, landlords can operate with impunity, inflicting this level harm on a senior tenant, because the law places the burden on tenants to make the landlord knowledgeable of any "imminently dangerous" condition in their rental housing environment.

21. Plaintiff asserts that the toxic mold spores present in her apartments at Senior Villages Apartments were "imminently dangerous", to the extent, that the environment posed unlivable conditions for Plaintiff's tenancy..

22. Factors to consider are mold spore levels, times of mold exposure, mold toxins and the immune system of the exposed individual ("Mold Exposure and Mold Sickness", Mold Test Company, page 5.

23. Plaintiff was exposed to these toxins for over nine (9) years.

24. Also, NC General Statue 42-42(a)(8) does not recognize mold infestation as being "imminently dangerous" to its residents; but it does recognize that under certain conditions, mold may occur. The Statue ends at this point.

25. The referenced Statue makes no provision for moisture, moisture control or identifying all affected areas when "excessive standing water, sewage and flooding problems cause plumbing leaks and inadequate drainage" after such occurrences. "Finding Mold and Moisture", EPA: Mold Course Chapter
3- Lessons 1-3.

26. In the workplace and schools, maintenance staff are responsible for identifying sources of moisture and to make repairs adequate for controlling excess moisture, which is mold- why should maintenance staff not have the same responsibility as in private dwellings, particularly in rental buildings.

27. OSHA has stringent requirements for mold and handling mold related problems, specifically for cleanup, to assure safety in the workplace environment.

28. The use of personal protective equipment PPE is recommended during mold investigations to avoid inhaling mold and mold spores and to avoid contact with the eyes and skin.

29. Sounds simple but " if moisture problems are not corrected, then the cleanup and removal may be short term solution; at some point the mold growth will recur" (NC's Department of Health and Human Services Occupational and Environmental Epidemiology Division of Public Health, "Mold and Human Health", Section IV, page 4, 2005).

30. Landlords making proper repairs for mold infestation may find that this can be a costly undertaking so the rely on their own maintenance personnel, for cost savings, without regards for their staff's competency level, in fully understanding the complexities, unique to mold infestation, which is more difficult than just the "everyday" repair that landlords encounter.

31. The manner and timing in which maintenance personnel extract excess water, dry the affected areas, and even before making appropriate and adequate repairs, moisture must be minimized in the dwelling which is a crucial contributor to mold proliferation.

32. Landlords may not act with expediency to address leaks and flooding not knowing that mold can start growing in 24 to 48 hours ("Moisture, Mold Prevention and Control Tips" p.7- EPA and Mold Test Company.

33. Mold visibly to the tenant may not be the starting point for tenant exposure and the Act makes no provisions for hidden molds cited by numerous sources to include the US EPA: EPA: Mold Course Chapter 3- Lessons 1, page 5, Hidden Molds- acknowledged circumstantially.

34. When entering Building "C" of the rental complex, dampness and a "nauseous" musty odor (as described by the certified mold inspector) that a moisture retention problem, and the odor were indicative of mold in the dwelling.

35. Maintenance staff should have suspected hidden mold as all the factors were occurring at Senior Villages Apartments, a musty odor of unknown origin, a water-damage building with a history of flooding, and the residents alerting management of health problems.

36. In the case at point, the property manager and maintenance supervisor were informed verbally and in writing of Plaintiff's unknown declining health coupled with severe breathing problems (written) accompanied by indoor allergies was affecting Plaintiff's ability to make timely and complete rental payments were occurring.

37. It is only when visible occurs to the Plaintiff that the landlord is obligated to make repairs.

38. Remediation is the process utilized to address mold issues.

39. The goal of remediation is to find the source of the water problem, fix it and cleanup the mold Finding Mold and Moisture", EPA: Mold Course Chapter 3- Lessons 3, page 9.

40. Simply stated, tenants may not have sufficient knowledge, experience, or equipment, designed for such purpose, to impart knowledgeably to the landlord the existence of mold.

41. And as such, the premise for 42-42(a)(8) is flawed in not recognizing that hidden mold may be the antecedent to visible mold.

42. Plaintiff alleges that between the span of time of hidden mold exposure until she, the unsuspecting tenant, was alerted to visible mold, significant harm had already come to health and with all the accompanying medical bills, her finances were devastated to the extent that Plaintiff' could no longer enjoy the "quality of life" that she was accustomed to.

43. NC General Statues 42 should have a General Statue to address specific maintenance requirements and inspections for mold in private rental dwellings; especially those marketed to seniors with historic flooding and water damaged.

44. It's not just the "housing codes" but the "building codes which are at issue since they address the role of maintenance and building construction of fit and safe buildings.

45. Building habitation as is defined in Article 12 N.C.G.S, "Minimum Housing Codes", 160D-1201 (6) b establishes quantitatively the point at which the building becomes dilapidation to the extent it is not suitable (fit, safe and sanitary) humans to occupy.

46. Dilapidation is define as housing which is "no longer ade uate for the purpose or use originally intended" "APHA-CDC Recommended Minimum Housing Standards 1986)" American Public Health Association, p. 8.

47. This Code for abandoned buildings are is being applied by Plaintiff, to Building "C", as no quantifiable standard could be found given the circumstances (level of dilapidation).

48. According to this Code, when the costs of repairs are expressed at 50% of the property's Fair Market Value (FMV), when applied to this Plaintiff, this 50% threshold was grossly lenient as the fitness of the dwelling was derived to be at 23% for Plaintiff (detailed in the complaint narrative) still giving no importance to the quality and the impact of the repairs to restore property to safety.

50. At the derived level of 23%, Plaintiff had already experienced respiratory distress and life support (ventilator) following surgical intubations for unknown allergen reactions twice which rises to the level of the Standard-N.C.G.S. 160D-1205.

51. These "Minimum Housing Codes" appear too lenient to protect North Carolians from unfit and unsafe conditions in private rental dwellings specifically.

52. There is an obvious deficiency in these General Statues, if the conduct of the landlord subjects a bedridden senior tenant to homelessness and uncertainty of permanent housing, when the tenant had complied with the terms of leasing agreement, the landlord refuses to relocate Plaintiff, when infestation is significant to the extent, that a licensed medical doctor in North Carolina, made a written request to the landlord to relocate the affected patient experiencing severe medical complications, in a mold infested living environment; and then, the landlord ignores the request.

53. Once North Carolina legislators avail themselves of all the credible sources on mold in the environment as a public health hazard, local municipalities should follow by enacting more effective codes for its residents.

54. Plaintiff believes that, if the referenced General Statues were more closely aligned with the Federal regulations cited, her health and quality of life would not have been so severely impacted by her domicile at Senior Villages Apartments.

55. Specifically, HUD QHS's incorporation of mold infestation as an intolerable condition in their dwellings with standardized inspection criteria and requiring that their inspectors have training; and further, by adopting more stringent and lowered levels, possibly as low as 25%, for repairs, to assure that its properties have structural integrity and are suitable for human occupancy.

56. By treating mold as a hazardous condition to human occupancy in housing, this offers greater protection for seniors in private rental dwellings since public housing already makes provisions for seniors in their properties.

57. Given the circumstances (homelessness) and timing (mold infestation recognition) on the same day, Plaintiff assumed that no remedy could be provided by the NC Real Estate Commission.

58. Unless these inadequacies and leniency in North Carolina General Statues are investigated, the next resident may not be as fortunate as Plaintiff, nearly succumbing to the hazardous conditions of toxic mold, in an aged water-damaged rental building in Charlotte Mecklenburg.

59. Consideration should be given by making a provision in all rental agreements implicitly stating who is responsible for changing the HVAC's. air filter when the dwellings have a flooding history; instead of being optional to the landlord.

In summation, Ron Leshhnower, an attorney at the Boston School of Law, which Plaintiff paraphrases, expressed that North Carolina's regulations, with regards mold in rental properties, are not recognized by the landlords to be a serious matter and should be considered a top environmental hazard. Further stating, that no rental property is immune from a mold outbreak and that mold problems could be costly cleaning and repair bills". This is why some landlords use their own maintenance staff, as a cost saving measure, to repair from mold who may not have sufficient expertise.

Trained professionals have the necessary competencies, devices and are equipped to adequately address conditions which stimulate mold growth.

These are the only explanations that Plaintiff entertain, after her near death encounters, in Building "C" of Senior Villages Apartments.

A qualified, internationally acclaimed, toxicologist, Dr. Shakil Saghir, MSc, MSPH, PhD, DABT, ERT, FATS, FRSB, rendered in this "Forensic Toxicology Report" of Senior Villages Apartments (Attachment #2) the following:

"it is my opinion that, based upon my observations, the above-named structure is a health hazard to all occupants. This opinion is based on the presence of pathogenic molds in the samples along with the presence of pathogenic bacteria and biomarkers of exposure of the pathogenic mold in the urine and/or stool of the resident. Further, by correlating the environmental and medical results, it has led me to render an opinion, with a great amount of scientific and medical certainty, that the pathogenic species of fungi found in the exposure victim's(s') mold-infested structure produced the same disease-causing mycotoxins that tested positive in the mold exposure victim's(s') body(ies). (*See "MEDICAL EFFECTS OF MYCOTOXINS EXPOSURE" hereinbelow for types of mycotoxins and their adverse health effects to humans*)...It is recommended that the structure located at the above-referenced Address should not be occupied or habited. Further, it is recommended that all occupants of said structure be immediately removed from the building. This recommendation is based on results of the environmental samples collected from the above-referenced address and exposure of the resident(s) living there.

Plaintiff's allegations have a factual basis and are detailed and fully supported from reputable sources and citations.

B. The Amount in Controversy:

Plaintiff prays that the United States District Court accepts authority for adjudication

The plaintiff claims the defendant amount at stake excee complaint, in its Western District of North Carolina Divisida

## III. Statement of Claim

### FACTS ALLEGED

1. The Plaintiff is a United States citizen who resided in the City of Charlotte, in Mecklenburg County, North Carolina from June 1995 until June 2024.

2. Plaintiff holds a Bachelor's (NC Central University), a Master's Degree (Clemson University with three (3) years of Doctoral Studies publishing a Master's Thesis (viewed worldwide through Clemson University Tiger Print) articles in refereed journals, and a Strategic Corporate Planning and Profitability Analysis for Industry Client as a required course (LinkedIn Profile in Attachment #3).

3. Upon returning to Charlotte, Plaintiff donated services in research and strategic management expertise in voluntary service capacities to the United Way/Children's Services Network and the City of Charlotte, Neighborhood Development Department to deceased West Area onsite director, Johnny Wallace at Amay James Center, tasked with creating a strategic operations' plan for one of City of Charlotte Police Department's first decentralized Police satellite cross-departmental station, in the Adam 2 Service Area on Freedom Division at 4150 Wilkinson Boulevard.

4. Plaintiff was age 57 with a permanent disability, bipolar disorder, at the time the first lease was executed at Senior Villages Apartments on April 1, 2013; subsequently, bipolar disorder has been in full remission since 2015.

5. As an older person (55 and over) in a retirement community, Plaintiff was experiencing vulnerabilities that accompany the aging process- pre-existing chronic illnesses compromising Plaintiff's immune system.

6. Plaintiff presented, at the time of residency, with the following stable chronic medical conditions: hypertension, chronic kidney disease, pre-diabetic, obese (reached 250 pounds by 2020), and obstructive sleep apnea.

7. Plaintiff's medical history did not include any allergies, breathing, respiratory, gastroenterological, liver, movement or pain issues before moving into Senior Villages Apartments.

8. Plaintiff had successfully balanced a sustainable "quality of life" with medical complexities on a "limited or fixed" income as most seniors in retirement.

9. In April 2013, Plaintiff was successfully providing voluntary strategic, financial and project management consultation to nonprofits in North and South Carolina (valued at approximately $35,522/year and as a substitute teacher with Charlotte Mecklenburg Schools with average earnings of $1,000/month. The plaintiff retired from substitute teaching after nine years, during the COVID-19 pandemic, in November 2021.

10. Plaintiff did not have any pets initially or at any time during her tenancy at Senior Villages Apartment.

11. Plaintiff sought Senior Villages Apartments in West Charlotte (WC) as Plaintiff's retirement community as Plaintiff was reared in the Pinecrest neighborhood, between West and Wilkinson Boulevards, in WC before university matriculations.

12. Senior Villages Apartments' advertised on SocialServe.com  2013) that their apartment complex was conducive as a retirement community for seniors, fifty-five and over, a most vulnerable age group.

13. The advertisement depicted a single-story building; however, walking upstairs was required to access the second floor (story)floor as the building did not have an elevator.  This was acceptable to Plaintiff.

14. Plaintiff applied at Senior Villages Apartments on March 7, 2013, and paid a $10 application fee.

15. Plaintiff paid Senior Villages Apartment a security deposit of $149 on March 11, 2013, to secure rental Apartment #24 in Building "C", one of the three buildings comprising the complex with a total of ninety-two units.

16. On April 1st, 2013, Plaintiff and Senior Villages entered into a housing rental leasing agreement (contract).

17. As a management consultant with some knowledge of contract law, Plaintiff understood that the concept of rent encompassed the idea of making a payment to the landlord for temporary occupancy of their property, Apartment #24 in Building "C.

18. Plaintiff further understood that their implied warranties in renting an apartment that is:

   A. The agreement promised "good faith" and "fair dealing."

   B. Neither party would do anything to destroy or injure the right of the other party to receive the intended benefit of the property under the terms of the rental agreement.

   C. The benefit to the landlord (Senior Villages, LLC) is one of a profitable investment; while simultaneously, providing a benefit to the tenant (Plaintiff) of a fit, safe, and livable housing environment while refraining from taking unfair advantage of each other consequential to receiving the intended benefit.

    D. The agreement further stated that maintenance would be provided, upon written notice, if hazardous conditions threatening the safety or health existed in the dwelling.

19. Upon entering Building "C," there was a slight odor and dampness of unknown origin when walking upstairs to Apartment #24.

20. Apartment #24 was freshly painted and cleaned thoroughly with new carpeting.

21. During Plaintiff's tenancy in Apartment #24, routine inspections by maintenance personnel, Tony, accompanied the pest control representative and Tony inspected the air vent and changed the filter.

22. At some point during Plaintiff's tenancy, the shower plumbing began leaking substantial water to a first-floor apartment. Maintenance placed a pan for water to deposit from the leakage of the HVAC system in the front room closet.

23. Plaintiff did not know any signs that would be indicative of possible mold growth nor water damage before moving into Apt. #24.

24. While in Apartment #24 in 2014, the onset of symptoms for mold exposure in one's living environment, caused illness, according to several sources (Biocide Labs in conjunction with Mold Law Group (2022) and Mold Test Company) published that there were levels to sicknesses in humans when exposed to toxic mold spores, see Table 1.

Table 1: Levels of Symptoms Characterizing Illnesses due to Mold Exposure

| Table 1: Symptom Characterizations From Environmental Mold Exposure | | |
|---|---|---|
| **LEVEL I** **Early Mold Exposure Symptoms** | **LEVEL II** **Advanced Mold Exposure Symptoms** | **LEVEL III** **Latent Mold Exposure Symptoms** |
| Headaches | Breathing Disorders | Blindness |
| Eye Irritation | Respiratory Distress | COPD |
| Sneezing | Earaches | Kidney Failure |
| Itching | Asthma | Liver Disease |
| Skin Redness | Pneumonia | Histoplasmosis |
| Skin Rash | Chronic Sinusitis | Hypersensitivity Pneumonitis |
| | Chronic Rhinitis | Cancer |
| | Joint and Muscle Pain | Death |
| | Swollen Glands | |
| | Loss of Appetite | |
| | Nausea | |
| | Vomiting | |
| | Diarrhea | |
| | Chronic Fatigue | |
| | Weight Loss | |
| | Nervous System Disorders | |
| | Neurological Disorders | |
| | Heart Palpations | |
| | Blurred Vision | |

Biocide Labs in conjunction with Mold Law Group (2022) and Mold Test Company

25. After clinical testing of over 2,000 clients with mold exposure, Mold Law Group redefined the symptoms of environmental mold exposure causing human illness in three areas: allergic reaction, invasive fungal infections, and toxicological poisoning.

26. For this "Complaint," Plaintiff is deferring to this reclassification utilizing the areas of symptoms related to mold exposure.

27. Information taken from the "Diagnostic Assessment" of Dr. H Beiley chronicled the onsite for allergic reactions (Table 2) and invasive fungal infections (Table 3) coinciding with Levels I and Level II previously stated.

| Table 2. Areas of Mold Sickness Resulting from Environment in Apartment #24 Mold Law Group/Medical Community Clinical Study Over 2,000 Participants | |
|---|---|
| **Allergic Reactions: Diagnosis** | **Date of Onset** (From Medical Reports) |
| Allergic Rhinitis | 10/31/2014 |
| Chronic Allergic Rhinitis | 12/11/2017 |
| Nasal Congestion /Environmental Allergies | 2/26/2019, 12/17/2019 |
| Allergic Reaction- Anaphylaxis – Intubation (2) | 3/15-3/20/2019 6/1-6/2/2020 |
| Allergic Reactions- Angio-Edema Hospital Emergency Room/In-patient Visits | 3/7/2020, 3/25/2020, 3/27/2020, 4/12/2020, 4/18/2020, 5/18/2020, 5/22/2020, 9/23/2020, 10/1/2020, 10/30/2020 |
| Allergic Rhinitis (Referral to Allergist) | 5/27/2020 |
| Throat Trauma Due Intubation- Eagles Syndrome | 6/1/2021 |

Diagnostic Assessment Dr. Harlan Beiley (Attachment #4)

| Table 3. Areas of Mold Sickness Resulting from Environment in Apartment #24 Mold Law Group/Medical Community Clinical Study Over 2,000 Participants | |
| --- | --- |
| **Invasive Fungal Infections: Diagnosis** | **Date of Onset (From Medical Records)** |
| Sinusitis | 11/18/13 |
| Generalized Pain | 11/21/2013 |
| Nausea | 2/19/2018 |
| Bronchitis (Acute) | 11/9/2019, 11/27/2019, 12/27/2019 |
| Loss of Balance - Vertigo | 12/27/2019 |
| Dizziness | 2/4/2020 |
| Abdominal Pain | 12/19/2020 |
| Fatty Liver | 12/19/2020 |
| Pneumonia | 12/23/2020 |
| Acid Reflux | 12/23/2020 |
| Candida Yeast (skin and vagina) | 2/29/2020 |
| Joint/Muscle Stiffness and Pain | 2/17/2021 |
| Shortness of Breath | 4/21/2021 |
| Generalized Anxiety | 2/22/2021 |
| Respiratory Distress | 4/25/ 2021 |

Diagnostic Assessment Dr. Harlan Beiley (Attachment #4)

28. Before December 2021, Plaintiff never defaulted on honoring her rental payment agreement.

29. It was at this time that Plaintiff advised the property manager of the ability to pay the complete monthly rental rate due to a substantial increase in medical expenditures.

30. On June 2, 2021, the Plaintiff relocated to the first floor or lower level, but still in Building "C" into Apartment #7.

31. Move-in conditions were satisfactory and signed off by Plaintiff; however, stains appeared in the carpeting at the door which could not be removed by Plaintiff's caregiver when cleaning the apartment in anticipation of Plaintiff's relocation.

32. Now, during the pandemic, Plaintiff worked part-time as an administrative assistant at Soul Care Christian Counseling Services until May 2021 when Plaintiff became physically impaired, orthopedically and spinally inhibited.

33. By July of 2021, one month after moving into Apartment #7, Plaintiff sought and received assistance from Centralina Area Agency for Aging to assist with the rental payment.

34. Plaintiff had so many medical appointments, that Centralina obtained medical transportation assistance from Charlotte Villages Network so Plaintiff could keep her medical appointments.

35. The Plaintiff had lost the ability to drive and perform household duties an in-home caregiver did apartment cleaning, grocery shopping, cooking, changing bed linens, washing clothes, emptying trash, and cleaning respiratory equipment – bipap and nebulizer.

36. Centralina also provided an in- home personal aid for a couple of days each month.

37. Plaintiff resigned after nine years from Charlotte Mecklenburg Schools around October 2021.

38. Plaintiff began a voluntary engagement to Soul Care Family Life Center, Inc. (part-time developmental service valued at $63.06/hr.) in the capacity of Acting Executive Director which is a federally designated religious charity chartered in North Carolina.

39. Plaintiff continued providing strategic, project, and fiscal management to churches, and other nonprofit and for-profit corporations (service valued at $104.03/hr.) given the complexities of her declining health, often working from bed.

40. As early as 2020 through August 2022, Plaintiff required in-home nursing, physical therapy, and occupational therapy.

41. By July 2022, Plaintiff was having breathing and nasal congestion issues indoors and outdoors. The following treatment modalities had been utilized up to this point for allergy symptoms and nasal congestion:

     • Nasal Corticosteroids- Fluticasone Nasal Sprays and Xhance Inhaler.

     • Antihistamines- Fexofenadine and Zyrtec.

- Azelastine Nasal Spray and Ipratropium Bromide Nasal Spray.

- Nasal Lavage- Neil Med Sinus Rinse/Salt Packet.

- Nebulizer for Breathing Treatments

42. On July 19, 2022, an allergist performed a "skin test". Immunotherapy (allergy shots) for allergens detected the skin tests are listed in Table 4 started.

43. Looking more in- depth at the environmental testing (2) and the "skin test" results, Plaintiff, was trying to synthesize all the aforementioned information, in hopes of recovering from the toxic exposure in the apartments at Senior Villages Apartments.



**Carolina Asthma & Allergy Center**

Telephone: 704-372-7200

Name: Debra Cauthen   Date: 7-19-22

Person #: CHA5651   DOB: 7-9-55

| Pediatric Screen A |
| Complete Skin test A/B |

| | | TREES | P |
|---|---|---|---|
| | 1 | Ash | |
| | 2 | Cedar, Red | 2+ |
| | 3 | Elm | Ø |
| | 4 | Hickory | |
| | 5 | Oak | |
| A | 6 | Maple/Box Elder | |
| | 7 | Poplar/Cottonwood | |
| | 8 | Sycamore | |
| | 9 | Birch | |
| | 10 | Mulberry | |
| | 11 | Walnut | |
| | 12 | Hackberry | |
| B | 13 | Pecan | |
| | 14 | Pine, White | |
| | 15 | Sweetgum | |
| | 16 | Willow | |

| | | GRASS | |
|---|---|---|---|
| | 1 | Bermuda | Ø |
| | 2 | Bahia | |
| A | 3 | Johnson | Ø |
| | 4 | Timothy | 2+ |
| | 5 | Perennial rye | Ø |
| | 6 | Kent, Blue | |
| B | 7 | Orchard | |
| | 8 | Fescue | Ø |
| | 9 | Red top | Ø |

| | | WEEDS | |
|---|---|---|---|
| | 1 | Lambs Quarter | 3+ |
| | 2 | Eng Plantain | Ø |
| A | 3 | Ragweed, Giant | 2+ |
| | 4 | Ragweed, Short | 3+ |
| | 5 | Pigweed, Rough | 2+ |
| | 6 | Cocklebur | Ø |
| B | 7 | Dock / Sorrel | 2+ |
| | 8 | Marsh Elder | Ø |
| | 9 | Kochia | |
| | 10 | Mugwort | Ø |
| | | SALINE | Ø |
| | | HISTAMINE | 3+ |
| | | | Time | Initials |
| 22 | | Pricks | 2:47 | SG |
| | | IDs | 2:47 | SG |
| P - Prick Testing |
| ANTIHISTAMINES   Y   N |

| | | MOLDS | P |
|---|---|---|---|
| | 1 | Alternaria | 2+ |
| | 2 | Aspergillus | 2+ |
| A | 3 | Penicillium | 2+ |
| | 4 | Bipolaris | |
| | 5 | Cladosporium | Ø |
| | 6 | Epicoccum | 2+ |
| | 7 | Sarocladium | Ø |
| | 8 | Aureobasidium | Ø |
| | 9 | Botrytis | Ø |
| | 10 | Candida | |
| B | 11 | Gliberella | |
| | 12 | Mucor plumbeus | |
| | 13 | Rhodotorula | Ø |
| | 14 | Saccharomyces | Ø |
| | 15 | Trichophyton | Ø |

| | | INHALANTS | P |
|---|---|---|---|
| | 1 | Cockroach | 2+ |
| | 2 | Dog dander | 2+ |
| A | 3 | Dust mite  F | 3+ |
| | 4 | Dust mite  P | 3+ |
| | 5 | Cat hair | 3+ |
| | 6 | Mouse | |
| | 7 | Feathers | |
| B | 8 | Guinea pig | |
| | 9 | Hamster | |
| | 10 | Horse | |

| | | FOODS | |
|---|---|---|---|
| | 1 | Egg White | |
| | 2 | Egg Yolk | |
| | 3 | Milk | |
| | 4 | Peanut | |
| | 5 | Soybean | |
| | 6 | Shrimp | |
| | 7 | Wheat | |
| | 8 | Codfish | |
| | 9 | Sesame | |
| | 10 | Oat | |

| | | ANIMALS | |
|---|---|---|---|
| | 1 | Cattle | |
| | 2 | Gerbil | |
| | 3 | Hog | |
| | 4 | Rabbit | |
| | 5 | Rat | |
| | 6 | Parakeet | |
| | 7 | Goat | |

| | INTRADERMALS 1-100 | (Pink) |
|---|---|---|
| | STERILE DILUENT | Ø |
| (1) | Trees | Ø |
| (2) | Timothy | |
| 3 | Weeds | |
| 4 | Ragweed | |
| 5 | Cat hair | |
| 6 | Dog dander | |
| 7 | Dust mite  F | |
| 8 | Dust mite  P | |
| 9 | Cockroach | |
| (10) | Bermuda | 1+ |
| 11 | Cedar | |
| (12) | Hickory | 2+ |
| (13) | Oak | 2+ |
| (14) | Feather | Ø |
| 15 | Alternaria | |
| 16 | Aspergillus | |
| (17) | Cladosporium | 3+ |
| 18 | Bipolaris | |
| 19 | Penicillium | |
| 20 | Epicoccum | |
| (21) | Johnson | Ø |

| | HISTAMINE | Purple |
|---|---|---|
| 22 | Dust mite F(1:10) | |

| CRITERIA: | | |
|---|---|---|
| | Flare | Wheal |
| 1+ | <15mm | |
| 2+ | <15mm | 1/2+ control |
| 3+ | <15mm | Equal + control |
| 4+ | <15mm | > + control<br>pseudopods |
| | Intradermals | |
| 1+ | 11-20mm | 6-10mm |
| | 1/2-2x neg control | |
| 2+ | 21-30mm | 6-10mm |
| | 2-3x neg control | |
| 3+ | 31-40mm | 6-10mm |
| | Equal or > positive control | |
| 4+ | >40mm | >15mm |
| | With pseudopods | |

Skin testing was performed by: SG

Interpretation: ①T5 WP-M Cr b, pm Cy m

Skin testing was reviewed and interpreted by Dr. Hungness   x _____   MD

7/19/22

| ITT Recomm. ended | Yes | No |
| Patient on a Beta Blocker | Yes | No |
| Beta Blocker Discussion | Yes | No |

Update 22FEB2019

44. Plaintiff's symptoms while in Apartment #7 continued exacerbation as reflected in a summary depicted in Table #4 to follow.

| Table 4. Areas of Mold Sickness Resulting from Environment in Apartment #7. Mold Law Group/Medical Community Clinical Study Over 2,000 Participants | |
|---|---|
| **Allergic Reactions Diagnoses PLAINTIFF:** | **Invasive Fungal Infections and Other Diagnoses PLAINTIFF:** |
| Allergic Rhinitis | Chronic Sinusitis |
| Allergic Chronic Rhinitis (Referral to Allergist) * | Atelectasis of Both Lungs |
| | Nasal Congestion /Environmental Allergies |
| | Candida Yeast |
| | Nausea |
| | Intractable Vomiting |
| | Abdominal Pain |
| | Food Intolerance (Severe) |
| | Constipation |
| | Chronic Fatigue |
| | Generalized Anxiety |
| | Chronic Pain Syndrome |
| | Joint/Muscle Stiffness and Pain |

Source: Diagnostic Assessment Dr. Harlan Bieley (Attachment #4).

45. By this time, toxicological poisoning, Level III, on the exposure symptom relationship in a mold environment was being experienced by Plaintiff with a primary diagnosis deduced to be "mold mycotoxicosis "after Beiley did an exhaustive review of Plaintiff's medical records.

46. To obtain this diagnosis, Plaintiff encountered many difficulties.

47. Conventionally, there was no widespread acceptance and knowledge in the present medical environment and within the medical insurance industries for the diagnoses of mold toxicity, mold poisoning, or mold "mycotoxicosis".

48. Consequently, mold mycotoxicosis is a "cash" business with the exceptions of allergies, asthma, and respiratory which are covered by most insurances as it relates to mold exposure.

49. Availability of affordable medical providers for "mold mycotoxicosis "could not be found locally.

50. Of those conventional providers utilized to treat the symptoms from the toxic exposure, many issues occurred (listing doctors and hospitals- Attachment #5).

51. Many conventional specialists had limited, or no knowledge of mold exposure symptoms related to their area of expertise such as in gastroenterology (Scholtz), pain management (Hoppenfeld), neurology (Guerrero), nephrology (Blake) and gastroenterology (Maambo).

52. Conventional medical diagnostic testing, scanning and imaging) may be ill-suited to rule- out conclusively mycotoxins from toxic mold spores as being causative of the presenting symptoms since these testing methods were not designed for such purposes.

53. Plaintiff experienced three specialists- an allergist (Hungness), gastroenterologist (Sachar), internist (Ahmed), and neurologist (Guerrero) who sought to rule out mycotoxin invasion from toxic mold spores when their testing, treatment modalities, and medication for their diagnosis failed to identify and remedy the medical issue.

54. Several specialists acknowledged that they did not know their education, internship, or practical experience on how to identify and successfully treat Plaintiff with nearly ten years of exposure (Hungness, Chalavadi, Melville, and Butler).

55. Conventional specialists would state that those symptoms indicative of their area of expertise were psychiatric in origin when varied tests and medication trials did not identify and relieve symptoms related to mold exposure (Scholtz and Guerrero).

56. Examining Table 6, Plaintiff's body was already showing sensitivities to several molds in the tape sampling  in two areas in Apartment #7.

57. A summary chart of mold spores in the environment (swab sampling) corresponding to those mold spores identified in Plaintiff's skin test results, Table 5 and Table 6 by pathogenicity of molds in environment.

**Table 5. Microscopic Examination of Fungal Spores, Fungal Structures, Hyphae, and Other Particulates from Tape Samples (EMSL Method Micro-SOP-200)**

| Spore Type | Air Vent Category (8/22/2022) | Carpet Dust Category (8/25/2022) | Allergy Skin Test (7/19/2022) |
|---|---|---|---|
| Alternaria (Ulcladium) | Rare | | X |
| Aspergillus/Penicillium | Rare | | X |
| Basidiospores | Rare | | |
| Bipolaris | | | X |
| Chaetomium | | Rare | |
| Cladosporium | Rare | | X |
| Curvularia | | Rare | |
| Epicoccum | Rare | Rare | X |
| Myxomycetes | Rare | Rare | |
| Pithomyces | | Rare | |
| Rust | | Rare | |
| Pestalotia | | Rare | |
| Hyphal Fragment | Rare | Rare | |
| Insect Fragment | Rare | Rare | |
| Pollen | Rare | Rare | |

Diagnostic Assessment Dr. Harlan Bieley (Attachment #4)

| Table 6. Other Types of Fungi Detected (Air-O-Cell, Swab, Tape Life, Bulk) | | |
|---|---|---|
| **Fungi Detected*** | **Pathogenic**** | **Area Dusted** |
| Alternaria (Ulocladium) | Y | Air Return |
| Aspergillus/Penicillium | Y | Air Return |
| Basidiospores | Y | Air Return |
| Chaetomium | Y | Carpet Dust |
| Cladosporium | Y | Air Return |
| Curvularia | Y | Carpet Dust |
| Epicoccum | Y | Air Return, Carpet Dust |
| Myxomycetes++ | N | Air Return, Carpet Dust |
| Pestalotia++ | Y | Carpet Dust |
| Pithomyces++ | Y | Carpet Dust |
| Hyphal Fragment | Y | Air Return |
| Insect Fragment | Y | Air Return |
| Pollen | Y | Air Return, Carpet Dust |
| Rust | Y | Carpet Dust |

Abstracted From Forensic Toxicological Study by Dr. Shakil Saghir (Attachment # 2)

*Note: Cladosporium in some cases may not be determined as "Pathogenic," However, due to its ability to produce fine and ultra-fine particulates have been known to cause Asthma, Lung Collapse, and Respiratory Failure, Via (1-3) β-D bateglucans overload in the respiratory system.

**Pathogenic," documented in the Scientific Literature to be disease-causing to humans.

58. Plaintiff had numerous specialists working diligently investigating and ruling out other diagnoses with similar symptoms (Table #7) to effectively treat Plaintiff's rapidly declining health.

## Table 7. Medical Diagnoses and Conditions Ruled Out for PLAINTIFF

### Other Confounding Illnesses
### (Symptoms Eliminated)

| Symptom (s) | Method for Illumination | Date |
|---|---|---|
| Nasal Cancer Polyps | Endoscopy | 12/6/2022 |
| Colon Polyps | Colonoscopy- Biopsy | 5/24/2021 |
| Esophageal Reflux/Reactive Gastropathy | Non-responsive medications for treatment | 5/21/2021, October 2022 |
| Candida (Stomach Yeast) | Upper GI Endoscopy | 10/7/2022 |
| Peritonitis | CT- Abdomen Pelvis W IV Contrast | 10/25/2022 |
| Gastritis | CT- Abdomen Pelvis W IV Contrast | 12/19/2020 |
| Gastroparesis | CT- Gastric emptying | 8/14/2023 |
| Brain Disorder- Nausea/Vomiting | Brain MRI | 10/4/2023 |
| Autoimmune Illnesses to Include - Rheumatoid Arthritis, Lupus, etc. | Ultrasound Hand | 2020-2023 |
| Deep Venous Thrombosis- Lower Left Extremities | Ultrasound Left Lower Extremities | 7/20/2021 |
| Left Side Weakness | CT Scan | 3/29/2021 |
| Stoke | Head CT – W/O Intravenous Contrast | 3/28/2022 |
| Seizures | EEG | 10/17/2023 |
| Neuropathy | EMG- Needle | 6/13/2022 |
| Heart | Heart Telemetry Monitor | 5/5/2022 |
| Eagles Syndrome | Surgery- Bilateral Styloidectomy | 7/11/2021 |
| Lumbosacral Radiculopathy | Surgery- Spine Lumbar Posterior Decompression/Fusion | 7/2/2021 |
| Spinal Stenosis | CT- Scan Spine (Without Symptoms) | 5/3/2021 |
| Sacroiliac Joints | Injection | 8/2/2023 |
| Covid -19 Screening- Aging Study | Never Exposed - Univ. Michigan, Ann Arbor | 2021 |

Diagnostic Assessment Dr. Harlan Bieley (Attachment #4)

59. As the primary care physician (PCP) was simultaneously ruling out any symptoms that could be contributory to the Plaintiff's health status, pre-existing illnesses were being ruled out also, Table 8.

| Table 8. Medical Diagnoses and Conditions Ruled Out | | |
| --- | --- | --- |
| **Pre-Existing Diagnosis (Symptoms Eliminated)** | | |
| Weight Loss from 2020 through 2022 (56 lbs.) | | |
| Bipolar Disorder | Complete Remission Since 2015 | Non-Active |
| Chronic Kidney Disease Stage 3A | Worsened During Exposure | Active Stage 4 |
| Hypertension | Well Controlled- 2022 Until "Flare-Ups" | Active Normal |
| Diabetes- Insulin Dependent (Onset 2015) | Intermediate Insulin 2023 Inject Only When Glucose +120 | Active Normal |
| Sleep Apnea (Moderate) | Seventy-six events Per Hour to Six events 2022 | Active Normal |

Taken from Medical Records 2000- 2024.

60. It was common for doctors to state that removal from the source of environmental mold should eliminate the symptoms. Yes, for mold allergies, this may be true depending on the individual.

61. It took three months after Plaintiff left Senior Villages to find a medical doctor who would accept providing treatment to Plaintiff.

62. A nasal endoscopy by otolaryngologist at CEENTA (1/24/2022), ruled out nasal polyps as contributing to Plaintiff's diagnosed severe nasal congestion. The Plaintiff's severe breathing issues are still unresolved. Patient now uses:

- Dehumidifier 2022.

63. November 2022 and Plaintiff was evaluated by Robinhood Integrative Winston, Salem NC with the following results, Tables 9 and Table 10.

64. Initial Mold Exposure Assessment by Robinhood Integrative Health- Diagnoses for Plaintiff's initial visit follow:

**Table 9.  Robinhood Integrative Health Diagnostic Summary**

| ICD-9 | ICD-10 | Diagnosis | Effective Date | Condition Status |
|---|---|---|---|---|
| 719.49 | M25-50 | Polyarthralgia | November 10, 2022 | ACTIVE |
| V87.31 | Z77.120 | Mold Exposure | November 10, 2022 | ACTIVE |
| 300.00 | F41.9 | Anxiety Disorder, Unspecified | November 10, 2022 | ACTIVE |
| 338.29 | G88-29 | Chronic Pain | November 10, 2022 | ACTIVE |
| 780.79 | R53.81-R53.83 | Malaise and Fatigue | November 10, 2022 | ACTIVE |
| 564.89 | K59.89 | Intestinal Dysbiosis | November 10, 2022 | ACTIVE |

Diagnostic

January 11, 2023, Robinhood Integrative Health- Additional Diagnosis follows:

**Table 10.  Robinhood Integrative Health Diagnostic Summary Addition**

| ICD-9 | ICD-10 | Diagnosis | Effective Date | Condition Status |
|---|---|---|---|---|
| 627.9 | N95.9 | Menopausal Disorder | January 11, 2023 | ACTIVE |

65. The otolaryngologist/ surgeon had previously performed a surgical procedure, bilateral turbinate reduction on February 28, 2022, with the hopes of improving the nasal congestion, and bilateral turbinate reduction.

66. Patient's ENT- otolaryngologist/ surgeon at UNC-Chapel Hill Hospitals (12/12/2023) to verify allergic fungal sinusitis and repeat nasal endoscopy for polyps for additional treatment, if so warranted.

67. Currently, for additional devices for breathing issues:
   - Atomizer 2023.
   - Oxygen Feed through Bi-pap 2023.

68.  January 24, 2023, Dr. Harlan Bieley's Preliminary Assessment concluding that "in my professional opinion, based upon the totality of the information  the clinical symptoms of the patient, the test results for mold mycotoxins in the patient, and testing for mold in the home, the primary diagnosis is mold mycotoxicosis due to mold exposure in her environment. B49, Z77.120, R53.83, R51.  Please find the complete diagnostic study in Attachment #4.

69.  Detoxification is required to release mycotoxins embedded in the body.  The process to rid the body of mycotoxins can be a slow process for medically compromised individuals.

70.  The patient was advised given the prolonged mold exposure and age an aggressive treatment regimen should precede with all due celebrity to minimize autoimmune illnesses and cancer which result in the latent stages of environmental mold poisoning (Bieley-January 24, 2023).

71.   While under this treatment regimen for 7 months, Plaintiff was diagnosed with a malignant well-defined tumor of the duodenum on September 8, 2023. There is no history of this type of cancer in Plaintiff's family, only breast cancer.

72. Development of cancer, a neuroendocrine tumor, in the duodenum. Presently, well-defined, rare, whether any physical changes had occurred to the tumor. There appeared no tumor Stage 1 (Dries and Baker).

73. There is no family history of this type of cancer in Plaintiff's family, only breast cancer.

74. Detoxification is required to release mycotoxins embedded in the body.  The process to rid the body of mycotoxins can be a slow process for medically compromised individuals.

75. The patient was advised given the prolonged mold exposure and age an aggressive treatment regimen should precede with all due celebrity to minimize autoimmune illnesses and cancer which result in the latent stages of environmental mold poisoning (Bieley-January 24, 2023).

76. While under this treatment regimen for 7 months, Plaintiff was diagnosed with a malignant well-defined tumor of the duodenum on September 8, 2023. There was an elevation from (January 10, 2024) to (April 5, 2024).

**Pictures #1.**



**Picture #2.**



Well- Defined Neuroendocrine Tumor in Duodenum

75. During treatment for mold exposure, mycotoxin urine tests were done along with the detoxification process to signify which mycotoxins from the mold spores in my living environment were being released from the body, Table 11 and Table 12 areas affected in humans for specific mold spore exposure.

| Table 11. Mycotoxin Tests and Resulting Toxins for Debra Ann Cauthen | | | | |
|---|---|---|---|---|
| **Test Number** | **Date** | **Ochratoxin A (OTA)** | **Gliotoxin (GRX)** | **CITRININ (DHC)** |
| #1 | 8/31/2022 | No Detection | Equivocal | No Detection |
| #2 | 11/16/2022 | 7.4 | No Detection | No Detection |
| #3 | 6/14/2023 | 16.06 | 200 | 35.78 |
| #4 | 6/27/2024 | No Detection | 647.47 | No Detection |

Realtime and Mosaic Diagnostics Mycotoxin Urine Tests.

| Table 12. Mycotoxins Found in Plaintiff's Urine Test Results Mosaic Diagnostics and Impact on Areas of Bodily Functions | | | |
|---|---|---|---|
| **TOXICITY IN BODY** | **ASPERGILLUS** | | **CITRININ** |
| | **Ochratoxin A (OTA)** | **Gliotoxin (GRX)** | **(DHC)** |
| Gastrointestinal Toxicity(GI) | X | | |
| Hepatotoxicity (Liver) | X | | X |
| Neurotoxicity (Nervous System) | X | X | X |
| Nephrotoxicity (Kidneys) | X | X | X |
| Immunotoxicity | X | | |
| Oxidative Stress | X | X | |
| Carcinogenicity | X | | X |

Source: Mosaic Diagnostics

Table 13. Reflects the full mold spore load in Apartment #7 and pathogenicity.

| Table 13. Types of Fungi Detected in Environment Apartment #7 (DNA) EPA-36 | | |
|---|---|---|
| **Types of Fungus Detected*** | **Pathogenic (Y/N)*** | **Spores E./mg Dust** |
| Aspergillums niger. | Y | 65 |
| Aspergillus sydowii | Y | 942 |
| Aspergillus pediculicides | Y | 161 |
| Aspergillus unguis | Y | 31 |
| Aspergillus versicolor | Y | 2,293 |
| Eurotium (A.) amstelodami | Y | 314 |
| Aureobasidium pollens | Y | 13 |
| Chaetomium globosum | Y | 45,404 |
| Caldosporium sphaerospermum | Y | 191 |
| Picklocks variotii | Y | 370 |
| Penicillium spinulosum | N | 419 |
| Penicillium variabile? | Y | 303 |
| Wallemia sebi | Y | 1 |
| Altemaria alternata | Y | 53 |
| Aspergillus ustus | Y | 8,133 |
| Cladosporium caldosporides | Y | 1,215 |
| Cladosporium caldosporides | Y | 6 |
| Epicoccum nigrum | Y | 92 |
| Mucor-Rhizopus Group | Y | 326 |
| Penicillium Chrysogenum | Y | 21,800 |

Abstracted From the Forensic Toxicological Study by Dr. Shakil Saghir (Attachment # 2)

*Note: Cladosporium in some cases may not be determined as "Pathogenic," However, due to its ability to produce fine and ultra-fine particulates have been known to cause Asthma, Lung Collapse, and Respiratory Failure, Via (1-3)β-D bateglucans overload in the respiratory system.

***Pathogenic," documented in the Scientific Literature to be disease-causing to humans.

83.  Often, hospital physicians were responding to the frequency of ED visits rather than the acute chronicity of these mold-related symptoms placing Plaintiff at risk of stroke or heart problem because of the escalating blood pressure during these periods, i.e. obtaining adequate emergency department care for stabilization of convergence of all the mold symptoms, rendering all the medications used to combat mold symptoms useless with escalating high blood pressures (PCP recommended ED care when blood pressure was more than 185/120, which was common during these periods- " flare-ups". See Below in Table 12 shows the frequency of these "flare-ups".

84.  Several doctors refused to adhere to an established protocol for crisis stabilization at Atrium Health, use of morphine to reduce pain and decrease blood pressure along with an infusion of EMEND, a cancer medication for nausea (same attending ER doctor at different Atrium Health (Carolinas, 1/10/2024, and Pineville, 5/72024, Dr. Cortlyn Brown and MUSC, Dr. Christopher Davis).

85.  The refusal of these two ED physicians was the exception not generally adhered to by other doctors given the same ED circumstances. These "flare-ups" occur like clockwork, every three to four weeks now, fifty-one episodes, requiring ED stabilization.

86.  Plaintiff's symptoms are still severe in "flare-ups" converging simultaneously causing elevated blood pressure with neurological and/or psychologically induced jerking/tremors. Blood pressure is so severe during these conditions Emergency Room (ED) visits are needed almost every month for medical stabilization. Under these conditions, all current and usually taken medications are ineffective. The recommended protocol medically prescribed is Emend infusions (gastroenterologist) with 4 mg/ml of Morphine (pain management MD).

87.  During the period when Plaintiff was detoxing and receiving and following an aggressive treatment regimen, the "flare-ups" did not occur April 2023 through August 2023).

| Table 14. Emergency Room Treatment for Mycotoxicosis "Flare-Ups" | |
|---|---|
| **DATE** | **HOSPITAL, DOCTOR OFFICE (DO) AND OTHER** |
| January 9, 2021 | Novant Health Presbyterian Hospital* |
| January 18, 2021 | Atrium Health Pineville |
| February 2, 2021 | Novant Health Presbyterian Hospital |
| April 25, 2021 | Novant Health Presbyterian Hospital* |
| April 28, 2021 | Dr. Villages CEENTA- Pineville Otolaryngologist/ Surgeon * |
| April 28, 2021 | Novant Health Presbyterian Hospital |
| May 5, 2021 | Atrium Health Mercy |
| May 17, 2021 | Centerwell Home Health |
| August 2, 2021 | Atrium Carolinas Medical |
| October 10, 2021 | Centerwell Home Health |
| October 27, 2021 | Atrium Carolinas Medical* |
| Nov. 30, 2021 | Atrium Carolinas Medical |
| Sept. 20, 2022 | Atrium Health Mercy |
| Sept. 24, 2021 | Atrium Carolinas Medical |
| Sept. 24, 2021 | Novant Health Presbyterian Hospital |
| Nov. 30, 2021 | Atrium Carolinas Medical* |
| Sept. 20, 2022 | Atrium Carolinas Medical |
| October 25, 2022 | Atrium Health Mercy |
| October 27, 2022 | Atrium Health Cabarrus |
| Dec. 8, 2022 | Office of Dr. Deering Carolina Pain Institute |
| Dec. 8, 2022 | Atrium Health Mercy |
| January 2, 2023 | Atrium Health Pineville |
| February 1, 2023 | Atrium Health Mercy |
| March 3, 2023 | Atrium Carolinas Medical |
| March 26, 2023 | Atrium Carolinas Medical |
| August 12, 2023 | Atrium Carolinas Medical |
| August 16, 2023 | Well Care Home Health of the Piedmont |
| Sept. 5, 2023 | Well Care Home Health of the Piedmont |
| Sept. 27, 2023 | Atrium Carolinas Medical |
| Sept. 28, 2023 | Atrium Carolinas Medical |
| Sept. 29, 2023 | Atrium Carolinas Medical |
| Sept. 30, 2023 | Atrium Carolinas Medical |
| October 1, 2023 | Atrium Carolinas Medical |
| October 20, 2023 | Atrium Health Mercy |
| Nov. 3, 2033 | Well Care Home Health of the Piedmont |
| January 10, 2024 | Landmark Health of NC |
| January 10, 2024 | Atrium Carolinas Medical |
| January 18, 2024 | Well Care Home Health of the Piedmont |

| March 27, 2024 | Atrium Carolinas Medical |
| April 9, 2024 | Landmark Health of NC |
| April 10, 2024* | Office of  Dr. Blake. Metrolina Nephrology |
| April 10, 2024 | Atrium Carolinas Medical |
| April 14, 2024 | Deliverance Holiness Church |
| April 14, 2024 | Medical University of Lancaster (MUSC) |
| April 15, 2024 | Atrium Carolinas Medical* |
| April 30, 2024 | Atrium Carolinas Medical |
| May 7, 2024 | Atrium Health Pineville * |
| May 7, 2024 | Atrium Carolinas Medical |
| June 18, 2024 | Medical University of Lancaster (MUSC) |
| July 9, 2024 | Medical University of Lancaster (MUSC) |
| Sept.  20, 2024 | Atrium Carolinas Medical |

\* Visit for Eagle Syndrome but attending physician stated the presence of severe illnesses causes unrecognized distress of Plaintiff.  Undiagnosed symptoms were indicative of "flare-ups" later described in other medical treatments.

88.  Impacted areas of the body, along with accompanying symptoms, by environmental dwelling, can be viewed in Table 15.

89.  The following tables provide supportive evidence that Plaintiff's body was poisoned over years of toxic mold exposure from the contaminated living environment in both apartments at Senior Villages Apartments.

| Table 15. Summary of Bodily Function Area and Symptoms in Dwelling | | | | |
|---|---|---|---|---|
| **Area of Bodily Functions** | **Symptoms** | **Apartment #24** | **Apartment #7** | **Currently** |
| **Gastrointestinal Toxicity (GI)** | | | | |
| | Nausea | X | X | X |
| | Vomiting | | X | X |
| | Abdominal Pain | | | X |
| | Bloating | | | X |
| **Hepatotoxicity (Liver)** | | | | |
| | Nausea | X | X | X |
| | Abdominal Pain | | | X |
| | Swelling Feet/Legs | | | X |
| | Joint and Muscle Pain | | X | X |
| | Fatigue | | X | X |
| **Neurotoxicity (Nervous System)** | | | | |
| | Nausea | X | X | X |
| | Vomiting | | X | X |
| | Excitability | | X | X |
| | Reaction Time Impairment | | X | X |
| | Tremors | | X | X |
| | Eye, Nose and Throat Irritation | | X | |
| | Obsessive/Compulsive Behaviors | | X | X |
| | Limb Weakness | | X | X |
| | Numbness | | X | X |
| **Nephrotoxicity (Kidneys)** | | | | |
| | Poor Sleep | X | X | X |
| | Itchy Skin | X | X | X |
| | High Blood Pressure | X | X | X |
| | Fluid Retention | | | X |
| **Immunotoxicity** | | | | |
| | Digestive Issues | | X | X |
| | Bronchitis | X | | |
| | Pneumonia | X | X | |
| | Sinus Infections | X | X | X |
| **Oxidative Stress** | | | | |
| | Joint and Muscle Pain | X | X | X |
| | Wrinkles | | | X |
| | Brain Fog | | | X |
| **Carcinogenicity** | Cancer/Tumor | | | X |

Mosaic Diagnostic (areas) and Google Search Engine (typical symptoms)

90. Yes, with the results of the testing as obtained, it is evident that the exposure started while in Apartment #24.

**Federal Longitudinal Study**

91. For purposes of this civil complaint, Plaintiff's participation in this Longitudinal Study can more objectively qualify subjective parameters that affected the quality of Plaintiff's life for the last fourteen (14) years, life expectancy was incorporated from the respondent's Plaintiff.

92. The life expectancy for the Plaintiff was stated at two years in 2022. The Plaintiff was making pre-needs funeral arrangements at that time because health had declined to this extent and the family requested their preparation.

93. Plaintiff has been participant in the "Quality of Life Longitudinal Study: Health and Retirement Study" By: the Survey Research Center (Dr. David Weir) University of Michigan, Ann Arbor:

   A. Funding Agencies: National Institute of Aging and the Social Security Administration.

   B. The study started at Plaintiff's age of fifty-five and will be repeated every other year until she is deceased.

   C. Survey participant years to date: 2010, 2012, 2014, 2018, 2020, 2022, and this year 2024 which was completed on August 6, 2024. The study started when Plaintiff was fifty-five and will be repeated every other year until she is deceased.

   D. Information obtained used to qualify, from formal research, the impact of "quality of life" indicators and the impact of the indicators on life expectancy and other factors were incorporated into survey questions. See the areas covered by the survey questions:

   > - health condition
   > - health care
   > - employment status
   > - income, individual and household assets
   > - activity level and participation
   > - retirement plans/opinions
   > - projected life expectancy

94. The Plaintiff was more optimistic about her future life, though still faced with many opportunities for volunteer service, and an uncertain prognosis from this

mold exposure alongside her chronic illnesses which ate stable and without symptoms.

95. Plaintiff's (participant) specific results to all surveys can be made available with a court order.

96. Presently, Plaintiff is gradually recovering and is still experiencing convergent symptoms resulting from the mold exposure.

97. Plaintiff's religious Charity and management clients have suffered tremendously due to Plaintiff's inability to fulfill her service commitments since all the recurrent, unpredictable and debilitating symptoms from the mold exposure are intense at times accompanied by anxiety given all the issues arising daily.  See Attachment # 6

98. Plaintiff still does not have permanent housing because suitable housing requirements cannot be found that is affordable, given the Plaintiff's current exorbitant financial burden of balancing medical treatment with personal and household debts.

99. Given years of untenable medical expenditures, Plaintiff was forced to default on financial accountabilities and currently Plaintiff is heavily.  See Attachment # 7.

100. Plaintiff 's creditworthiness is challenged due to paying increasing medical costs from the mold exposure which is not covered by conventional insurance like the Plaintiff's, Medicare.

101. The cost of Plaintiff's medical care before 2013 averaged $ 6,400 annually; and now Plaintiff's expenditures for medical care for the last five years, of the greatest financial increase, were as depicted in Graph # 18.

Graph #1:  Income to Medical and Related Costs to illustrate financial devastation.



102.  In years 2020 and 2024 and 2024 (third quarter), Plaintiff has truly little income for personal care because the income and costs are nearly equal.

103. The year 2021 was the worst year by far as Plaintiff's medical and related costs exceeded the available income by approximately $8,205.

104. Years 2022 (COVID- 19) and 2023, Plaintiff had approximately $9,980 for all other "quality of life" sustaining indicators such as rent, utilities, food, other medical along with all personal revolving credit accounts.

105. Outstanding medical bills either past due or in collections $10,509.

106. Plaintiff has outstanding loans of $18,192 family and friends and $6,439 loan companies.

107. The remaining accounts which are in default (credit cards, deficiency costs from repossessions and other charge-offs total $21,238. For these expenditures, See Attachment #7.

## DEFENDANT # 1. STATE OF NORTH CAROLINA, USA

### 1. ELEMENT OF NEGLIGENCE: DUTY OF CARE FOR STATE OF NORTH CAROLINA

A. Although, all the Defendants had a "Duty of Care", in varying ways and degrees, to protect to the Plaintiff, according to the terms of the leasing agreement consistent with NC General Statues, all of the Defendants defaulted on providing a livable environment for the Plaintiff.

1. North Carolina had an obligation to provide substantive General Statues to assure that landlords were providing fit and safe environments for its residents according to Article 5, Chapter 42.

2. Sections 38-44 of Chapter 42 are referred to as the "Residential Rental Agreement Act" passed in 1977.

3. It is from this Act that the "implied warranty of habitability is guaranteed to tenants in rental dwellings.

4. This Act compels landlords to protect tenants from mold growth by minimizing dampness (moisture) when flooding occurs in their dwellings.

5. The landlord is obligated to make necessary repairs (remediation) in the case of mold, consistent with North Carolina General Statutes, "Minimum Housing Codes" (Chapter 12 §160d- 1201(6) at a cost of less than 50% of the property's Fair Market Value (FMV).

6. As a general rule, the residents have a reasonable expectation that if the living environment has a hazardous condition threatening the tenant's health and safety, the tenant could be relocated until the condition or necessary repairs, in this case, mold could be remediated in the rental property (apartment unit).

### 2. ELEMENT OF NEGLIGENCE: DUTY OF CARE FOR STATE OF NORTH CAROLINA

B. Nature of Mold

1. Understanding the nature of mold, its proliferation, and the applicability of laws and housing codes to water-damaged rental dwellings are germane to Plaintiff's allegations that health was severely compromised by toxic mold exposure given the role of all the defendants foundational to this civil complaint for personal injury.

2. Mold itself is a sign of excess moisture.

Page 41 of 481

3. Without a source of moisture and nutrients for the mold spores to feed on, mold does not grow.

4. Controlling indoor moisture helps eliminate mold growth such as from floods, condensation due to high humidity (RH), cold spots in buildings, slow leaks in plumbing fixtures, roof leaks, sprinkler systems, and areas around sinks and windows.

5. In a room, the relative humidity (RH) should be kept between 40% -60 % to protect the health of the individual and to minimize mold growth, "Mold Contamination: Symptoms, Self-Help Remedies and Particular Concern for Renter and Homeowners" taken from the Environmental Law Fact Sheet by the NC Bar Association, updated 2009.

6. Mold spores are microscopic, may be suspended indoors and outdoors and can fluctuate from season to season from day to day or even from hour to hour.

14. Mold spores may be behind hidden surfaces such as the underside of carpeting and in the padding, backside of drywall behind walls, paneling, topside of ceiling tiles and behind ceiling, pipes, acoustic liners in ventilation ducts and roofing materials above ceiling tiles, any damp area.

15. The EPA states that almost all molds have the potential to cause unfavorable health reactions, especially in people who have pre-existing sensitivities.

16. The Center for Disease Control and Prevention (CDC) stipulates that some people may be more sensitive to most spores than others, and they may develop respiratory symptoms after inhaling even a small number of mold spores.

17. The CDC does state that some people may be more sensitive to small quantities and varying types of mold spores than others.

1. The CDC further states that almost any human may have health issues in large quantities of environmental mold spores.

19. The CDC does not acknowledge that mold exposure can cause various diseases and illnesses in this complaint except for allergies, respiratory and certain respiratory diseases.

20. Considerations must be adequate to address water-damaged and those dwellings with historic water intrusion from any source to be identified later in this "Complaint".

Page 42 of 481

21. Controlling indoor moisture helps eliminate mold growth such as from floods, condensation due to high humidity or cold spots in buildings, slow leaks in plumbing fixtures, roof leaks, sprinkler systems and areas around sinks and windows.

22. According to the EPA, all molds are not dangerous and may grow indoors or outdoors.

23. They are fungi and are considered to be a very important part of the natural environment, and their role in the environment is to break down and help with digestive organic materials in the environment, such as dead leaves.

24. Mold spores are microscopic, may be suspended indoors and outdoors and can fluctuate from season to season from day to day or even from hour to hour.

25. Mold spores can land on damp spots to start growth and are located at damp areas behind walls and crawlspace, inside walks where water and other pipes run, acoustic liners in ventilation ducts, and roofing materials above ceiling tiles.

26. Mold can grow on any organic substance, which provides nutrients for the mold to feed on including paper, wood, cloth, plant material, and soil.

27. Mold spores may be behind hidden surfaces such as the underside of carpeting and in the padding, backside of drywall, paneling, topside of ceiling tiles.

28. As molds grow, some (but not all) of them may produce potentially toxic byproducts called mycotoxins under some conditions.

29. Some mycotoxins from mold spores are commonly found in moisture-damaged buildings.

30. The Center for Disease Control and Prevention (CDC) stipulates that some people may be more sensitive to most spores than others, and they may develop respiratory symptoms after inhaling even a small number of mold spores.

31. The CDC does state that some people may be more sensitive to small quantities and varying types of mold spores than others.

32. The CDC further states that almost any human may have health issues in large quantities of environmental mold spores.

33. The CDC <u>does not</u> acknowledge that mold exposure can cause various diseases and illnesses supported in ongoing research of mycotoxins from mold spores in the body causing other diseases in humans.

34. Though research has been ongoing for decades, much research, empirical and clinical, is still needed on environmental toxic mold exposure and the resulting impact on human health and well-being.

C. Habitability

35. North Carolina does not have any statutes or regulations that require landlords to disclose high concentrations of mold in rental properties to prospective tenants.

36. For OSHA, EPA, or NIOSH, there are no federal standards (levels) or regulations for airborne concentrations of contaminants (mold spores) with/without being in a water-damaged dwelling.

37. Literature reviewed shows that normal amounts of mold spores range from 200- 500 and 1-1,000 in a living environment; and, stated at this level no substantial health risk to healthy people with regular immune system functioning is anticipated.

38. Commonly appearing mold spores in water-damaged dwellings may be from Aspergillus, Penicillium and Chaetomium.

39. Chaetomium is reported to be the most prevalent mold in environmental dwellings and is usually occurring with the black mold, Stachybotrys.

40. Chaetomium was the most prevalent mold spore found in Apartment #7.

41. The Landlord introduced pertinent testimony, revealing a first-hand account by the supervisor of maintenance that was not consistent with minimizing mold in dwellings with a history of significant flooding (inadequate preparation of Apartment #7- steam cleaning instead of carpet removal) and the resultant plastered ceiling in the bedroom of Apartment #7 from apparent water damaged from pipes bursting and flooding through the ceiling.

42. Around the time of my latent exposure in 2024, a tenant (Lenore Janus) posted a complaint to the Senior Villages website stating "My apartment flooded from the ceiling pipe. Water up to my ankles. Attachment #

43. A former resident in Building "C" Apartment #22 stated on an occasion after flooding had occurred in the building, maintenance had placed huge fans in the hallways to dry soaking wet carpet, about her feet, with the entrance doors opened. <span style="float:right">Page 44 of 481</span>

44. SpanglerR Restoration in Charlotte stated in their advertisement the proper way to extract water and dry out is:

    A. Contain the water or sewage quickly removing any standing water.

    B. Air movers are used to create airflow against walls, furniture, and floors to assist in moisture evaporation.
    C. Industrial-grade dehumidifiers draw in cool, wet air and blow out warm, dry air to speed up the drying phase.
    D. Throughout the process, technicians used hygrometers and moisture meters to measure and track trouble spots.
    E. These things must be completed before repair and restoration.

45. Senior Villages Apartments' maintenance workers did the least expensive manner to extract water, dry, and repair water-damaged areas with no evidence of utilizing experienced technicians for such purposes as observable.

46. OSHA states that visible mold is objectionable, and mold odors are unacceptable in the work environment in terms of OSHA.

47. Moldy and musty odors should alert inspectors and maintenance personnel of the presence of mold.

48. Unchecked molds may damage buildings and furnishings, rot wood, damage drywall, cause structural damage to buildings and may appear as cosmetic damage such as stains to furnishings.

49. All state laws entitle tenants to safe and livable housing, regardless of how much rent the tenant pays.

50. Unlivable conditions denote that the living environment may jeopardize the tenant's health, safety, or well-being.

51. They include severe pest infestations, structural damage, lack of essential services (like heat or water), hazardous materials (e.g. such as asbestos, mold, and lead), inadequate sanitation, and fire safety violations.

52. The federal government has mandated as law in rental agreements that lead-based paints must be disclosed in all rental contracts; however, each state can set its requirements for other rental disclosures.

53. However, the purpose of all such standards, as outlined in law, for any state, is to legally protect the occupant consistent with federal standards.

Page 45 of 481

54. Many states, including North Carolina, use federal regulations to create safe and livable conditions for unit habitability.

55. Federal standards that represent the minimum requirements of a dwelling to be considered fit for human habitation are often used as the basis for states to develop their statutes and housing codes as reflected in Chapters 5 and 12 of its General Statutes. Key components of these habitability standards include provisions for:

    A. Structural Integrity: The property must be free from structural hazards that endanger the health or safety of the occupant(s).

    B. Clean and Sanitary Conditions: The housing must have access to a sanitary water supply and adequate sewage and waste disposal facilities.

    C. Ventilation: The unit must have adequate ventilation to prevent moisture and mold buildup.

    D. It has been stated that in the United States alone, 43 percent of buildings have current water damage, and 85 percent with past water damage (Google Engine)

56. In an article dated July 10, 2024, <u>Home Advisors</u> publication, titled "Water Damage Statistics: Key Insights and Trends for Homeowners", they list water-damaged homes to be second in terms of housing liability claims filed at 29%. Water damage (Class 4) restoration costs typically range between $20,000-$100,000 with an average cost value of $11,605. See Attachment #13.

57. The question is, were the apartments at Senior Villages Apartments livable or habitable?

    58. On June 2, 2021, given the severity of Plaintiff's health condition and encumbrances from "mold sickness" or Plaintiff's diagnosis of "mold mycotoxicosis", was apparent from the diagnostic assessment (Attachment #4) and the two toxicological reports (Attachments # 2 and #11 that both Apartments #24 and #7 were physically unhabitable for Plaintiff.

    59. A quantitative determination can be made for those perceived areas of hidden mold in the condition on the day the lease was signed.

    60. The Plaintiff created a data set for analysis, listing all medical claims and related expenses of 11,145 entry points, in chronological order, based on the date of occurrence.

Page 46 of 481

At least 85% of the entries were paid Medicare claims directly related to the Plaintiff's symptoms from mold exposure.

Since the actual repair costs were not available, the total of the data entry claims provided a reasonable substitution in the formula for the Plaintiff''s habitability determination.

58. The date at which the Plaintiff's exposure rendered the apartments unlivable was crucial to the case since her tenancy spanned nine (9) years in two different apartments #24 (8 years) and #7 (14 months) in the same building

59. The results were astounding; highlighting the exact date that Building "C" became uninhabitable corresponding to December 31, 2020.

60. December 31, 2020, corresponds to the point at which a 5%, mold hazard reduction, is expressed as a percentage based on the Fair Market Value (FMV) of the building (CFR § 203.673). See Attachment #12.

61. First, a quantitative determination was made to verify whether Building "C" was habitable in its present condition:

Federal: Variables for Habitability Calculations (CFR § 203.673):
Fair Market Value (FMV) of the land and property- **$4,279,200** (Mecklenburg Tax Valuation*)

Assumed FMV distributed equally for three buildings- **$ 1,426,400**

Hazardous Reduction- **5%** to FMV, **$71,320**

Number of Units or Occupied Apartments- **88 apartments** (stated in the advertisement on SocialServe.com)

Assumed FMV distributed per Apartment- **$48,627**

Square Feet (ft$^2$) per Apartment- **600 ft$^2$** (stated in the advertisement on SocialServe.com)

**Building**
Average per square foot:
Costs for Repairs Home Advisors, based on insurance claim filings

Average Cost per ft$^2$ for repairs - $7.00 (range based on severity $7 to $7.50)

Page 47 of 481

Hazardous Reduction Percentage 5% - (calculated $7 \times 600$ (ft$^2$) =$4,200

Repairs in Present Condition Total, $4,200 (Hazardous Reduction %) < $73,477

**Building Is Deemed Habitable** (basis used <u>CFR § 203.673</u>)
(Code Violation for No Carbon Monoxide Detector Not Included)

Calculations were as follows using areas where pictures were taken.

**Apartment**
<u>Average per area in dwellings:</u>
Costs for Repairs Home Advisors, based on insurance claim filings 2024.

Repairs Needed (hidden mold areas defined by EPA: Mold Course Chapters 1 and 3

| | Range/Area |
|---|---|
| Carpeting (entire unit- ) | $500 |
| Ceiling (bedroom range $350 to $1,250) $1,250 | $350 |
| Drywall (bedroom range $300 to $800) $800 | $300 |
| Bathroom (wall, plumbing, and fixtures range from $4,000 | $1,000 |
| <u>Lower Level (Basement) Given Flooding History 50% max.</u> <u>$40,000</u> | $500 |

Repairs by Area in Present Condition **$2,450    $46,550**

Total Apartment #7, $48,267 > $2,450 but, < $46,550

Apartments on the lower level should fall within the range unless significant water damage has occurred.

**Apartment #7 Deemed Habitable** (basis used <u>CFR § 203.673</u>)

* Mecklenburg Tax Valuation for Property (Parcel # 06115207)
** Since Plaintiff's last look-up.  The number of available apartment rentals has declined by four units (88 since the Plaintiff moved there in 2013 (92) units), SocialServe.com.
*** N.C.G.S. Article 12 §160D-1201(6)b.

<u>North Carolina: Variables for Habitability Calculations N.C.G.S. Chapter 12</u> <u>§160D-1201(6) b.</u> ***
Fair Market Value (FMV) of the land and property- **$4,279,200**

(Mecklenburg County Tax Valuation*)                    Page 48 of 481

Assumed FMV distributed equally for three buildings- **$ 1,426,400**

Hazardous Reduction (threshold limit for building repairs to be habitable)- **50%***** <u>N.C.G.S. Chapter 12 §160D-1201(6) b.</u> to FMV, **$713,200.**

Habitability determination based on N.C.G.S. Chapter 12 §160D-1201(6)b.

> Average Cost per ft$^2$ for repairs - $7.00 (range based on severity $7 to $7.50)

> Hazardous Reduction Percentage 50% - (calculate $7 × 600 (ft$^2$) =$4,200

Repairs in Present Condition Total, $4,200 (Hazardous Reduction at 50 %) < $713,200

**Building Is Deemed Habitable** (basis N.C.G.S. 12 §160D-1201(6)b (Code Violation for No Carbon Monoxide Detector Not Included)

62. In the present condition of Building "C", it should be habitable based on federal (C.F.R. § 203.673) and North Carolina (N.C.G.S. Chapter 12 §160D-1201(6) b.); however, for Plaintiff, the building was not habitable as she became severely ill.

63. The tolerance parameters for repair costs are set at 5% (Federally) and 50% (North Carolina) to provide a decent (fit), safe, and sanitary condition in the rental dwelling.

64. From the database, the gap between the federal standard ($71,320) and North Carolina's minimum standard ($713,200), is the range for the upkeep of the dwelling: Plaintiff's value for mold-related expenditures, were substituted for the hazardous reduction, was $324,070, or a <u>23%</u> hazard reduction based on the FMV for the building.

65. The federal standard (C.F.R. § 203.673) for habitability clearly illustrates that the building was uninhabitable from December 31, 2020, until August 22, 2022, when Plaintiff was advised to evacuate the building as a life-sustaining measure.

66. Of the total expenditures, $324,070, self-pay accounted for 24 % equaling 79,105 with 51% of the self-pay unmet $40,131.

67. All landlords must adhere to this Act and must maintain the residential rental premises accordingly and `make clear to the tenant that the tenant's rights to such standards cannot be waived.

68. All these landlord accountabilities constitute an "implied warranty of habitability" to the tenant that the rental unit is livable and that the tenant 's health, safety, and well-being will not be adversely impacted by the dwelling.

69. Given the totality of all the circumstances meriting laws to protect Plaintiff, a senior, based on federal standards in a private complex, with historic flooding for over 40 years, with an indicator of possible structural damage from mold proliferation from presenting musty odor when entering Building "C", with numerous sources for unattended moisture and hidden sources for mold growth, should have been foreseeable that serious harm to the tenant was inevitable

70. It is evident that despite the negligent omissions in North Carolina's General Statutes, for the protection of an older adult (55 and over), the State of North Carolina has not acted in "good faith" to prevent an unsuspecting Plaintiff from becoming severely ill from hidden toxic mold exposure in her rental dwelling at Senior Villages Apartments.

**Picture #1**



**Hidden and Visible Mold (Carpeting from the Door Entry Passing the Living Room and Kitchen)**

**Page 51 of 481**

**Page #2**



**Hidden and Visible Mold (s) Bathroom Baseboard Along Flooring (type of floorings may be a source for mold)**

Page 52 of 481

**Picture #3**



**Hidden and Visible Mold (s) Bathroom Wall Underneath the Sink**

**Picture #4**



**Hidden Mold (s) Toilet Bowl Inside Lid Cover**

**Picture #7**



**Hidden and Visible Mold (s) Toilet Bowl Inside Tank**

**Picture #8**



**Visible Mold at Toilet Base at Hidden Mold (s) given Flooring Type**

**Picture #9**



**Hidden and Visible Mold (s) along the Baseboard above Carpeting in The Bedroom**

**Picture #10**



**Hidden Mold (s) Bedroom Ceiling Repair/Water Damage**

**Picture #11**



**Hidden Mold (s) in Air Vent Indicated by Dust on Outside Cover At Carpeting Level (moisture can attach itself to dust particles)**

**Picture #12**



**Hidden Mold (s) in Air Vent Indicated by Inside of Cover**

**Picture #13**



**Hidden Mold(s) in Air Vent indicated by Particles Under Topside of Filter (condition of the filter contributes to mold growth).**

**Picture #14**



**Hidden Mold(s) in Air Vent indicated by Particles Backside of the Filter (The condition of the filter contributes to mold growth).**

71. It is for all the reasons stated that Plaintiff attributes equal culpability to the State of North Carolina along with Senior Villages LLC for the severe decline in Plaintiff's health with no prognosis for toxic mold symptoms subsiding.

72. Lastly, although the EPA has made no determination for mold disclosure in a rental agreement, the same as for lead, The State of North Carolina should consider joining those states, making provisions in rental dwellings for toxic mold exposure.

**DEFENDANTS #2 NC Golf Homes of Locust Valley LLC aka Senior Villages LLC for Senior Villages Apartments and Travelers Insurance**

## 1. ELEMENT OF NEGLIGENCE: DUTY OF CARE

A. The accountability to protect the tenant is the responsibility of the landlord in a rental agreement.

   1. Senior Villages, LLC was obligated to provide rental property that would not threaten the Plaintiff's safety and well-being in "imminently dangerous "environmental conditions upon receipt of a written notice given to management.

   2. As outlined for Defendant 1 in Article 5, Chapter 42 addresses those standards to provide a fit and safe rental dwelling in Sections 38- 44, 49 "Residential Rental Agreement Act" passed).

   3. All landlords must adhere to this Act and must maintain the residential resident accordingly and make clear to the tenant that the tenant's rights to such standards cannot be waived.

   4. This Act establishes the extent to which landlords have accountability which constitutes their "implied warranty of habitability" to the tenant that the rental unit is livable and that the tenant 's health, safety, and well-being will not be adversely impacted by the dwelling.

   5. Though mandated, landlords are left to their discretion to appropriately address water intrusion and to make repairs, resulting from flooding, in such a manner as to minimize dampness stimulating mold growth.

   6. The landlord is obligated to make necessary repairs (remediation) in the case of mold, consistent with North Carolina General Statues, "Minimum Housing Codes"–Chapter 12 §160D- 1201(6) b.

   7. The Code sets the parameters for when repairs are needed in public dwellings for fit human habitation and for the minimization of unsafe and unsanitary, or dangerous or detrimental conditions which may be a health hazard such that the dwelling may be determined to be dilapidated by not being usable for its intended purpose (habitability).

   8. The Code of Federal Habitability " – 12 C.F.R. § 203.673 "States that the property shall be structurally sound, reasonably durable, and free from hazards that may adversely affect the health and safety of the occupants or may impair the customary use and enjoyment by the occupants.

9. Unacceptable hazards include, but are not limited to, subsidence, erosion,

flood, exposure to the elements, exposed or unsafe electrical wiring, or an

10. accumulation of minor hazards, such as broken stairs."

11. The North Carolina Department of Health and Human Services Division of Public Health participating in the National Conference of State Legislatures (NCSL) listed in the formation of minimum standards for rental property and assigns specific duties to landlords and tenants, and to a certain extent, private housing, codes for home safety and moisture and weatherproofing a part of their "Healthy Housing Codes" which referenced "HUD Housing Quality Standards".

12. These Codes postulates HUD's minimum quality standards (24 C.F.R. § 982 4011) for tenant- based (occupied) programs to ensure "safe, decent and sanitary" for its premises both initially and during the term of the lease.

13. As a general rule, in North Carolina, relocation is warranted to protect the safety of the tenant and to allow for repair (remediation).

14. It is generally anticipated that 9 days (black mold) to 30 days is sufficient time for the required repair.

## 2. ELEMENT OF NEGLIGENCE: BREACH OF LANDLORD AND TENANT AGREEMENT

The Magistrate, in District Court Case 22CVM22137 (Attachment # 9) agreed with the Plaintiff that Senior Villages Apartments had an obligation to provide a mold-free apartment to Plaintiff. The sequence of events leading to "The Complaint for Summary Ejectment" filed September 26, 2022, against Plaintiff follows.

A. Sequence of Events:

15. On August 16, 2022, the in-home nurse commented to Plaintiff that the smell of mold appeared to be coming from the walls after being informed of the skin test results.

16. Plaintiff had a certified mold inspector come and investigation whether mold existed in Apartment #7 (August 22, 2022).

17. Mold Inspector, Blake Bouldin, of Integrity Energy Solutions, told Plaintiff that she needed to immediately evacuate Apartment 7 given the presenting conditions at the time of the inspection, extremely high relative

humidity (76.6 %) and Plaintiff was bedridden and receiving a nebulizer treatment (breathing treatment) during the inspection.

18. Senior Villages Apartments was informed verbally on August 22, 2022, that the apartment had significant mold infestation, followed up in writing, on September 5, 2022.

19. The inspection was witnessed by the Plaintiff's caregiver and the verbal findings were given to the Plaintiff and Ms. Burke the caregiver.

20. After numerous months of treatment for indoor and outdoor allergies causing angio-edema reactions to unknown allergens with two intubations, sinus infections, nasal congestion, and respiratory illnesses and distress as outlined in Tables 2, 3 & 4 Plaintiff's, caregiver, and the mold inspector deduced that the mold, primarily in her living environment could be the unknown culprit causing her declining health.

21. On September 5, 2022, the Plaintiff hand-delivered written documents to the property manager via Ken (office and maintenance supervisor) which he signed as receiving:

    A. Reports from the first two certified inspections, August 22 and August 26, 2022.

    B. A letter from Dr. Susan Hungness of Carolinas Asthma and Allergy that Apartment #7 was not habitable for Plaintiff due to severe mold allergies. See attachment #10.

    C. The same letter requested relocation until repair (remediation) could be done in Apartment #7.

    D. The Plaintiff also presented a grossly underestimated "Demand Letter" requesting monetary compensation ($355,631- not including future care) for past medical bills, credit restoration (untenable costs of care had depleted most of Plaintiff's assets), and future treatment expenses.

22. Plaintiff never received a response from Senior Villages Apartments after sending five emails and numerous calls from August 22, 2022 until October 3rd requesting relocation and remediation while Plaintiff was waiting on Apartment #7 to be repaired.

23. During this period, Plaintiff was displaced several times to different locations awaiting Senior Villages Apartments to respond to the requests for relocation.

24. Plaintiff was never in a living environment where mold re-exposure (HUD) dwellings or housing without any water intrusion/damage.

25. Doctors had told me that by leaving the infested environment, my symptoms would subside, which was a fallacy and Plaintiff became worse having to go to the emergency room several times for the same recurring symptoms.

26. During this period of displacement, Travelers Insurance, the general liability insurer for Senior Villages, LLC contacted Plaintiff as their client had filed a claim with them to address Plaintiff's "Demand Letter" from September 5, 2022.

27. On September 20, 2022, Will Hartlove, claims representative, at Travelers stated that he would be investigating my allegations of severe sickness from Plaintiff's tenancy at Senior Villages Apartments.

28.  Case (A2G9421) was resolved by Travelers stating they would have "no involvement" based on Senior Villages, LLC's policy coverage.

29. Travelers reiterated that their interest was only to ascertain whether they had a liability to their insured not to determine the legitimacy of Plaintiff's injury allegations.

30. On October 3, 2022, urgently needing housing options, after no response from the complex on relocation, Plaintiff went to the rental office at Senior Villages Apartments and requested relocation.

31. Having spoken with the office attendant numerous times on the matter, upon advisement to return to the apartment for the manager's response, an eviction notice was posted on the door along with a letter from Senior Villages, LLC's request for possession.

32. Plaintiff returned the keys to the attendant and went directly to file a counterclaim.

33. There were seven days to prepare for the hearing and Plaintiff could not get legal representation to appear for the hearing; but Legal Aid of North Carolina assisted Plaintiff with relevant NC General placement information, from the time Plaintiff saw the notice of eviction on (October 3, 2022), Senior Villages management offered no resolution to address

34. Plaintiff's dire circumstances (homelessness) until the original court hearing which was scheduled for October 10, 2022.Statutes for the hearing.

35. On October 10, 2022, the Plaintiff and caregiver appeared for the hearing only to receive a continuance granted to Senior Villages, LLC's attorney, stating he lacked the preparation to adequately represent their client without obtaining witnesses.

36. Before adjudication on October 18, 2022, Senior Villages, LLC's attorney, requested a meeting with the Plaintiff to offer her a settlement of $5,000, payable that day.

37. The condition of the settlement was that Senior Villages, LLC would dismiss the current Court proceeding for $3,035 against Plaintiff; and in turn, if Plaintiff would hold them harmless, for all future litigations related to my domicile Senior Villages Apartments and sign documents that were prepared for such purpose.

38. Plaintiff opted to decline the proposed settlement, and the hearing commenced.

39. The plaintiff proceeded forward with the adjudication.

40. After the certified mold inspection reports (inspector present and authenticated reports) were given to Plaintiff by Defendant on August 26, 2022, Plaintiff gave notice of the lease being terminated on September 26, 2022. They posted the Summary Ejectment Notice on the Door of Apartment #7.

41. The mold inspector contacted and hired, at the Defendant's expense reported the presence of two extremely dangerous types of mold spores, Aspergillus and Chaetomium (stated usually present with black mold (Stachybotrys) on August 22, 2022.

42. The court acknowledged that the Plaintiff was not living in the apartment at the time of the hearing, though anticipated to continue leasing Apartment #7; but was forced to leave the apartment at the physician's request that the apartment was uninhabitable for Plaintiff due to mold allergies and further requested relocation outside of the complex.

43. The Court acknowledged the presence of Senior Villages' maintenance supervisor who gave testimony of 40 years of experience and awareness to the history of flooding in this building dated to the aging of the property.

Page 68 of 481

44. The Court maintained that no employee of the Senior Villages attempted to "remedy" the conditions in Apartment #7. See Attachment #11.

Page 68 of 481

45. The Court maintained that immediately after Defendant informed Plaintiff about the existence of mold in Defendant's apartment, Plaintiff gave Defendant default notice and terminated the lease (wrongful and retaliatory).

46. The Court ruled that Senior Villages failed to prove their case by a greater weight of the evidence and dismissed their case with prejudice.

47. The Magistrate adjudicated in favor of Plaintiff's counterclaim (filed October 19, 2022) that no further monies were due to Senior Villages, LLC.

48. Plaintiff was then awarded a monetary judgment of $1,778.59 which covered her expenses during displacement.

49. Senior Villages, LLC settled the judgment in "Certificate of Payment/Satisfaction of Judgment By Judgment Creditor" on October 25, 2022, with check # 6192, drafted on the NC Iolta Trust Accounts/Stephen D. Koehler, P.A. dated October 17, 2022.

50. The pictures taken during the inspection of Apartment #7 were entered in the Court's case file.

51. This award was further indicative that Apartment #7 was so significant with mold spores that relocation was necessary possibly because the environment was not habitable.

52. The decision of the court still left the Plaintiff displaced to a Charlotte affordable rental housing market for seniors with substantial waiting times for occupancy on the date of the settlement.

53. Plaintiff was without housing until November 17, 2022, when she moved into an affordable "tax credit" complex for seniors at Archdale Flats Senior Living.

54. The Plaintiff's rent was $850, qualifying at 60% of the area's average median income, without provisions for utilities and cable like Senior Villages Apartments.

55. In October, when the area's average median income increased, the
current raised the rental rate to $1,045 which was no longer affordable Plaintiff.

56. To further complicate matters, on January 10, 2023, Plaintiff was forced

57. to vacate this apartment as a severe rainstorm on January 8, 2023 had caused water intrusion in the bedroom and the landlord delayed repairs for two days.

58. Plaintiff's primary care physician (Melville) ordered Plaintiff to evacuate her newly built apartment so as not to become re-exposed to mold growth which could possibly start growing after 48 hours.

59. Still severely ill, Plaintiff's caregiver was granted permission to temporarily house with her for six months for health reasons and for financial recovery to obtain another affordable senior dwelling.

60. As the caregiver's apartment was HUD subsidized, an Inlivian complex, formerly Charlotte Housing Authority already certified to be mold-free for habitation.

61. In June, Plaintiff was displaced again to her current residence in Lancaster South Carolina, which had received regular inspections, the house was mold-free.

## Defendants #3 and 4: The City of Charlotte (municipal government) and the County of Mecklenburg in North Carolina.

1. **ELEMENT OF NEGLIGENCE: DUTY OF CARE FOR LOCAL GOVERNMENT**

   A. Housing codes, by definition, are those rules that dictate the minimum standards for safety and a healthy place to live referred to as a "healthy home " in the City of Charlotte.

      1. Minimum housing codes as created by City ordinances are in keeping with General Statute 42 for residential housing supportive of an "implied warranty" to the tenant that the property is safe and healthy to live in which constitutes the habitability in a rental dwelling.

2. **ELEMENT OF NEGLIGENCE: BREACH OF DUTY OF CARE BY LOCAL GOVERNMENT**

   B. Thus, the lack of a housing code violation for the Plaintiff, in a private senior rental complex, with a history of flooding in Building "C", is a discriminatory practice within the City of Charlotte against Plaintiff due to her age while residing in a property designated for an older person when this privilege is afforded to older people in their Charlotte Housing Authority senior apartment complex managed by Inlivian.

      2. The City of Charlotte and Mecklenburg County <u>do not</u> consider mold infestation a housing code violation; consequently, they will not inspect dwellings for the presence of mold; but will address the source creating possible mold conditions.

      3. Suggestive in the state and local housing codes are that all mold is visible which more likely than not is hidden. If visible, often leases offer options for the tenant to clean.

      4. Hidden microscopic mold spores are potentially most dangerous to human health, especially for vulnerable older adults.

      5. Notably, older people living in private rental dwellings do not have the same protection under the law as other older adults residing in senior dwellings, in Charlotte, under the auspices of HUD's "Housing Quality Standards". HUD specifies that these dwellings' must be in an environment free of mold (at move-in); and, any subsequent inspections when mold exists and requires immediate remediation.

      6. Since there were no safeguards (inspections) for private senior rental apartments in Charlotte, Plaintiff's health was severely compromised and

Plaintiff still experiences "flare-up" symptoms from prolonged toxic mold exposure/poisoning.

7. The City of Charlotte has equal culpability for the severe decline in Plaintiff's health with no prognosis for toxic mold symptoms subsiding.

8. Senior Villages Apartments #24 and #7 did present with a City housing code violation (42-42: (a) (8), no operable carbon monoxide alarm detector).

9. In all fairness to former Mayor Pro Tem, The Honorable Braxton Winston, in 2023, he did allow Plaintiff to share information about her exposure to mold at Senior Villages Apartments and requested any appropriate assistance that he could provide.

10. His recommendations were to request a hearing at the public forum for the entire City Council and to reach out to County Commissioner, George Dunlap, which was done to no avail deferring back to the City Council.

## 3. ELEMENT OF NEGLIGENCE: CAUSATION FOR MOLD INJURY FOR ALL DEFENDANTS

A. Findings of causation supporting that Senior Villages Apartments is culpable for Plaintiff's substantial health decline is outlined in the next sections; certified mold inspections (3), medical diagnostic determination and toxicological findings.

B. Overwhelmingly, the reports establish Senior Villages Apartments, owned by NC Golf Homes of Locust Valley IV, LLC aka Senior Villages, LLC, has culpability for Plaintiff's injury accordingly:

1. Establishment that the specific molds, emanating mycotoxins, as deduced in Apartment #24 and verified conclusively in Apartment #7, created a hazardous- unlivable- living environment for the Plaintiff.

2. And the level of exposure, no precedent for hidden mold in water-damaged buildings, was sufficient to cause the severity of Plaintiff's collective symptoms diagnosed as mold mycotoxicosis or toxicological poisoning.

<u>Certified Mold Inspections</u>
Integrity Energy Solutions, LLC
941 Briarmore Drive
Indian Trail, NC 28079
Phone: 704- 995- 5994

August 22, 2022

Upon entering Building "C," there was an overwhelming musty odor present. It was to the degree that it was nauseating.

The carpet in Apartment #7 was damp; there was poor ventilation; the relative humidity was substantially above 60% (mold can thrive in areas with high relative humidity): and the return vent was extremely dirty. which was the case in Apartment #7. All these factors are conducive to mold growth.

There was evidence of water damage in Apartment #7 in the bedroom ceiling.

In my professional opinion, the whole apartment complex was unkept and unsanitary. Maintenance was not adequate to provide a safe and sanitary living space.

Based on my knowledge of the maintenance conditions in Apartment #7, I believe that mold could be present throughout the building.

If you need any further assistance or additional information, please let me know. Best regards,

Blake Bouldin-CMI, CMR
Inspector Certification Number: 40155 Integrity Energy Solutions, LLC


<u>The complete report #1 is found in Attachment # 9.</u>


Sent: August 24, 2022 9:27 am Subject: Microscopic Test Vent Integrity Energy Solutions, LLC Client: Cauthen
Address: 1705 Queen City Dr., Charlotte, NC 28208
Apt.107 Date: September 22, 2022

Ms. Cauthen-                                      .

Thank you for working with Integrity Energy Solutions, LLC. I have attached your results. The actual results are on page 4. **You DO have mold.** 6 genus of molds were detected. 4 of those molds are allergenic. The levels at which they tested are low, however, the combination of

those molds, coupled with the kinds of molds they are, have the potential to create an environment that is not conducive to an individual that is suffering from mold exposure symptoms. Further, the hyphal fragments that were detected are important to note. Hyphal fragments may be allergenic or may even contain mycotoxins depending on the genera/species and on its growth conditions.

The growth conditions of this dwelling are "highly" conducive to mold growth. As the attached pictures will suggest, there are other mold colonies that are growing which are aided by the relative humidity which is close to 80%.

**Recommendation:**

Based on the client's symptoms, my strong suggestion is to do further testing to identify the overall mold load of this dwelling. A simple swab test of the dust is not indicative of the gravity of mold that is present. Because of the symptoms that the client is demonstrating and her age, I suggest evacuation of the unit until further testing can be done and a protocol from mitigation/remediation is developed.

Please feel free to contact me if you have further questions or concerns.

Best Regards-

Blake Bouldin, CMI, CMR
Integrity Energy Solutions, LLC
704.995.5994

DISCLOSURE: The information contained in this document is unofficial and opinionated in nature and is to be used as a guide to help understand mold concentrations. This guide shall not be considered a final conclusion of mold remediation requirements and does not guarantee end results. Furthermore, this guide shall not be used to anticipate end medical results. Always consult with your physician if you are experiencing a medical condition.


The complete Mold Inspection Report #2 is found in Attachment #11.

**From:** "angie bouldin" <abbouldin@aol.com>

**To:** "dcau1@yahoo.com" <dcau1@yahoo.com>

**Sent:** Mon, Aug 29, 2022 at 6:28 PM

**Subject:** Mold Test # 2

Ms. Cauthen-

I am attaching your second mold test taken on August 26, 2022 at 3:45 PM. 7 molds were detected at low levels in this test. However, of special concern was the mold Chaetomium. Chaetomium is a dangerous mold species commonly found in soil, plant debris, and compost. Any material containing cellulose feeds Chaetomium. This mold type feeds and spreads quickly making it difficult to contain. Chaetomium is highly dangerous and can trigger infections in humans. Autoimmune diseases such

as lupus and multiple sclerosis have been linked to Chaetomium mold exposure. Other symptoms could include coughing, memory loss, nose bleeds, seizures, dermatitis, fever, and internal lesions. Chaetomium globosum grows on damp cellulosic materials indoors and can adversely affect human health through both allergic and toxic reactions.

**Based on the mold exposure symptoms you are experiencing; it is highly likely that the Chaetomium mold is a "contributing" factor. Even in small amounts, Chaetomium can have devastating effects on those with mold exposure issues. As more testing is done, we will be able to identify what other molds are contributors as well.**

Please call me if you have any questions. I will take a test tomorrow at 2:00 PM.

Best Regards-

Blake Bouldin, CMI, CMR

Integrity Energy Solutions, LLC

704.995.5994

**DISCLOSURE: The information contained in this document is unofficial and opinionated in nature and is to be used as a guide to help understand mold concentrations. This guide shall not be considered a final conclusion of mold remediation requirements and does not guarantee end results. Furthermore, this guide shall not be used to anticipate end medical results. Always consult with your physician if you are experiencing a medical condition.**

The complete Mold Report #3 is found in Attachment #11 .

Sent: Thu, Sep 15, 2022 9:27 am
  Subject: Mold Test Results: EPA-36: Integrity Energy Solutions, LLC

**Client: Cauthen**
**Address: 1705 Queen City Dr., Charlotte, NC 28208**
**APT.7 Date: September 2, 2022**
**Time: 3:30 PM**
**Test Administered: EPA-36 (ERMI)**

*Thank you for working with Integrity Energy Solutions, LLC. I have attached your EPA 36*
*(Environmental Relative Moldiness Index) results. The actual results can be found on page 2.*

The mold burden of a building or dwelling can be defined by two factors: the quantity of each mold species and the diversity of species present. The ERMI takes into account both of these factors and measures the long-term mold burden of a building or dwelling.

The ERMI consists of Group 1 which indicates water damage has occurred, and group 2 which are commonly occurring species. The combination of the 36 molds determines the mold burden in a particular building. Buildings with an ERMI value above 5 have the greatest likelihood of having a mold problem.
Buildings with an ERMI value below 0 are less likely to have a mold problem. Buildings that score below -4 are the least likely to have a mold problem. **The score at 1705 Queen City Dr., Charlotte, NC 28208, Apartment 7 is 13.1, Level 4**. This indicates that there is a **High Relative Moldiness** and further investigation is needed to determine the sources of this mold.

**Observation:**

Upon physical observation, it should be noted that the relative humidity in the apartment is over 72%. This is an optimal environment for mold growth. The carpet is very dirty and has what looks like moisture staining throughout. The air return is extremely dusty, and the air filter looks as if it hasn't been changed in a long time. There are noted areas that have been spackled and painted over. This usually indicates a water intrusion issue. There are moisture spots on the walls. The toilet has mold growing all along the inside cover and in the water storage area. The bathroom has an open wall cavity under the sink with mold growing on the back of the vanity there. And finally, there is mold growth all along the window seals.

**Recommendation:**

Based on the physical examination and now the test results, I recommend that a professional mold remediation company and a general contractor be contacted to come and develop a protocol for deconstruction and mold remediation. The amount of Chaetomium mold that is presenting on the EPA-36 (45,404) is very serious. Like many molds, Chaetomium can lead to severe allergic reactions and respiratory infections in immune compromised people. Several species produce carcinogenic mycotoxins. Chaetomium is also known to cause skin and nail infections. In rare cases, fatal brain infections have been associated with Chaetomium. This is a mold that is VERY dangerous and at the levels that it is presenting in this dwelling. As such, based on the age and physical symptoms the tenant is demonstrating and the overall score of the EPA-36, I recommend that the dwelling be vacated until a plan for remediation is developed and performed. Future testing should be done before re-entry.

Please feel free to call me with any questions or concerns.

Best Regards-

Blake Bouldin, CMI, CMR Integrity Energy Solutions, LLC

**DISCLOSURE: The information contained in this document is unofficial and opinionated in nature and is to be used as a guide to help understand mold concentrations. This guide shall not be considered a final conclusion of mold remediation requirements and does not guarantee end results. Furthermore, this guide shall not be used to anticipate end medical results. Always consult with your physician if you are experiencing a medical condition.**
The complete report #3 is found in Attachment #10.

Sent: Thu, Sep 15, 2022 9:27 am

Subject: Mold Test Results: EPA-36: Integrity Energy Solutions, LLC

**Client: Cauthen**
**Address: 1705 Queen City Dr., Charlotte, NC 28208**
**APT.7 Date: September 2, 2022**
**Time: 3:30 PM**
**Test Administered: EPA-36 (ERMI)**

*Thank you for working with Integrity Energy Solutions, LLC. I have attached your EPA 36 (Environmental Relative Moldiness Index) results. The actual results can be found on page 2.*

The mold burden of a building or dwelling can be defined by two factors: the quantity of each mold species and the diversity of species present. The ERMI takes into account both of these factors and measures the long-term mold burden of a building or dwelling.

The ERMI consists of Group 1 which indicates water damage has occurred, and group 2 which are commonly occurring species. The combination of the 36 molds determines the mold burden in a particular building. Buildings with an ERMI value above 5 have the greatest likelihood of having a mold problem.
Buildings with an ERMI value below 0 are less likely to have a mold problem. Buildings that score below -4 are the least likely to have a mold problem. **The score at 1705 Queen City Dr., Charlotte, NC 28208, Apartment 7 is 13.1, Level 4**. This indicates that there is a **High Relative Moldiness** and further investigation is needed to determine the sources of this mold.
**Observation:**

Upon physical observation, it should be noted that the relative humidity in the apartment is over 72%. This is an optimal environment for mold growth. The carpet is very dirty and has what looks like moisture staining throughout. The air return is extremely dusty, and the air filter looks as if it hasn't been changed in a long time. There are noted areas that have been spackled and painted over. This usually indicates a water intrusion issue. There are moisture spots on the walls. The toilet has mold growing all along the inside cover and in the water storage area. The bathroom has an open wall cavity under the sink with mold growing on the back of the vanity there. And finally, there is mold growth all along the window seals.

**Recommendation:**

Based on the physical examination and now the test results, I recommend that a professional mold remediation company and a general contractor be contacted to come and develop a protocol for deconstruction and mold remediation. The amount of Chaetomium mold that is presenting on the EPA-36 (45,404) is very serious. Like many molds, Chaetomium can lead to severe allergic reactions and respiratory infections in immune compromised people. Several species produce carcinogenic mycotoxins. Chaetomium is also known to cause skin and nail infections. In rare

cases, fatal brain infections have been associated with Chaetomium. This is a mold that is VERY dangerous and at the levels that it is presenting in this dwelling. As such, based on the age and physical symptoms the tenant is demonstrating and the overall score of the EPA-36, I recommend that the dwelling be vacated until a plan for remediation is developed and performed. Future testing should be done before re-entry.

Please feel free to call me with any questions or concerns.

Best Regards-

Blake Bouldin, CMI, CMR Integrity Energy Solutions, LLC

**DISCLOSURE: The information contained in this document is unofficial and opinionated in nature and is to be used as a guide to help understand mold concentrations. This guide shall not be considered a final conclusion of mold remediation requirements and does not guarantee end results. Furthermore, this guide shall not be used to anticipate end medical results. Always consult with your physician if you are experiencing a medical condition.**

To tie all elements of "general and specific causation "cohesively, the following toxicological studies were conducted. The conclusions were as follows:

<u>Abstracted Report #1: Attachment #6Analysis of Toxicological Causation and Toxicology Screening, Assessment And Opinion– Dr. Shakil Saghir</u>



**ToxInternational Inc.**
5057 Stonecroft Ct.
Hilliard, OH 43026
**Shakil A. Saghir, MSc, MSPH, PhD, DABT, ERT, FATS, FRSB President and Toxicologist,**

Date: January 9, 2024

Project Name: Debra A. Cauthen
Project Address: Senior Villages Apartments #7 and #24 Charlotte, North Carolina, 28208

To Whom It May Concern:

This report has been prepared at your request to determine the possible causality for the adverse health effects of Debra A. Cauthen.

This report begins with a review of my qualifications as a board-certified toxicologist (Diplomate of the American Board of Toxicologists [DABT], United Kingdom Registered Toxicologist [UKRT], European Registered toxicologist [ERT]), a Fellow of the Academy of Toxicological Sciences, a Fellow of the Royal Society of Biology, and a public health expert.

This report includes my opinions based on peer-reviewed publications, my knowledge, training, and experience. I also have attached my curriculum vitae and relevant scientific materials reviewed to base my opinions.

Sincerely,

**Shakil A. Saghir,** *MSc, MSPH, PhD, DABT, ERT, FATS, FRSB* President

# POSSIBLE CAUSES OF ADVERSE HEALTH EFFECTS

## Name
*Debra A. Cauthen*

Residence in Question
*Senior Villages Apartments #7 and #24, Charlotte, North Carolina, 28208*

## BACKGROUND

Ms. Cauthen lived at the Senior View Apartment from April 1, 2013 through August 22, 2022. She first lived in the apartment #24, from April 1, 2013, until June 01, 2021, then she moved to apartment #7 and lived there until she moved out from the Senior Villages Apartment on August 22, 2022. Both apartment units had water intrusion/damage to the residence with visible molds.

Ms. Cauthen now lives at Archdale Flats Senior Living, which is a newly constructed housing complex and is a certified mold-free as a part HUD tax credit dwelling. Ms. Cauthen has diabetes, gastroesophageal reflux disease, GERD, hyperparathyroidism, hypertension, and bipolar disorder (in remission since 2015) ; she is a former smoker (cessation 1981).

Ms. Cauthen was healthy prior to moving to the above-mentioned residences. While living at #24, Ms. Cauthen suffered two major anaphylactic episodes from allergens and once went into respiratory distress, additionally, she developed many symptoms related to allergens. Those allergic symptoms included rhinitis, nasal congestion, angioedema, sinusitis, bronchitis, shortness of breathing, nausea, fibromyalgia, anxiety, joint & muscle pain, vertigo, and dizziness ( Appendix 2.). Ms. Cauthen was diagnosed with allergies to molds based on skin tests (Appendix 2) . She also suffered from cutaneous candidiasis, candidal vulvovaginitis, pneumonia, developed fatty liver, and her kidney function was compromised while living in the unit #24 of the Senior Villages Apartments (Appendix 2 ).

While living at #7, Ms. Cauthen continued to experience symptoms described above, i.e., angioneurotic edema, histaminergic angioedema, nasal congestion, nasal drainage, postnasal drainage, sneezing, chronic rhinitis, chronic sinusitis, allergic rhinitis, shortness of breath (Appendix 2 ). To correct nasal congestion, Ms. Cauthen had bilateral styloid process excision on August 11, 2021 (Appendix  2).

Some of the symptoms Ms. Cauthen now experiencing include many types of allergies both indoor and outdoor that include allergies to pet, allergies to insect, allergies to food, and allergies to medication. She is experiencing daily nausea, vomiting, involuntary body movement, facing grimacing, brain fog, and facial flushing.

Apartment unit #7 was tested for molds on August 22, 2022. Following the results of the sampling of air and dust became available, mold inspectors instructed Ms. Cauthen to vacate the apartment immediately due to possible life-threatening levels of toxic mold in her apartment. Air samples taken from the residence contained high levels of the following toxic mold spores (spores E/mg dust).

of

(for detail, see Forensic Toxicology Report and Diagnostic Assessment of Healthy Living & Longevity Medical Center):
Aspergillus sydowii (942),

- *Aspergillus versicolor (2,293),*
- *Aspergillus ustus (8,133),*
- *Chaetomium globosum (45,404),*

- *Cladosporium cladosporioides I (1,215),*
- *Penicillium chrysogenum (21,800).*

The urine of Ms. Cauthen was sampled twice, November 16, 2022 and on January 14, 2023. Urine samples contained three mycotoxins (for detail, see Forensic Toxicology Report and Diagnostic Assessment of Healthy Living & Longevity Medical Center):

- *Ochratoxin A,*
- *Gliotoxin,*
- *Citrinin (dihydrocitrinone DHC).*

The stool of Ms. Cauthen was also analyzed for pathogenic bacteria and other biomarkers of toxic mold exposure. The stool was positive for one pathogenic bacterium *(Klebsiella pneumoniae)* and more than 2-fold higher than normal levels of IgA was detected. A correlation has been reported between higher IgA levels and exposure to toxic molds and mycotoxins (Vojdani et al. 2003a, 2003b).

## POSSIBLE REASONS FOR MS. CAUTHEN CONDITIONS

Ms. Cauthen lived at Senior Villages Apartments #7 and #24, Charlotte, North Carolina, 28208. The residence had a water leak which resulted in the growth of toxic mold. A total of 22 toxic molds were detected in the air collected from inside the residence. This was from the total of 36 the collected air samples were tested for. This included species of *Aspergillus, Penicillium, Caldosporium, Chaetomium,* and others.

## MOLDS AND RELATED TOXICITIES

Molds grow from tiny spores of fungi invisible to naked eyes that float in the air. Not all fungi produce molds, some produce mushrooms and others grow as single cells like yeasts. Molds are ubiquitous both outdoors and indoors. Outdoors, molds play an important role as they breakdown dead organic matter like fallen leaves and dead trees. Indoors, molds start growing when spores land on surfaces that are wet, there are many types of molds, none of them grow without water or moisture (Empting 2009; U.S. EPA 2023). Indoors, molds are usually found in damp/steamy and dark areas with poor ventilation (e.g., bathrooms, kitchens, cluttered storages, recently flooded areas, and basements); outdoors, molds grow in humid environments (Empting 2009; U.S. EPA 2023). Levels of molds and its components (i.e., molds, hyphal fragments, and spores) in the outdoor air mostly remain below the level of health concern, even in high humid conditions, due to the presence of natural light and continuous movement of air, making the concentration below the

of

threshold for health concern. Whereas, under high humidity, inadequate ventilation, and poor lighting (especially natural light), levels of molds and its components in the indoor air easily reach to unsafe levels for the occupants.

Components of many mold species are known to cause allergies such as hay fever-type symptoms (sneezing, runny nose, red eyes), inflammation, skin rash, and chronic fatigue (Creasia et al. 1990; Johanning et al. 1999; Gorny et al. 2002; Gorny 2004; Hooper et al. 2009; WHO 2009; Brewer et al. 2013; Baxi et al. 2016; Thrasher et al. 2016; Jaksic et al. 2020; U.S. EPA, 2023). In addition to causing allergic reactions, exposure to molds in indoor settings can be dangerous to human health (Baxi et al. 2016; Robbins et al. 2000). In some cases, molds produce potentially toxic secondary metabolites (mycotoxins) that may cause allergic reactions and/or other severe adverse health effects; even deaths of infants have been reported from mold exposure (Croft et al. 1986; Dearborn et al. 1999; Empting 2009; Kohler et al. 2015; Harding et al. 2020; WHO 2023). Molds are recognized to have hypersensitivity and immunomodulatory effects with growing evidence suggesting mycotoxins are of specific concern for individuals with preexisting immune system impairments (Bennett and Klich 2003; Empting 2009; French et al. 2019; Gao et al. 2020; Gonkowski and Gajecka 2020; Kraft et al. 2021).

People living or working in moldy buildings complain of a variety of health issues ranging from allergies described above to suffering from serious health issues (e.g., chronic fatigue, neurotoxicity [increased anxiety, depression, and cognitive deficits], nephrotoxicity, hepatotoxicity, pneumotoxicity, and cancer) from prolong high levels of exposure to certain toxic molds (Bennett and Klich 2003; Empting 2009; Brewer et al. 2013; Kohler et al. 2015; Harding et al. 2020; WHO 2023). In a metanalysis of 148 studies, exacerbation of asthma was observed with mold exposure in allergic and nonallergic individuals (Mendell et al. 2011).

Mycotoxins are toxic compounds that are naturally produced by certain molds. According to WHO (2023), mycotoxins can cause a variety of adverse health effects ranging from acute poisoning to long-term effects such as immune deficiency and cancer, posing a serious health threat to both humans and animals. People hypersensitive to mycotoxin are at higher risk of developing these toxicities. For example, OTA has been reported to affect immunological response in piglets (Marin et al. 2017) and may have immunomodulatory effects in humans (Wood et al. 2017).
Symptoms of mycotoxin poisoning depend on the type of mycotoxin involved, dose, frequency, and duration of exposure as well as gender, health, and age of the exposed individual. Exposure to mycotoxins can also enhance the vulnerability to microbial diseases (Bennett and Klich 2003). Mycotoxins have been reported to impair barrier function of epithelial cells, including cells that make blood brain barrier, resulting in inflammatory changes and neurological effects in healthy individuals and exacerbation of many inflammatory conditions, like pneumonia, chronic fatigue in immunocompromised individuals (Bennett and Klich 2003; Empting 2009; Brewer et al. 2013; French et al. 2019; Gao et al. 2020; Gonkowski and Gajecka 2020; Kraft et al. 2021).
Mycotoxins are easily absorbed following inhalation, dermal, and oral routes and reported to cause innate immune activation, neural, cognitive, and emotional dysfunction (Kercsmar et al. 2006;

of

Harding et al., 2020). There is now mounting evidence, both from animal and human (epidemiological) studies, that exposure to molds and mycotoxins in indoor settings can cause adverse health effects (Duarte et al. 2011).

# TOXIC MOLDS FOUND IN MS. CAUTHEN BODY (MONITORED IN URINE) TO HER SICKNESS

Ms. Cauthen's urine was tested for the presence of mycotoxins (see Forensic Toxicology Report for details). Her urine showed elevated levels of (OTA); which was not a surprise given the presence of high levels of *Aspergillus* species which produce OTA. High level of gliotoxin is also produced by *Aspergillus*. Elevated levels of citrinin were also detected in Ms. Cauthen urine, indicative of exposure to multiple species of toxic molds.

**MOLDS AND BACTERIA FOUND AT THE SENIOR VILLAGES APARTMENTS #7 AND #24, CHARLOTTE, NORTH CAROLINA, 28208 AND THEIR RELATED TOXICITIES**

# MOLDS AND MYCOTOXINS

## 1. Aspergillus

*Aspergillus* (found inside the house) may be woolly or cottony in texture and shades of green, brown, or black in color. Sixteen species of *Aspergillus* have been documented to cause human diseases. *Aspergillosis* is the second most common fungal infection requiring hospitalization in the United States. Many *Aspergillus* species produce mycotoxins (e.g., aflatoxins and OTA) that may cause, nausea, vomiting, abdominal pain, and convulsions from acute exposure, chronic exposure can lead to chronic fatigue, hepatotoxicity, immunotoxicity, teratogenicity as well cancer (Marchese 2018; Kumar et al. 2017). *Aspergillus* is a common cause of extrinsic asthma with symptoms including edema and bronchospasms, chronic cases may develop pulmonary emphysema. OTA is nephrotoxic, hepatotoxic, teratogenic and immunotoxic to several species of animals and to cause kidney and liver tumors in mice and rats (Pfohl-Leszkowicz and Manderville, 2007; Tao et al., 2018; WHO, 2018). Based on the lowest observed adverse effect level (LOAEL) of 8 µg/kg/day in pigs that caused renal function deterioration in a dose-response study (Elling 1979), regulatory agencies have set tolerable human intake of OTA between 3 and~17 ng/kg/day and 4 ng/kg/day as negligible cancer risk intake (Jelinek et al. 1989; Olsen et al. 1991; Van Egmond 1991; Sweeney et al. 2000; EFSA 2006; JECFA 2007; Kuiper-Goodman et al. 2010).

## 2. Chaetomium

*Chaetomium* (found inside the house) are readily found on the damp or water damaged paper in sheetrock. *Chaetomium* grows rapidly to produce cottony and white to grey to olive color colonies and produce two mycotoxins (chaetoglobosins A and C) (Fogle et al. 2008). *Chaetomium* are reported to be the third most common indoor fungi (Pieckova 2003; Zhang et al. 2012) with inhalation as one of the routes of exposure. These mycotoxins are known to inhibit cell division and are shown to be fatal to rodents (Ohtsubo et al. 1978). Chaetomium is reported to be allergenic,

of
especially in patients with moderate or severe asthma (Niedoszytko 2007); C. *globosum* was
identified as one of the primary *Chaetomium* in the homes of asthmatics (Vesper et al., 2007).
Invasive *Chaetomium* infections have been reported in the lung (Barron et al. 2003).

### 3. Cladosporium

*Cladosporium* (found inside the house) are the most frequently found species of molds, often found
indoors in dirty refrigerators, on moist window frames, interior paint, paper, and textiles stored under
humid conditions, and on the surface of fiberglass duct liners in the interior of supply ducts. Their
spores become easily airborne and are transported over long distances. *Cladosporium* colonies are
relatively slow growing and are powdery or velvety olive-green to olive-brown in color and grow
well between 0° C and 35° C. *Cladosporium* is a common cause of hay fever and asthma and is a
known allergen.

### 4. Penicillium

*Penicillium* (found inside the house) has a characteristic blue or green color with a velvety texture
often found in water damaged homes and buildings, many of which produce mycotoxins. Spores of
*Penicillium* are easily airborne and inhaled by occupants causing pulmonary inflammation and
asthma. Long-term exposure can lead to chronic sinusitis. *Penicillium* exposure can lead to worse
symptoms and health complications in people with immune disorders. Its mycotoxins are known to
cause liver cancer in rats and mice, and are very potent immunosuppressant (e.g., mycophenolic acid
is often used to prevent rejection in renal transplant patients [Holt 2017; Takahashi et al. 2017]).

### 5. Other toxic molds

The mycotoxin citrine (dihydrocitrinone DHC) is produced by many molds indicating exposure to
multiple types of molds and is known to be an allergen and to cause a number of toxicities, e.g.,
Balkan endemic nephropathy (EFSA 2012).

## CONCLUSIONS

Based on the available information, i.e., results of the inspection of the house (Senior Villages
Apartments #7 and #24, Charlotte, North Carolina, 28208) for the presence of toxic molds and
exposure assessment by determining mycotoxins in urine, and medical reports, following conclusions
are deduced with very high scientific certainty. These conclusions are scientifically supported by the
fact that mycotoxins are easily absorbed through inhalation, dermal, and oral routes from indoor
environment and can cause adverse health effects (see above for details and references to peer-
reviewed papers).

- Ms. Cauthen lived in a mold-infested apartments for resulting in exposure to molds including
  toxic molds and mycotoxins.

- Ms. Cauthen was exposed to toxic molds as shown by the presence of one mycotoxin (OTA)
  produced the *Aspergillus* mold in her urine.

- *Aspergillus* causes the second most common fungal infection *(Aspergillosis)* requiring hospitalization in the United States. *Aspergillus* is a common cause of extrinsic asthma with symptoms including edema and bronchospasms, chronic
  of

- cases may develop pulmonary emphysema. Ms. Cauthen was exposed to many species of Aspergillus. Mycotoxins (e.g., aflatoxins, gliotoxin, and OTA) produced by Aspergillus are known to cause nausea, vomiting, abdominal pain, and convulsions from acute exposure; hepatotoxicity, nephrotoxicity, immunotoxicity, teratogenicity, and chronic fatigue. They have also been reported to cause cancer from chronic exposure.

- Based on the presence of other toxic mold inside the house, exposure of Ms. Cauthen to other mycotoxins can easily be concluded with very high scientific certainty. This includes exposure to at least *Penicillium, Caldosporium, Chaetomium,* and others.

- Mycotoxins produced by *Penicillium* are very potent immunosuppressant resulting in exacerbation of existing conditions.

- Mycotoxins produced by *Cladosporium* is a common cause of hay fever and asthma and is a known allergen.

- Mycotoxins produced by *Chaetomium* is allergenic, especially in people with moderate or severe asthma, they have been identified in the homes of asthmatics people and to cause invasive infections in the lung.

- Ms. Cauthen chronic symptoms may have many etiologies. There is emerging evidence of its link also to the exposure to mycotoxins originating from toxic molds grown in water- damaged buildings, especially in immunocompromised individuals. In many circumstances, these patients remain chronically ill despite varying attempts at treatment and diagnosis remains elusive, as in the case of Ms. Cauthen.

- Therefore, with a high level of scientific certainty, we can conclude that Ms. Cauthen's sickness, notwithstanding age and pre-existing conditions, is directly linked to the exposure to toxic molds present at Senior Villages Apartments #7 and #24, Charlotte, North Carolina, 28208; her age along with pre-existing chronic medical conditions may have exacerbated her diagnosis of mold mycotoxicosis commonly referred to as mold poisoning or mold toxicity.

Please find the complete report in Attachment #6 .

<u>Abstracted Report #2: Forensic Toxicology Report And Opinion– Dr. Shakil Saghir</u>

# Forensic Toxicology Report
### Environmental Justitia omnibus



## Prepared By:

**Shakil A. Saghir**, MSc, MSPH, PhD
*Diplomate, American Board of Toxicology (DABT)*
*European Registered Toxicologist (ERT)*
*United Kingdom Registered Toxicologist (UKRT)*
*Fellow, Academy of Toxicological Sciences (FATS)*
*Fellow, Royal Society of Biology (FRSB)*

## TOXICOLOGY SCREENING, ASSESSMENT AND OPINION

Shakil Saghir, MSc, MSPH, PhD, DABT, UKRT, ERT, FATS, FRSB
Toxicologist/Pharmacokineticist
Public Health Specialist, Environmental Toxicologist
Regulatory Toxicologist

Date: December 7, 2023
Project Name: Debra A. Cauthen
Project Address: Senior Villages Apartments #7 and #24
                 Charlotte, North Carolina, 28208

To Whom It May Concern:

This report entails the microbiological findings from the inspection and environmental testing of the structure located at the above-referenced Project Address, which was dated and collected on 8/22/2022. The following report, including its Conclusion, Opinion, and Recommendations, is based upon the data collected and presented, certified microbiology laboratory report(s) generated by a an AIHA, EMLAP certified microbiology laboratory, medical reports and records, third party documentation and information, pertinent scientific literature (annexed hereto), interviews and conversation with client(s) and/or the structures inhabitants, if so applicable, and my opinions and conclusions based upon all of the above-stated data.

All my professional conclusions and opinions given in this report are stated to reasonable degree of scientific and toxicological certainty or probability depending upon the legal definition under current state law. My conclusions are unbiased. I did not have any previous knowledge of the client(s), any previous knowledge of the suspect contaminated structure(s), or any previous knowledge of the past or current conditions of said structure(s).

## CONCLUSION AND OPINION:

Based upon the foregoing, including the certified environmental microbiology reports from an AIHA certified microbiology laboratory in good standing and the U.S. Federal Government "CLIA" certified medical laboratory which produced the medical testing results, also in good standing with the U.S Federal Government and CLIA, it is my opinion that, based upon my observations, the above-named structure is a health hazard to all occupants. This opinion is based on the presence of pathogenic molds in the samples along with the presence of pathogenic bacteria and biomarkers of exposure of the pathogenic mold in the urine and/or stool of the resident. Further, by correlating the environmental and medical results, it has led me to render an opinion, with a great amount of scientific and medical certainty, that the pathogenic species of fungi found in the exposure victim's(s') mold-infested structure produced the same disease-causing mycotoxins that tested positive in the mold exposure victim's(s') body(ies). (*See "MEDICAL EFFECTS OF MYCOTOXINS EXPOSURE" hereinbelow for types of mycotoxins and their adverse health effects to humans*).

## RECOMMENDATIONS:

It is recommended that the structure located at the above-referenced Address should not be occupied or habited. Further, it is recommended that all occupants of said structure be immediately

removed from the building. This recommendation is based on results of the environmental samples collected from the above-referenced address and exposure of the resident(s) living there.

Should any new information be discovered which could affect this report, conclusion and recommendations made herein, I request any and all such information be immediately forwarded to my firm. This report may be modified at any time with the use of reliable and new scientific data.

## SIGNATURE:

Prepared by:

_____
Shakil Saghir, MSc, MSPH, PhD, DABT, ERT, FATS, FRSB
Toxicologist/Pharmacologist

DISCLAIMER

The environmental investigation performed was a "limited" environmental investigation. The absence of any pathogens not detected at the time of sample collection does not preclude the existence of other microbials that may be present in the structure. All environmental testing is only a snapshot in time of what is present and is obtainable at that specific point in time.

This Forensic Toxicology Report was constructed with diligence and judgement, locating, and using reliable sources for the information contained herein. However, the opinions herein make no express or implied warranty or guarantee in connection with the content of information contained herein, including accuracy, correctness, value, sufficiency, or completeness of the data, methods, and other information contained in this work. The opinions of this author will not be held liable for incidental, special, or punitive damages, including lost profits, lost settlements, or lost revenue, caused directly or indirectly by any error or omission, or arising out of, or in connection with, the information contained herein. The author of this work is not responsible, nor can be held liable, for the accuracy of any third-party opinions, documents, or reports.

The information contained herein is of a confidential nature to the owner of this work. The content of this work is derived from years of historical data collected from multiple sources and are the opinions of the authors.

The complete "Forensic Toxicology Study" is found in (Attachment #2) . 

## Conclusions for Plaintiff's allegations:

81. Given the results from these sections, there is no reason Building "C" should be in its current condition of disrepair from mold damage, potentially to the extent that the structural integrity of the building has been compromised from its maintenance practices which was deemed habitable based on federal standards given the FMV of the property.

82. After the onset of mold sickness in Apartment #24 (November 2013) which appeared to be the point at which an "uninhabitable" living environment was evident based on the chronology of the Plaintiff's medical records which were consistent with sources determination as to the starting conditions for mold sickness.

83. For the purposes of uninhabitability, by federal standard for Building "C"- was unfit and unsafe by December 31, 2920. See Attachment

84. Senior Villages LLC was unduly being enriched financially while Plaintiff could not reap the benefits of a fit and safe environment while the owner neglected to invest its profits into maintaining this investment property.

85. Being a protected group under the Fair Housing Act for Older People, with accompanying vulnerabilities from the aging process and the pungent musty odor and damp environment in "Building "C", a competent maintenance department should have suspected hidden mold which is adverse to the aging process; especially, since these mold spores proliferating, constantly producing mycotoxins, were determined to be hazardous to Plaintiff's health – several types of Aspergillus and Citrinin (multiple mold types).

86. After nine years of exposure to toxic mold, Senior Villages Apartments should have known mold infestation was problematic in Building "C" because of the pungent musty and moldy odor.

87. The extent of the mold infestation in this building was such that the certified inspector and internationally acclaimed toxicologist reported Building "C" was not fit, safe and sanitary and the building may be deemed "uninhabitable" for its occupants.

88. Given the age of the building (built in 1976), since acquired by the current owner, September 2005, given the maintenance history for flooding in this building, any prudent landlord would not have marketed this apartment for rent until a mold-free living environment was certified which was surely warranted under these circumstances.

89. It is blatantly obvious that to maintain the integrity of the structure, the apartment complex should have engaged professionals to address extraction, drying and any other preventive measure to minimize moisture and dampness after flood occurrences.

90. The Division of Occupational and Environmental Epidemiology Division of NC Public Health states that if the moisture problem remains undiscovered or not addressed, mold growth may be difficult to control indoors.

91. The resulting mold spores, in large doses of certain molds, can generate a toxic poisoning when the mycotoxins in the mold cell are inhaled.

92. Waiting until the tenant is visibly knowledgeable of mold, then alerting the landlord, may have been consequential to substantial mold growth as in Plaintiff's case, which allowed the landlord to escape responsibility for the property, thus causing the Plaintiff to suffer medical and financial devastation.

93. Such delay to a senior who may already be vulnerable, from the aging process itself, often with compromised immune systems, places the senior tenant at great risk for health complications in a moldy living environment.

94. Further, Plaintiff believed that a prudent landlord would not have acted in this manner, to wrongfully and retaliatorily evict Plaintiff , to avoid that Plaintiff's sickness was related to the mold in her living environment.

95. Senior Villages Apartments owned by NC Golf Homes of Locust Valley IV, LLC was negligent and culpable for the Plaintiff's current health condition and for her future care which may be lengthy given her age, chronic conditions, notwithstanding a genetic predisposition.

96. Being a protected class under the Amendment to the Fair Housing Act for Older Persons, it is implicit in the rental agreement, that an adult over 55 years age could receive, the benefit of, a habitable dwelling in an advertised retirement community; and that neither party would be unfairly taken advantage- a measure of "good faith".

97. "Good faith" on the part of the landlord is generally considered to be a higher level of culpability than negligence.

98. Apartment #7 never should have been advertised and marketed for rent on June 2, 2021, especially to a senior.

99. Senior Villages, LLC was a "bad" faith landlord given their egregious, deceitful practices and unconscionable actions which were encountered by Plaintiff.

100. As such, Plaintiff should be entitled to a monetary award for a rental abatement, unfair and deceptive trade practices along with the actions of Defendants #1 completely disregarding Plaintiff's well-being, depraved indifference.

## SUMMARY CLAIMS FOR RELIEF

Wherefore, Plaintiff requests the following relief: A monetary judgment against the defendants for damages as follows:

### State of North Carolina in United States of America

**HARM  $4,853,010  Punitive $1,000,000= $5,853,010**
Economic Monetary Damages

| | |
|---|---|
| Current Expenditures (2020-2024) | $324,070 |
| Future Expenditures (5 Year Projection) | $125,005 |
| Property Loss | $   2,000 |
| Loss of Revenue for 3-year Commitments (2022-2024) * | $209,143 |
| Business- Acting Executive Director** | $106,567 |
| Other Businesses- Mgt. Consultant*** | |
| Rental Abatement $700 (4) +$700 (2)(4) +  $750 (12)(4) | $ 44,400 |
| Security deposit | $     149 |

|  | Total | $811,334 |
|---|---|---|

Non-Economic Monetary Damages

| | | |
|---|---|---|
| Pain, Suffering and Emotional Distress****$2,020,838 | | |
| Depraved Indifference****$2,020,838 | | $4,041,676 |

* Businesses ceased functioning due to my inability to honor commitment
** Comparable value to Manager Medical 10-1000 US Bureau of Labor Statistics Occupational Wages 2023  $1,105 hours $63.09/hr. per obligation.
***Comparable value to Consultant 11-9111 US Bureau of Labor Statistics 2023  1,024 hours@104.07/hr.
****Pain and Suffering Calculator 2024  (365 days, 4.5 multiplier= Daily rate $1,230)

### NC Golf Homes of Locust Valley IV,  LLC aka Senior Villages LLC for Senior Villages Apartments and Travelers Insurance Group Holdings, Inc

Same as the State of North Carolina

**HARM  $4,853,010  Punitive $1,000,000= $5,853,010**

## <u>Mecklenburg County in North Carolina and The City of Charlotte</u>
(Singularly)

**HARM  1,622,668**
Economic Monetary Damages (Same as Defendants #1) $811,334/Defendant

Total monetary damages being sought in the civil action from all Defendants is
**$13,307**,85

Plaintiff defers to Court to determine if any punitive damages are merited in this civil case.


## PRAYER FOR RELIEF



K. Denise Burke
1147 Marsh Road Apt. #206
Charlotte, NC 28209
July 29, 2024

<u>Caregiver Observations and Commitment as Health Care Power of Attorney Agent</u>

As of 2019, Debra A. Cauthen has been through a "living hell" literally. Unbeknownst to her, while living at Senior Villages, 1705 Queen City Drive in Charlotte, NC, she was exposed to toxic mold. She initially moved into Apt. #24 which is upstairs. Upon finding out that she would have to have back surgery and could no longer walk up and down stairs, she was relocated to the ground level, Apt. #7 on June 2, 2021.

Prior to Ms. Cauthen moving into Apt.# 7, I tried to clean a black spot inside of her door at the entrance. I scrubbed and scrubbed but could not remove the spot. The apartment complex did not bother to replace the carpet or get it steam clean. Since moving into that lower-level apartment, Ms. Cauthen's health got worse. On several occasions when I came over to cook, clean and check on her, she would still be in bed. Sometimes I would get upset with her because she was not out of bed. At times she could not lift her head off the pillow. We had no definitive medical information as to why Ms. Cauthen's health was declining. In-home skilled nursing, physical and occupational therapies witnessed the challenges on a routine basis for most of the time. Additionally, she had allergies, nasal congestion and breathing issues during this time.

Everything finally hit the fan on August 22, 2022, when one of her nurses, during an in-home visit with her, said that Ms. Cauthen's apartment smelled moldy. Upon hearing that, within the next two days Ms. Cauthen had a certified mold expert to

come inspect her apartment. After his inspection he suggested that Ms. Cauthen leave the premises immediately because the level of relative humidity was so high from mold outgrowth. I really did not completely understand how sick Ms. Cauthen was until our conversation with the mold inspector who was knowledgeable about mold sickness, treatment issues and complications in mold injury cases.

Ms. Cauthen notified her apartment manager of the mold experts' findings, verbally August 22, 2022; and, then in writing on Labor Day of 2002 (signed acknowledgement of receipt). They did nothing to arrange living accommodations for her as her allergist had written a letter to the complex that the apartment was uninhabitable, given that she was allergic to several mold listed in the report from the mold inspector.

You would think that the apartment complex would jump at the chance of assisting Ms. Cauthen since she was such an excellent tenant until her health started to decline. But that did not happen, and they stopped communicating with her altogether. Ms. Cauthen was homeless for the next four months. She ended up staying with me, at various hotels and relatives. Ms. Cauthen was very selective about her environment so as not to become re-exposed. She spent most of the time during her homelessness in my apartment which was HUD inspected and had to be mold-free for my occupancy for two- week monthly periods (allowed by lease). During that time, she was in and out of the emergency room at least four times. Those episodes were very traumatic; even though Ms. Cauthen was physically going through it, I was affected emotionally seeing her suffer like she did.

In November of 2022 she moved into a new apartment called Archdale Flats for Seniors, 130 Kings Branch Way Charlotte North Carolina. Since moving there, she has had several plumbing problems with the commode backing up. It took management at least 2 weeks to resolve one situation. Then in January 2024, the ceiling in the new apartment had water intrusion from a storm, which Ms. Cauthen moved out of, two days, later because her doctor and the mold inspector advised her to do so when the apartment complex delayed attending to the water-damaged apartment. Again, physically disabled she had to move to a safer environment with her dehumidifier, BiPAP, large stationary oxygen tank, and other respiratory equipment, in tow. Again, upon notifying the property manager of her situation they did not offer to put her up in a hotel.

From January to June of 2024, my apartment complex allowed Ms. Cauthen to live with me for a prolonged period so her health could stabilize in a safe environment and to allow Ms. Cauthen relief financially so she could afford treatment from the toxic mold exposure.

None of the doctors, tests, medicines and medical devices for mold toxicity were covered by Medicare. Utilizing conventional doctors to help with symptoms from exposure was a nightmare. Many of the doctors, clinics and hospitals were mold treatment-illiterate. This was a constant source of stress for Ms. Cauthen as they were constantly documenting treatment notes without a medical frame-of-reference to justify their assertions for treatment of a person with mold sickness. The allergist, first gastroenterologist and first neurologist, attempting to rule out mold toxicity after expressing they had no substantive knowledge as a basis for their treatment of a mold sick patient.

I have been with Ms. Cauthen through all the treatment issues, severe allergic reactions, intubations, complications from allergic reaction intubation causing "eagle syndrome" a very rare illness which we had to go to the University of Chapel Hospitals for treatment- by a regionally acclaimed ENT surgeon, Dr. Trevor Hackman, most of the ER visits to include those from the gastro "flare- ups", immense pain and now cancer in the gastrointestinal tract, duodenum. I was also present and helped her prepare for her "Summary Ejectment" court case against Senior Villages. Ms. Cauthen has been unable to obtain legal counsel in North Carolina for several reasons.

Her finances, credit and general "quality of life" have been devastated because of some of her toxic mold treatment issues which is a costly cash business only. She has received money from family members, friends and clergy just to stay afloat of her medical treatment needs. Her head is still barely above water. I too have made sacrifices beyond caregiving- personal loan, paying for her special dietary groceries even now. My physical health has subsequently declined.

Ms. Cauthen's symptoms on any given day vacillate as she as good days and medically challenged days. She is learning to adapt to her health predicament. As a result of the exposure to the toxic mold Ms. Cauthen has had to considerably slow down her current service engagements to the Charity she is developing and her strategic management clients. Ms. Cauthen is so committed to her life's work, that she continues to honor her service to others even if she must be in bed to do so.

We pray for relief to Ms. Cauthen. Her only intent was to retire in West Charlotte where she grew up. Not to literally die in fulfillment of living in a senior living community and continue her voluntary Christian ministry of service to others.


Submitted by:

K. Denise Burke

Karen Denise Burke
Caregiver , Church Member and Friend

## V.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint:

(1) is not being presented for improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law.

(3) the factual contentions have evidentiary support or, if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the complaint otherwise complies with the requirements of Rule 11.


### For parties without an Attorney:

I agree to provide the Clerk's Office with any changes to my address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: September 28, 2024

*Debra Ann Cauthen*

Signature of Plaintiff
Typed Name of Plaintiff: Debra Ann Cauthen