# UNITED STATES DISTRICT COURT
## for the

### Western District of North Carolina

### Charlotte Division

**FILED**
CHARLOTTE, NC

MAR 2 6 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

## Case Number 3:24-cv-950-FDW

No Jury Requested

Debra Ann Cauthen *pro se*

    **Plaintiff**
      -v-
NC Golf Homes of Locust Valley IV, LLC
And Senior Villages LLC
    Singly/Jointly

City of Charlotte (municipal government)
In Mecklenburg County

Mecklenburg County in the State of North
Carolina
    Singly/Jointly

        **Defendants**

## AMENDED COMPLAINT
## Pursuit to Rule 15

**A. Plaintiff**
Debra Ann Cauthen
505 Laurel Court
Lancaster, SC 29720
704-816-9904
dcau1@yahoo.com

## Defendants

### Defendant No. 1
Senior Villages LLC (operating owner)
Registered Agent: Kristin George
1705 Queen City Drive

Attorney Mr. Stephen Koehler
112 South Tryon/Tryon Plaza Suite 1100
Charlotte, NC 28284
TEL: 980-219-5200
stephen.koehler@bridgehouse.law

### Defendants No.2
NC Golf Homes of Locust Valley IV, LLC
(asset protected real estate owner}

Registered Agent: Kristin George
Attorney Mr. Stephen Koehler
112 South Tryon/Tryon Plaza Suite 1100
Charlotte, NC 28284
TEL: 980-219-5200
stephen.koehler@bridgehouse.law

### Defendant No. 3
City of Charlotte in Mecklenburg County
Registered Agent: City Manager Marcus D. Jones
Office of The City Attorney
Isaac Sturgill, Esquire
600 4th Street
Charlotte, NC 28202
TEL: 980-417-3057
Isaac.sturgill@charlottenc.gov

### Defendant No. 4
Mecklenburg County of North Carolina
Registered Agent: County Manager Mike Bryant
Attorney Kimberly Sullivan, Esquire
Attorney Richard L. Rainey, Esquire
WOMBLE BOND DICKINSON (US) LLP
301 South College Street   Suite 3500
Charlotte, NC 28202-6037
TEL: 704-331-4900
Kimberly.Sullivan@wbd-us.com
Richard.Rainey@wbd-us.com

## II. Basis for Jurisdiction Senior Villages LLC, NC Golf Homes of Locust Valley IV LLC, City of Charlotte (Municipality) and Mecklenburg County

Federal Question under§ 28 USC 1331

A.1: List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution:

Title VIII of the 1968 Civil Rights Act: Amendment creating the "Fair Housing Act" and amended in 1995 creating the "Housing for Older Persons Act".

As Plaintiff is identifying herself as a member subject to the provisions of Title VIII "Fair Housing Act" of 1968 amended in 1995 for older people. Inherent in this law is that the dwelling (housing) must be habitable (fit and safe) prior to marketing the property before a discriminatory act can occur. Senior Villages Apartments (can be termed a "qualified multifamily dwelling" (4 or more units in the same building), the dwelling must be rentable meaning that it is "fit and safe" for occupancy.

Should it matter that as a senior with same needs as those in publicly held rental housing not be afforded the same level of protection? The Plaintiff maintains that she is entitled to the same safety afforded by enforced housing codes/standards that any senior should have regardless of income?

**Cause of Actions:**

24 C.F.R. § 203.673 - Habitability.

The Code of Federal Habitability" - 12 C.F.R. § 203.673 "States that the property shall be structurally sound, reasonably durable, and free from hazards that may adversely affect the health and safety of the occupants or may impair the customary use and enjoyment by the occupants. Unacceptable hazards include, but are not limited to, subsidence, erosion, flood, exposure to the elements, asbestos and lead- based paints, unsafe electrical wiring, or an accumulation of minor hazards, such as broken stairs."

The Plaintiff uses 12 C.F.R. § 203.673 as the basis for an "implied warranty of habitability" to her tenancy for fit and safe occupancy in Senior Villages Apartments, Building "C": only.

24  C.F.R. § 982 401 " Housing Quality Standards" (HQS)

An inherent objective to develop minimum housing standards is not only for the protection of the tenant but also to prevent deterioration of housing quality (American Public Health Association and the Center for Disease Control- Recommended Minimum Housing Standards (1986)).

HUD's minimum quality standards, 24 C.F.R. § 982 401, for tenant-based (occupied) programs are to ensure "safe, decent and sanitary" for its properties, both initially and during the term of the lease.

<u>The HUD HOS incorporates mold as an intolerable condition in the living environment of its premises, as reflected in their standardized inspections and the inclusion for the training of their inspectors.</u>

N.C.G.S. §1201

*Federal: Variables tor Habitability (C.F.R. § 203.673*)
A "quantitative" determination was made to verify whether Building "C" was habitable in its present condition.

➢ Fair Market Value (FMV) Mecklenburg County Tax Valuation 2022 of land/property-**$4,279,200**

➢ Assumed FMV distributed equally for three buildings- **$ 1,426,400**

➢ Hazardous Reduction- **5%** to FMV, **$71,320**

➢ Number of Units or Occupied Apartments- **88 apartments** (stated in the advertisement on SocialServe.com)

➢ Each apartment **600 ft$^2$** (stated in the advertisement on SocialServe.co

➢ Assumed FMV distributed per Apartment- **$48,627**

By utilizing this formula, 24 C.F.R. § 203.673 at 5% and N.C.G.S. § 1201 at 50%

Hazard Reductions, the building would be safe to inhibit; however, this was blatantly not

accurate. If the correlation is correct to Plaintiff's medical costs, the disconnect must be

that Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC were not

monetarily investing in the structure to improve safe habitation coincidentally to

Plaintiff's medical costs.

When applying "uninhabitability" level based on a hazard reduction of 5%, the Plaintiff's

substitution hazard reduction based on was 23%, which both are much lower than 50%

comparable N.C.G.S. §§ 1201,1205 when derived similarly from the substituted data. It

is apparent that the state tolerance, utilized by the city, needs to be more aligned with

the federal standard (5%) to assure its tenants/residents a "fit and safe" living

environment.

<u>Unsubstantiated Allegations of Defendants</u>

Contributory negligence can be held as grounds for dismissals for the purposes of common law which North Carolina ascribes; however, the experts contend that there was nothing on the part of the Plaintiff that contributed to her years of toxic mold exposure, both hidden and visible. It is ludicrous that the Plaintiff contributed to her hidden mold exposure in Apartment #24 clearly indicated by the environmental toxicologist.

The monetary judgment was ordered in magistrate's court case #22CVM22137 for relocation and related expenses because the landlord had breached their rental contract to the Plaintiff which had nothing to do with the injuries sustained in the mold infested environment as determined by the magistrate.

The Plaintiff has never received any payments, reimbursements or monetary restitution related to mold mycotoxicosis, commonly referred to as mold exposure and mold toxicity. The Plaintiff's healthcare provider, Medicare, has no benefit provisions for diagnostic testing, medical devices, treatment protocols and maintenance for the said diagnosis (es).

The Medicare claims paid were limited to diagnostic assessments provided by conventional healthcare providers and hospitals were to no avail as the Plaintiff's symptoms are only minimally stabilized between hospitalizations, emergency room care) and is presently receiving home-bound care.

The Plaintiff's issues are more substantial than the rental *dwelling* in question. The issue is a matter of life deprivation (significantly declined health restricting facets of the Plaintiff's life) which can be adequately described by the 14th Amendment to the Constitution, passed June 6, 1866, and ratified July 9, 1868).

A.2: List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution:

The Fourteenth Amendment to the United Constitution (year) grants that life, liberty and the pursuit of happiness should be afforded to its citizens as unalienable rights. These are considered inherent rights that cannot be taken away by any government as those governments should secure these rights for its citizens and residents.

The Declaration of Independence for the United States of America grants that life, liberty and the pursuit of happiness should be afforded to its citizens as unalienable rights. These are considered inherent rights that cannot be taken away by any government as those governments should secure these rights for its citizens and residents. More specifically to the Claimant's assertions- the right to exist and not be deprived of life and the right to strive for personal fulfillment and well-being; namely, the XIV Amendment to the Constitution of the United States as quoted, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce

any law which shall abridge the privileges or immunities of citizens of the United States:

"nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any within its jurisdiction the equal protection of the laws."

The 14th Amendment guarantees human rights of "Substantive" Due Process and Equal Protection.

## Cause of Action: 42 U.S.C. § 1983

42 U.S.C. § 1983 (Monell Claim) Supreme Court Monell *v.* Social Services 436 U.S. 658, 690-91 (1978) - a federal statute for which a legal remedy and a mechanism to enforce violations of a specific inherent federal right afforded by the 14th Amendment to the Constitution such as life (wellness), property and the pursuit of happiness (sustainable "quality of life").

The immunity for local governments is typically governed by state law and not the Eleventh Amendment. Sovereign immunity is only afforded to the state and its legislators based on the Eleventh Amendment to the United States Constitution unless the agency meets the test to be designated as "arms of the state" which neither the city *or* county qualifies.

Local municipalities such as the city or county are not immune to negligence claims (civil) stating sovereign Immunity also because the US Supreme Court rejected this claim this assertion in Lake County Estates v. Tahoe Reg. Planning Agency, 440 U.S. 391 (1979).

Should it matter that as a senior with same needs as those in publicly held rental housing not be afforded the same level of protection? The Plaintiff maintains that she is entitled to the same right to "healthy homes" that any senior should have regardless of income?

## Introduction

Pursuant to Rule 15, this Amended Complaint 3:24-cv-950-FDW seeks addition of Senior Villages LLC be incorporated as an indispensable party, Rule 12(b)(7), which the Plaintiff failed to join as a necessary party to this personal injury civil complaint, not excluding the real estate owner NC Golf Homes of Locust Valley IV LLC, since the leasing agreement was executed with them. Relying solely on Mecklenburg County property registration for taxation, the structure was owned 100% by NC Golf Homes of Locust Valley, asset protected real estate owner, for the same structure which was unbeknownst to the Plaintiff at the time of the original filing.

This personal injury civil lawsuit commences against landlords Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC for gross negligence for the Plaintiff's life-threatening symptoms from her exposure to pathogenic mold spores at Senior Villages Apartments in Building "C", Apartment #24 and Apartment #7.

State of North Carolina (State) , Mecklenburg County (County), General Court of Justice District Court Division- Small Claims, Case 22-CVM-22137, has already rendered a judgment against Senior Villages LLC (landlord) for breaching their residential rental agreement with the Plaintiff (tenant) for failure to acknowledge toxic and pathogenic mold spores in Plaintiff's senior apartment and that the mold infestation was at a level warranting relocation for uninhabitability to facilitate timely repairs (remediation).

Was Senior Villages Apartments fit and safe for habitation for an older person, 55+, in a 50-year-old building with a history of flooding acknowledged by the maintenance supervisor in Mecklenburg County- District Court Case 22CVM22137

on October 18, 2022?

It was deemed that the mutually owned structure, Building "C", located at 1705 Queen City Drive, Charlotte, North Carolina 28208 in Mecklenburg County was adjudicated to be "uninhabitable" for the Plaintiff on August 22, 2022 after nine (9) years of exposure to toxic and pathogenic mold spores, primarily Aspergillus (emanating mycotoxins-Aflatoxin B1, Aflatoxin G1, Fumonisins B2, Gliotoxin, Citrinin, and Ochratoxin A) and mycotoxin Zearalenone from Fusarium fungi, detected in the Plaintiff's urine when last tested on June 6th, 2025. The first mycotoxin urine test on September 7th, 2022, had equivocal detections for the mycotoxins as previously listed. Mold medical doctor, Weirs, at the Center for Occupational and Environmental Medicine (COEM) (See Attachment #1: COEM with Dr. William Weirs, MD) which asserts that such tests performed to release these mycotoxins require provocation given in the pre-specimen collection instructions. No such preparatory instructions were given to the Plaintiff by the laboratory entrusted with collecting urine specimens for Realtime Laboratory who indicated after-the-fact that provocation, glutathione could enhance release of these toxins. It is to be further researched that the antidotal information ascribed to as the mechanism for releasing/detoxing these toxins from the body mechanism (s) of the body is an area for additional research by Dr. Shakil A. Saghir (See Attachment #2).

The predominant mold spore detected in Apartment #7 was Chaetomium which usually co-exists with Stachybotrys- black mold per numerous sources; however, the mycotoxin Chaetoglobosin A was not detected in the bodily testing, Docket No. 1. Attachment # : EPA-36.

Applicability of the formula in 24 C.F.R. § 203.673 – Habitability ) can be made when

substituting medical expenses for the hazard reduction. This substitution can be made given that a direct correlation was established for medical expenses due to the mold poisoning and the toxic molds in the environment. See Attachment #2: Toxicology Report, p. 102 in the Civil Complaint. See Original Civil Complaint Attachment #12: Medical and Related Mold Expenses (uninhabitability was determined to be December 31, 2020, utilizing a 5% Hazard Reduction Tolerance according to 24 C.F.R. § 203.673 – Habitability as identified in Attachment #12 of the original civil complaint.

## Defendants: Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC

Before August 22, 2022, the Plaintiff had never contacted management or maintenance of any potential hazard in the apartment possibly requiring repairs.

On September 5, 2022, Senior Villages received written notification that Plaintiff was ill from mold allergies and need to be relocated out of the complex. At that point, the Apartment complex ceased all communication with the Plaintiff, as evidenced to the Magistrate, in a sequence of emails to Janis Hils, property manager, to address relocation, a demand letter for medical bills and remediation. The maintenance supervisor, now the acting on-site property manager, signed a receipt of information for the property manager Janis Hils.

### *Plausible Claim for Negligence (Trombly)*

*Facts Alleged*: Docket No. 1, pages 14 through 40 of 481.

*Element of Negligence:* **Duty of Care** ("implied warranty of habitability"), Docket No. 1, page 64 through page 65 of 481. *Judgment Against Senior Villages LLC in* Case 22-CVM-22137, State of North Carolina, Mecklenburg County, General Court of Justice District Court Division- Small Claims

*Element of Negligence: **Breach** Proximate Cause to Plaintiff's Substantial Harm*
*Docket No.1*
*Attachments*
2) Forensic Toxicology Report pages 101 through page 218.
6) Forensic Toxicology Mycotoxin and Environmental Analysis, pages 272 through page 420.
9- 11) Certified Mold Inspections, 8/22/2022, 8/26/2022, and September 3, 2022, pages 338 through page 422.

*Docket 48.1*
Sworn Written Affidavit Dr. Shakil Saghir, pages 27 though 87
Sworn Written Affidavit Dr. William Weirs, pages through
Letter of Uninhabitability, Dr. Susan I. Hungness, MD, pages 91-92.
Sworn Written Affidavit Blake Bouldin pages 94.
Sworn Written Affidavit K. Denise Burke, Eyewitness Testimony of Personal Caregiver, pages 109 through 112.

*Docket No. 55.1*
*Attachment # 1*: Medical Records Dr. Susan I. Hungness, MD, pages 1 of through 89.

*Docket No. 79*
*Attachment #1* Sworn Written Affidavit Dr. Susan I. Hungness, MD, pages 3 through 4.

*Docket No. 85.2*
*Attachment #2*: Sworn Written Affidavit Dr. Shakil Saghir, pages 6 through page 51.

## III. Statement of Claims

### Claim #1

The Plaintiff claims that Defendants were grossly negligent when Senior Villages LLC

breached their "duty of care" to her to provide a fit and safe dwelling pursuant to the

NC Residential Rental Act; and that because of this breach in their "implied warranty

of habitability" to Plaintiff; substantial medical harm was endured by Plaintiff as the

proximate cause from mold exposure in Building "C: of Senior Villages Apartments

owned by Senior Villages LLC and NC Golf Homes of Locust Valley IV, LLC.

These Defendants had a "duty of care" to assure that Plaintiff's senior rental dwelling

was suitable for occupancy when she first moved in Senior Villages Apartment (58

years of age) and later when she relocated in Building "C" complex at age 65).

Senior Villages breached this "duty of care" in the ruling in Mecklenburg County's-

Senior Villages knew that Plaintiff reported severe breathing problems on August 1,

2022, to the maintenance supervisor and revealed financial devastation from all the

medical bills, (See chart below of medical debts to income from 2020 through 2025)

not recognizing that mold infestation in the Building "C", Apartments #24 and #7, was

at level of concentration to cause the severity of Plaintiffs mold sickness.

Graph #1:  Income to Medical and Related Costs Illustrating Financial Devastation



Taken From SSA 1099 Statements 2020-2024

- In years 2020 and 2024 and 2024 (third quarter), Plaintiff has truly little income for personal care because the income and costs are nearly equal.

- The year 2021 was the worst year by far as Plaintiff's medical and related costs exceeded the available income by approximately $8,205.

- Years 2022 (COVID- 19) and 2023, Plaintiff had approximately $9,980 for all other "quality of life" sustaining indicators such as rent, utilities, food, other medical along with all personal revolving credit accounts.

- The Plaintiff's exhausted her income to treat symptoms in various areas in the body affected by her toxic mold exposure

| Summary of Plaintiff's Affected Body Areas | | | | |
|---|---|---|---|---|
| Area of Bodily Functions | Symptoms | Apartment #24 | Apartment #7 | Currently |
| Gastrointestinal Toxicity (GI) | | | | |
| | Nausea | X | X | X |
| | Vomiting | | X | X |
| | Abdominal Pain | | | X |
| | Bloating | | | X |
| Hepatotoxicity {Liver) | | | | |
| | Nausea | X | X | X |
| | Abdominal Pain | | | X |
| | Swelling Feet/Legs | | | X |
| | Joint and Muscle Pain | | X | X |
| | Fatiaue | | X | X |
| | | | | |
| Neurotoxicity (Nervous System) | | | | |
| | Nausea | X | X | X |
| | Vomiting | | X | X |
| | Excitability | | X | X |
| | Reaction Time Impairment | | X | X |
| | Tremors | | X | X |
| | Eye, Nose and Throat Irritation | | X | X |
| | Obsessive/Compulsive Behaviors | | X | X |
| | Limb Weakness | | X | X |
| | Numbness | | X | X |
| Nephrotoxicity {Kidneys) | | | | |
| | Poor Sleek | X | X | X |
| | Itchy Skin | X | X | X |
| | Hiah Blood Pressure | X | X | X |
| | Fluid Retention | | | X |
| immunotoxicity | | | | |
| | Digestive Issues | | X | X |
| | Bronchitis | X | | |
| | Pneumonia | X | X | |
| | Sinus Infections | X | X | X |
| Oxidative Stress | | | | |
| | Joint and Muscle Pain | X | X | X |
| | Wrinkles | | | X |
| | Brain Fog | | | X |
| Carcinogenicity | Cancer/Tumor | | | X |

Maintenance staff should have suspected or "should have known" hidden mold was probable as factors of mold infestation were occurring at Senior Villages Apartments Building "C"- a musty odor of unknown origin, a water-damage building with a history of flooding, dampness, high relative humidity (see Attachment #14.2 : Sworn Affidavit Blake Bouldin- CMI, CMR Inspector's Certification Number: 40155; and, when Plaintiff reported severe breathing issues, it should have been incumbent upon the landlord to investigate whether mold was present in Building "C" especially since two other residents on the lower level had signs on their doors indicating oxygen in use as observed by the Plaintiff.

Senior Villages, LLC's maintenance chose to be "willfully ignorance" to all indicators that the building may be mold infested; and, the owners continuing to rely on their own maintenance personnel, for cost savings, without regards for their staffs competency level, in fully understanding the complexities, unique to mold infestation, which is more difficult than just the "everyday" repair that landlords encounter. Senior Villages LLC refused to acknowledge the presence of mold in Building "C" even when shown photographs of visible mold on September 5, 2022. The Magistrate made the decision on October 18, 2022. Without their acknowledgement of mold, the process of relocation and remediation could not take place. So, they decided to evict the Plaintiff rather than deal with the costs to restore Apartment #7 to fit and safe occupancy.

Senior Villages Apartments' management, actions were not consistent with those of any prudent landlord given the same set of circumstances. No reasonable care was extended to the Plaintiff and the devastation to the Plaintiff's severity of harm as

an older person in Building "C" was foreseeable with a likelihood that their maintenance could cause harm. And lastly, the burden of eliminating the risk of the toxic mold in Building "C" was solely the responsibility of the landlord.

In the case of Senior Villages LLC, the Defendant has engaged in willful behavior involving actual and deliberate intention to harm with indifference to the Plaintiff's safety which rises to the level of "gross" negligence.

*Claim #2*

The referenced Defendants acted with depraved indifference when Senior Villages apartments on-site management subjected this senior citizen, who was bedridden at sixty-six (66) years of age, to homelessness when the management refused to relocate

Plaintiff, causing Plaintiff emotional distress diagnosed as mental anxiety with involuntary jerking being a physical manifestation from the psychological emotional stress as reported in her medical records; and the accompanying pain and suffering; consequently, the Plaintiff is seeking monetary renumeration to compensate for the insecurity of not having a permanent housing since August 2022 because of financial decimation and credit unworthiness of Plaintiff. The Plaintiff sort public assistance through Medicaid but was denied twice in 2022 and 2023. Centralina, Area Agency for Aging, provided a rental payment for June 2022, medical transportation and an in-home aid for light housekeeping through a membership with Charlotte Villages Network which is currently closed for business.

Mold infestation was significant to the extent, that a licensed medical doctor in North

Carolina, made a written request to the landlord to relocate the affected patient experiencing severe medical complications, in a mold infested living environment; and, the landlord refused to acknowledge that the Apartment #7 had mold even when they had received pictures to the contrary on September 5, 2022; at this point, the onsite-management ignored all calls and written requests that was presented to the Magistrate Mecklenburg County's- District Court Case 22CVM22137 October 18, 2022, to the extent that Plaintiff is unable to meet the credit requirements to acquire permanent housing since 2022.

The maintenance supervisor acknowledged receiving documents but could not offer any reason for not responding to the requests of the Plaintiff, defendant on the counter claim in that court proceeding.

At that time, Plaintiff was receiving restorative in-home therapy- skilled nursing and occupational therapy for certain symptoms due to mold allergies and mold exposure from Centerwell. Plaintiff's services from a skilled nurse and occupational therapy were always rendered in the bedroom and most often in bed. The dates of service for such home health care were from April 28, 2022, through September 25, 2022.

*Claim #3*

The Plaintiff claims that Senior Villages LLC wrongfully evicted her from Apartment #7 compounding emotional distress along with pain and suffering while the Plaintiff was rushed to defend against this eviction. The Magistrate stated in the "Judgment in Action for Summary Ejectment" that the default termination of Plaintiff's lease was predicated on Plaintiff's disclosure of severe mold spore infestation in Apartment 7

which was the basis for the eviction, Case No. 22- CVM-22137.

*Claim #4*

The Plaintiff claims that the Defendants were <u>culpable for deceptive trade practices</u> <u>since;</u> from December 30, 2020 until June 1, 2022, the Plaintiff paid rent to Senior Villages Apartments when Apartment #24 and Apartment #7 were quantitatively calculated to be "uninhabitable" based on 24 C.F.R. § 203.673- Habitability and medical records support this span of time for severity of harm to the Plaintiff.

*Claim #5*

Further, the Plaintiff alleges that Senior Villages Apartments was is in violation of North Carolina's General Statutes Chapter 75 which protects consumers from deceptive practices such as unfair competition and false or misleading advertising. Section 75.1-1 prohibits unfair methods of competition and unfair or deceptive practices affecting commerce. Senior Villages marketing with "A Place for Mom" is such an advertisement that would give them an unfair advantage to increase their profit margins by advertising lower rents to often low-wealth older people, as identified in Title VIII, as an enticement to accept substandard habitation which Plaintiff alleges to be the case with Senior Villages, LLC, as described in "The Journal of Urban and Contemporary Law" Volume 38:205, p. 222, <u>Urban Law Annual 1990.</u>

## Claim#6

Plaintiff asserts that punitive damages should be awarded to her for being displaced into homelessness to serve as a deterrent to Senior Villages LLC from this egregious act such that no other older person treated in this manner, when rendered disabled in their dwelling when the older person has an implied warranty of habitability, "fit and safe", housing under then laws in The State of North Carolina- General Statues Chapter 5: 42-42(a).

During my first period of being displaced to homelessness by a landlord when the Plaintiff had complied with the leasing agreement from August 22, 2022, until November 17, 2022, she was displaced to six dwellings like a vagabond which were free of mold; however, the Plaintiff experienced congestion, and the breathing difficulties continued. During this time, the Plaintiff was plagued with nausea, vomiting and sharp abdominal pain which still exists. The Plaintiff had severe food intolerances and often could not stomach foods. Then, like clockwork, almost every three to four weeks, the Plaintiff was in the emergency room for unbearable nausea with or without vomiting, often dehydrated and excruciating joint pain and stiffness. The convergence of all these symptoms simultaneously would elevate my blood pressure extremely high warranting emergency medical stabilization. Then, the involuntary jerking of the upper body with facial grimacing, night sweats- profuse head and facial sweating, hot flashes and intermittent facial flushing then and still continue to this day. The Plaintiff's diagnosed anxiety and excitability were/are, as on any given day, often vacillated when she became overly anxious. Then, her breathing would become impacted from nasal congestion which cannot be detected

by measuring the oxygen saturation percentage which pertains to the lungs, the breathing could become labored along with nausea, vomiting, abdominal pain and involuntary upper body movement aggravating and intensifying the abdominal pain. This was truly an immense period of emotional distress with pain and suffering. The Plaintiff's caregiver, K. Denise Burke, witnessed almost daily her medical conditions and challenges from 2020 through the present time.

Senior Villages Apartments' website falsely lists attributes of living there for dedication in quality service with honor, dignity, trust integrity, peace of mind and safety, the entire listing has false representations as to their purpose and philosophy which clearly does represent the Plaintiff's tenancy in Building C after mold was evidenced to Senior Villages Apartments' on-site management.  Senior Villages apartments current website advertisement page 1, page 2 depicts Building "C".  It is probably hard to phantom the degree of mold infestation in Building "C" based on this advertisement for perspective tenants.

The Plaintiff was truly deceived by this advertising and consequently chose to live in these apartments for nine years daily being exposed to toxic mold spores as an unsuspecting independent senior, working who was circumstantially reduced to being "homebound", very dependent on others with limitations, requiring services for caregiving and utilizing UBER to meet my transportation needs between Lancaster, South Carolina and Charlotte, North Carolina, causing her to be heavily in debt and from all the medical bills from years of mold exposure to pathogenic and carcinogenic mold spores in Building "C" of the complex.  The Plaintiff's treatment protocol for

episodic "flare-ups" (# ) cited in Table 14: Emergency Room Treatment for Mold

Mycotoxicosis "Flare-Ups" on page 35 in the original complaint, at Atrium Health

(NC), Novant Health (NC) and MUSC (SC) Hospitals.

IV.    **Relief Sought: Actual Damages in Excess of $75,000- Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC**

Plaintiff is seeking monetary renumeration to compensate her for the adverse change in her "quality of life" from the mold exposure symptoms inhibiting the Plaintiff from working and performing volunteer work to the least among us.  This prolonged exposure caused significant personal property loss and decimated her finances and credit worthiness to the extent that Plaintiff is unable to meet the credit requirements to acquire permanent housing since 2022.

**Proximate Harm Claims #1 through #3 in "Healthy Homes" Modeling, Arguably**
**Compensatory Damages of $966,814.15**
*Medical and Related Expenses (See Attachment #1 Summary of Claims for Relief)*

➤ September 2024 Medicare (UHC-NC) 2013- 2023 & Medicare (UHC-SC) 2024-TBD and Plaintiff Self Pay $5,933.13 from 2013- 2026.
➤ Medical Housing & Related Expenses, Charlotte. NC, January 2025- present= $35,496.39.
➤ Immediate Mold Mycotoxicosis Detoxification/ Chemical Sensitivities exhibited as Allergic reactions totaling $23,513.71.
➤ Ongoing September 2024 through February 7, 2026, totaling $56,072.22 to-date
➤ Permanent housing and Relocation for Medical Necessity totaling $86,194.21.
➤ *Security Deposit= $149*
➤ *Rental Rebate from December 31, 2020, until July 2022 totaling $*
➤ *Christian Ministry: Income Deficit (2021) from Medical Retirement-Charlotte Mecklenburg Schools averaging $10,000/year) and Vocational Losses to Management Consultant Clients 70/hour totaling 7,142.9 hours with Client losses more than $500,000.*

Plaintiff's monetary input to her management consultant clients (2024- 2026); substantially delaying the development of Soul Care Family Life Center Inc (NC SOS ID 198120) and branding for Swing Phi Swing Social Fellowship Inc (NC SOS ID 0144017), church development and physical project funding and management. Wings of the Morning Cathedral Ministries (NC SOS ID 2050871) and strategic management review, brand analysis with capital funding, grants for operations, and project feasibility in "food desert" to the West Boulevard Neighborhood Coalition (NC SOS ID 0893134), West Boulevard Food Cooperative Market (NC SOS ID 2458457 aka Three Sisters Market (NC SOS ID170494), funding streams for 501(c)(3), primarily grants for God's Way Prison Ministry (NC SOS ID 2552930), providing financial management to Howell & Associates Holdings Inc (NC SOS ID 2733205) restructuring and refinancing options to a church experiencing a loss of revenue due to membership attrition since COVID 19, Tabernacle of Praise Worship (NC SOS ID 076269) and Deliverance Holiness Church (Lancaster, SC) as the Plaintiff is certified in community development finance, profitability of NC business opportunity (franchise agreement) and independent branding for "Karlos da Barber" partner in RFLA LLP (NC SOS ID 2430915) ; and lastly, investigate financial options to sure up On Time Car Services (NC SOS ID for 2026 decline in revenues. See Attachment Mayoral Service Acknowledgment.

> ➢ *Legal Research and Related Duplication Expenses= $6,016.07.*
> ➢ *Credit Restoration from 2020-2022= $5,115.00*

## Non-Compensatory

Pain, Suffering and Emotional Distress totaling (5 multiplier) $4,834,070.75
Senior Villages LLC & NC Golf Homes of Locust Valley IV LLC Only

Depraved Indifference: Claim #4 totaling (5 multiplier) $4,834,070.75
Senior Villages LLC & NC Golf Homes of Locust Valley IV LLC Only

False and Misleading Advertisement: Claim #5 $0.00
Senior Villages LLC & NC Golf Homes of Locust Valley IV LLC Only

Punitive Damages
$5,000,000 or Court's Discretion

---

NC Golf Homes of Locust Valley IV LLC needs to remain a defendant in this law as the real estate owner of the property structure given it is unknown whether the rental owner can satisfy any monetary relief for stated claims (Docket #48) and other criteria for inclusion of this defendant. It is unknown presently, the Plaintiffs losses are due to ongoing necessary medical care and supportive and appropriate housing for medical purposes here in Charlotte, NC. Plaintiff has not been released as stable to return to her temporary permanent housing in South Carolina for her service ministry to a church in Lancaster in Lancaster County who cannot service the medical treatment protocol for Plaintiffs recurring symptoms- recurring need for infusion medicine, Emend, for gastrointestinal "flare ups".

## II. Basis for Jurisdiction City of Charlotte (Municipality) and Mecklenburg County

*Introduction*

The City of Charlotte and Mecklenburg County request that as local governmental entities that they should be terminated from this civil complaint predicated on their belief that "governmental immunity" is applicable for a presumed monetary relief for negligence, which the Plaintiff refutes.

The Plaintiff asserts that this civil complaint against the City and County extend beyond negligence as claimed for the landlords.

This complaint against both local governmental entities is premised in deprivation and abridgment of inherent constitutional rights. Those "unalienable rights" to life, property and the pursuit of happiness which cannot be taken away from any US citizen according to the 14th Amendment to the Constitution guaranteeing fairness in "due process and equal protection under the "color of the law". For this matter, the law itself is the issue, substantiative "due process".

With a lay understanding of "sovereign" and "governmental" immunities: the State of North Carolina has not waived its "sovereign" immunity as granted to all the states consistent with "Eleventh Amendment to the Constitution". Extending "governmental" immunity to its states for monetary damages recoverable in civil litigation as stated bythe defendants the City of Charlotte and Mecklenburg County.

Whereas, the state's immunity is absolute, there are exceptions to "governmental"

immunity in civil litigation recovery. The Plaintiff contends that the exception has been repeatedly alluded to in her replies to these various motions for dismissals.

The Plaintiff offers for the Court's approval deprivation of the Plaintiff inherent federal rights to life and the pursuit of happiness utilizing the 14th Amendment that grants substantive rights and limits state power and the local government's abridgement of such rights. And, utilizing 42 U.S.C. § 1983, a federal statue to provide a remedy or course of action to enforce the protection of the Plaintiff rights to life and the pursuit of happiness based the guarantee of "due process" and "equal protection" of these laws.

Yes, the City of Charlotte (Docket# 66, 82 & 83) aligns itself with Mecklenburg County (Docket #67, 72, 77) to be dismissed from this personal injury civil complaint. The assertion by Defendant Mecklenburg County that "governmental" immunity granted by the State as the premise for dismissing them from this complaint is not applicable when the Plaintiff has provided evidence of prima facie showing to prevail in this case based on the deprivation of her inherent rights such as those listed in the response afforded to her in the Fourteenth Amendment to the United States Constitution which supersedes the Defendants assertions of "governmental immunities", which allows the Plaintiff to recover damages as under 42 U.S.C. § 1983 as a Monell Claim.

The U. S. Supreme Court has held that only states and "arms of the state", which neither referenced Defendants qualify, possess immunity from civil litigation suits which can be adjudicated under federal law (s).

Further, given the egregious imprudence of the referenced landlords and their maintenance practices to minimize moisture in the structure/apartments from historical floodings, were left unmonitored by local governmental entities

promoting "healthy homes". "Healthy Homes" was a widely accepted custom for

the City of Charlotte and Mecklenburg County, undergirding their "duty of care", so

to say, for a fit and safe living environment:

Evolution of Model
See Attachments # & # : NC Department of Health and Human Services (DHHS)
adoption of the Healthy Homes model in response to their study on "Indoor Air
Quality" inclusive of mold exposure. Also included are other industry models for
"environmental air quality" Attachment # .

Local Governments Adopting Model
Attachment # : City defines this model in their "Rental Housing Handbook" (2020),
which prevailed during my tenancy in Apartment #7 at Senior Villages Apartment.
There is a section on "Mold Hazards in the Home" causes and controlling moisture
in the home; and,

Attachment #9: Mecklenburg County endorses "Age-Friendly Mecklenburg" (a
collaborative community-wide initiative which) is premised similarly to promote the
"quality of life" for its senior based on the "Critical Home Repair" focused on
repairs that a safe, healthy, and free of hazards. This initiative includes repairs for
water damage and specifically lists mold remediation.

By contrast, referring to the essence of the City County Ordinance 9651, upheld

by Mecklenburg County, which states:

"(b)  In order to protect the health, safety and welfare of the residents of the city as authorized
       by G.S. 160A-360.it is the purpose of this chapter to establish minimum standard
       requirements for the initial and continued occupancy of all buildings used for human habitation
       as expressly authorized under G.S. 160A-441- 160A-450.  This section does not replace or
       modify requirements otherwise established for the construction, repair alteration or use of
       buildings, equipment or facilities except as provided in this chapter.

(c)  The purpose of this chapter is to arrest, remedy and prevent the decay and deterioration of
      places of habitation and to eliminate blighted neighborhoods by providing standards for
      places of habitation for the protection of life, health, safety, welfare and property of the
      general public and owners and occupants of places of habitation".

City and County cannot have it both ways.  "Healthy Homes" are mold free

supportive to the original study, "Mold and Human Health" recognized by NC

DHHS, Division of Public Health Department of Epidemiology (See Attachment # )
from as far back as 2005, as a foreseeable consequence, potentially impacting
human health from exposure to dangerous toxic mold spores, in the living
environment.

The same study addressed the manner skilled rental maintenance teams should
minimize moisture (water) within the rental dwelling in a timely, appropriateness
and adequacy in repairing/remediation.

Given the maintenance practices in dealing with flooding and leaks, it can be
deduced that "Building "C", Apartments #24 and #7, became life-threatening to the
Plaintiff after December 31, 2020, until August 22, 2022 (See Attachment #11:
Mold Law Group's "Linking Mold Sickness to Environments" and Attachment 12:
Diagnostic Medical Review Study 2024). Then; after her tenancy, further support
of the Plaintiff's medical demise, was conveyed in sworn written testimony by Dr.
Weirs (See Attachment #2) attesting that the Plaintiff needs immediate medically
necessary toxic mold detoxification for toxicological mold poisoning- latent stage
"mold mycotoxicosis" commonly referred to as mold exposure or mold toxicity.
The Plaintiff's diagnoses were "mold exposure" 2022 and "mold mycotoxicosis"
2023. Thes diagnoses are synonymous with "mold toxicity" 2024. Regardless of
the diagnosis, the symptoms are the same and have caused the Plaintiff's
immense suffering from breathing issues, allergic chemical sensitivities,
gastrointestinal "flare ups", carcinoid neuroendocrine tumor of the duodenum,

Case 3:24-cv-950-FDW

chronic abdominal, joints, muscles and generalized pain with neuro-psychological involuntary bodily jerking and resulting anxiety.

*Plausible Claim Under 42 U.S.C. 1983 (Monell Claim) Twombly*

Specifically, Section 1983 allows individuals to sue state and local governments who have violated their constitutional rights.

*Count I.*

The City and County governmental entities failed to provide the Plaintiff with a "healthy home" as the model for her living environment which was infested with toxic mold with poor air quality resulting from the release of the specific mold spores in apartment's atmosphere.

Supporting Facts

1) City and County governments advocated housing revitalization in West Charlotte neighborhoods in several initiatives during my tenancy at senior Villages Apartments located in West Charlotte.

2) From the entire rental tenancy of the Plaintiff in the referenced apartment complex (2013 through 2022), there was no involvement given by the City in its mandate for preserving quality in their aging housing stock.

3) Deprivation of Rights based on Constitutional law, 14th Amendment to the Constitution addresses constitutional violations of unalienable rights to life (wellness), property (loss of physical domicile with personal property) and the pursuit of happiness (inability to perform her Christian ministry of service

primarily in Charlotte Mecklenburg) for substantive due process and fairness afforded therein to any US citizens.

4) The Plaintiff is significantly challenged medically (right violated to wellness in life); all-the-while continuing her life's Christian ministry of service that has imperiled her "pursuit of happiness" (right violated).

5) Additionally, consequential to medically necessary care for "mold mycotoxicosis", the Plaintiff's Medicare, her medical insurance provider, administered by United Health Care has not covered any of the diagnostic treatments, laboratory testing, supportive medical equipment, or the treatment regimen itself with proprietary supplements and compounded medications, the Plaintiff has been repeatedly without conducive permanent housing (right violated to property).due to financial devastation which compromised her credit worthy by making rental housing problematic due to credit issues stemming back to 2020.

6) And the deprivation of these Constitutional rights afforded by the 14th Amendment, being violated by local governmental entities in their official capacity at the time (2013-2022) of these occurrences, denoting their actions were in their official capacity denoting their actions accordingly "under color of law.

7) The Plaintiff is significantly challenged, as an individual with "exceptional circumstances" according to the American with Disabilities and the Rehabilitation Acts.

8) The Plaintiff further asserts that this violation of her civil rights was the proximate

cause (moving force) inflicted by the local governments - City and County given their inconsistencies between Ordinance 9651 and their adoption of the "healthy homes" model inclusive of toxic mold exposure possibly being an "imminently dangerous condition" unique to the individual tenant, in an infested living environment.

9) Given the circumstances of this amended complaint for civil rights violations of the Plaintiff's 14th amendment guaranteed inherent rights, specifically. that on or before December 31, 2020, the living environment was deemed "uninhabitable" when quantitatively derived utilizing 24 C.F.R. § 203.673 - Habitability.

10) Applicability of this formula can be made when substituting medical expenses for the hazard reduction (See Docket No. 1, Attachment #12, p. 455 through 481) This substitution can be made given that a direct correlation was established for medical expenses due to the mold poisoning and the toxic molds in the environment.

11) Medical and Related Mold Expenses (uninhabitability was determined to be December 31, 2020, utilizing a 5% Hazard Reduction Tolerance based on 24 C.F.R. § 203.673 - Habitability as defined for the purposes of substantive due process (fairness of the City County Ordinance 9651 itself) and assurances of equal protection under the "healthy homes" model as a senior residing in this municipality and county.

12) NC General Statues 160A-441- 160A-450 and 160-A-360 are applicable to minimum standards for unfit and unsafe dwellings for human habitation referenced in City Ordinance 9651.

13) Applicability of this formula can be made when substituting medical expenses for the hazard reduction. This substitution can be made given that a direct correlation was established for medical expenses due to the mold poisoning and the toxic molds in the environment. See Attachment #2: Toxicology Report, p. 102 in the Civil Complaint. See Original Civil Complaint Attachment #12: Medical and Related Mold Expenses (uninhabitability was determined to be December 31, 2020, utilizing a 5% Hazard Reduction Tolerance based on 24 C.F.R. § 203.673 – Habitability as identified in Attachment #12 of the original civil complaint.

*Federal: Variables tor Habitability (C.F.R. § 203.673)*
A "quantitative" determination was made to verify whether Building "C" was habitable in its present condition.

➤ Fair Market Value (FMV) Mecklenburg County Tax Valuation 2022of land/property-**$4,279,200**
➤ Assumed FMV distributed equally for three buildings- **$1,426,400**
➤ Hazardous Reduction- **5%** to FMV, **$71,320**
➤ Number of Units or Occupied Apartments- **88 apartments** (stated in the advertisement on SocialServe.com)
➤ Each apartment **600 ft** $^2$ (stated in the advertisement on SocialServe.co
➤ Assumed FMV distributed per Apartment- **$48,627**

14) By utilizing this formula, 24 C.F.R. § 203.673 and N.C.G.S. 50% Hazard Reduction, that the building would be safe to inhibit; however, this was blatantly not accurate. If the correlation is correct to Plaintiff's medical costs, the disconnect must be that Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC were not monetarily investing in the structure to improve safe habitation coincidental to the Plaintiff's medical costs.

15) The Plaintiff's right to life is plagued with symptoms of latent stage toxicological mold poisoning or "mold mycotoxicosis" which is synonymous to mold exposure and mold toxicity with immense suffering due to breathing issues, allergic

chemical sensitivities, gastrointestinal "flare ups" carcinoid neuroendocrine tumor of the duodenum, chronic abdominal, joints, muscles and generalized pain with neuropsychological involuntary bodily jerking and resulting anxiety.

16) The Plaintiff is also in need of treatment for allergic reactions, angio-edema, anaphylaxis and intubations, due to chemical sensitivity to primarily RX medications and pollock fish.  The Plaintiff's last reaction, in this manner, was September 2025 when being treated for gastrointestinal onsite of up "flare-ups" arising from an

inpatient hospitalization for an "acute kidney injury and COVID 19.

17) Aside from the physical manifestations of environmental mold exposure causing much harm to the Plaintiff medically, it is Plaintiffs contention that through further development in discovery by Senior Villages Apartments' maintenance incident logs, repairs indicated, repairs completed, timeline for repairs and costs for repairs, after water intrusion by flooding, from 2013 to 2022, verify Plaintiff's assertion is true supporting that on or before December 31, 2020, the living environment was deemed "uninhabitable" when quantitatively derived utilizing 24 C.F.R. § 203.673 – Habitability.

18) There is also a disconnect when a building "quantitatively" determined habitable nearly kills its tenant from toxicological mold poisoning.

19) Additionally, "governmental immunity" as alleged by the City of Charlotte and Mecklenburg County, is not warranted for dismissal of this <u>civil rights complaint, Monell claim under 42 U.S.C. 1983; whereby, the human rights of its citizen (Plaintiff) residing in their geographical domains were violated during their</u>

official capacities to assure fit and safe habitation under their widely publicized

an accepted custom promoting "healthy homes"...

20) The City and County are not "arms of the state and there is no "qualified

immunity" attached.

21) Since these immunities are secured by Constitutional and federal law, local

governments may have culpability/liability in this elucidated matter before the

Court.

## *Count II*

The Plaintiff was not afforded equal protection under the local laws to safeguard

her health, as other seniors, in the geographical domains of City of Charlotte and

Mecklenburg County, to toxic mold exposure from leasing to occupancy.

## *Supporting Facts*

Though mold infestation is not presently recognized as an unacceptable

hazard, it is not excluded given that other environmental hazards may exist

as stipulated in 12 C.F.R. § 203.673 and the North Carolina Residential

Rental Act N.C.G.S. 5 42-42 (a)(7). N.C.G.S. 42-42(a)(l) considers:

"Excessive standing water, sewage, or flooding problems caused by plumbing leaks or inadequate drainage that contribute to mosquito infestation or mold". This is supported by local housing code as intolerable which may be termed an "imminently dangerous condition".

1)   Legal provisions for privately owned aging rental water-damaged dwellings,

with histories of flooding problems are usually delegated by the landlords

using their own maintenance teams whether knowledgeable of such repairs

as a cost reduction measure.

2)   These in-house teams inspect and ensure their own compliance to these

provisions.

3) The City of Charlotte Handbook, 2020 states that landlord tenant law in NC is designed to protect the maintenance and condition of rental properties.

4) It maintains that state statues and local laws are purposed to provide protection for renters and landlords.

5) These laws were indicated in the Handbook are specifically designed to prevent deterioration of the quality of rental property to promote the health and safety of the renters in their living environments.

6) A healthy living environment is supposed to be the goal of both the landlord and the tenant based on the Seven Healthy Home Principles comprising safe and fit places of habitation.

7) The first principle is maintaining a healthy rental unit by keeping the unit dry from moisture which is stated to produce favorable living environments from-mites, rodents, molds, and roaches all of which are said to be associated with moisture.

8) However, in the case of toxic molds symptoms of toxicity may result given the length of exposure, age and medical condition of the exposed individual.

9) For the Plaintiff's, age and pre-existing chronic illnesses such diabetes, chronic kidney disease, hypertension, etc. compromising her immune system as documented in the Diagnostic Assessment Docket #1 according to Mold Law Group's limited clinical study, Attachment #1 "Mold Affects Human Sickness to Environments" and supportive mycotoxin testing in the Plaintiff'sbody from the mold spores detected in her living environment.

10) Different assurances for fit and safe rental dwellings differ vastly for seniors in public, tax credit dwellings from those in private senior dwellings in North Carolina, the City of Charlotte.

11) Low wealthy seniors below various percentages of the area gross median income are assured though inspections that they will not be leased or live in an environment with visible mold.

12) Their HUD inspections are such that maintenance repairs minimize moisture in the structure such that mold growth is stymied at the onset which may be 24 to 48 hours from the source of water intrusion.

13) Yes, it is obvious that mold spores were present in Senior Villages Apartments, Building "C" as previously depicted and reported by the certified mold.

14) He stated further that the building was unsanitary, damp and a pungent odor, presumably decomposition of certain structural components such as wooden components, which were indicative "moisture spots" (water) being retained in the structure

15)  Mold (fungi), particularly hidden mold, may cause decay such that the structural integrity of the dwelling is compromised.

16) According in Building "C" in the apartment complex, this building from all indications, and the harm to the Plaintiff's health, could be termed "deteriorated" according to City Handbook cited.

17) By definition, the place of lodging or habitation is deemed deteriorated when to structure is unsafe or unfit for humans to occupy and can be repaired or

improved consistently with repairs adhering to standards of fitness as established in this Handbook at a cost less than the 50% of the physical value as determined by the inspector.

18) When the Plaintiff did a "quantitative" determination to whether building "C" was habitable in the condition she experienced.

19) Obviously, the threshold value for the building did not accurately represent the threat of the building's physical value which should have been a direct correlation to medical expenses substituted for the hazard in the dwelling.

20) The toxicologist established in his Toxicology report that the condition of the building with the infestation, or hazard, was directly correlated.

21) Based on the calculations for federal variables of habitability, the following was determined:

22) So, it is not plausible or a logical deduction that the structure, at less than 50% of its physical value, was safe or fit for habitation given the devasting affects to the Plaintiff's health reflecting in her catastrophic medical expenditures.

23) And the conclusions and professional toxicological opinion along with recommendations, highlight the enormity of the Plaintiff's tenancy (See Attachment : 3: Eyewitness Written Sworn Affidavits in Building "C" of Senior Villages Apartments #24 and #7.

The recommendations from nationally recognized senior housing referral service "A Place for Mom" .See Docket # , as summarized by the examiner, Dr. Shakil A. Saghir, renown international acclaimed toxicologist:

## "CONCLUSIONS AND OPINION

Based upon the foregoing, including the certified environmental microbiology reports from an AIHA certified microbiology laboratory in good standing and the U.S. Federal Government "CUA" certified medical laboratory which produced the medical testing results, also in good standing with the U.S Federal Government and CLIA, it is my opinion that, based upon my observations, the above-named structure is a health hazard to all occupants. This opinion is based <u>on the presence of pathogenic molds in the samples along with the presence of pathogenic bacteria and biomarkers of exposure of the pathogenic mold in the urine and/or stool of the resident. Further, by correlating the environmental and medical results. it has led me to render an opinion, with a great amount of scientific and medical certainty, that the pathogenic species of fungi found in the exposure victim 's(s') mold-infested structure produced the same disease-causing mycotoxins that tested positive in the mold exposure victim's(s') body(ies).</u> *(See 'MEDICAL EFFECTS OF MYCOTOXINS EXPOSURE' hereinbelow for types of mycotoxins and their adverse health effects to humans.*

## RECOMMENDATIONS

It is recommended that the structure located at the above-referenced Address should not be occupied or habited, Further, it is recommended that all occupants of said structure be immediately removed from the building. This recommendation is based on results of the environmental samples collected from the above-referenced address and exposure of the resident(s) living there.

Should any new information be discovered which could affect this report, conclusion and recommendations made herein, I request any and all such information be immediately forwarded to my firm. This report may be modified at any time with the use of reliable and new scientific data."

## DISCLAIMER

The environmental investigation performed was a "limited" environmental investigation. The absence of any pathogens not detected at the sample collection does not preclude the existence of other microbials that may be present in the structure. All environmental testing is only a snapshot in time of what is present and is obtainable at that specific point in time.

This Forensic Toxicology Report was constructed with diligence and judgement, locating, and using reliable sources for the information contained herein. However, the opinions herein make no express or implied warranty or guarantee in connection with the content of information contained herein, including accuracy and correctness. value, sufficiency, or completeness of the data, methods, and other information contained in this work. The opinions of this author will not be held liable for incidental, special, or punitive damages, including lost profits, lost settlements, or lost revenue, caused directly or indirectly by any error or omission, or arising out of, or in connection with, the information contained herein. The author of this work is not responsible, nor can be held liable, for the accuracy of any third-party opinions, documents, or reports.

The information contained herein is of a confidential nature to the owner of this work. The content of this work is derived from years of historical data collected from multiple sources and are the opinions of the authors.

24) The filing of this civil complaint in 2024, alerted state and local governmental entities, City and County of a potentially hazardous housing state and code violation that the apartments in Building "C" had no carbon monoxide detectors which could be unsafe (lethal) and silently and adversely affect air quality in the living environment.

25) It is unknown whether the state, city or county has offered any remedies or

assessed penalties against Senior Villages LLC for non-compliance with

N.C.G.S. 42-44(a)(a2) or City of Charlotte Ordinance No.9651 (Sec.

45(e)(13) as stated:

"(e) It shall be unlawful for the owner of a place of habitation that is imminently dangerous to health or safety to collect rent from another person who occupied the place of habitation at the time became imminently dangerous to health or safety or to permit any other person to begin occupancy of such place of habitation. A place of habitation is imminently dangerous to health or safety if it is in violation of any one of the following minimum standards of fitness… (13) every place of habitation shall comply with the current county health regulations governing carbon monoxide. (11-77(r)."

27) There was/is no distinction, in this ordinance, between low wealthy residents and those residents who are not, senior or otherwise. Equal protection under Ordinance 9651 and the widespread custom for "healthy homes" in this matter before the Court was denied to the Plaintiff. The Ordinance further states this practice is unlawful as a place of habitation. The matter is further complicated since the private landlord police themselves, so to speak.

28) In January 2024, the Plaintiff experienced another occurrence of water intrusion in her private, senior tax credit rental apartment which the maintenance gave no priority to repairing (See Attachment #3).

29) When the apartment did not respond for 48 hours, the Plaintiff was forced to leave this dwelling as directed by her primary care physician as this apartment had become an unfit place for her patient to inhabit.

30) The Plaintiff knew, from prior experience, that the NC Housing Finance Agency was tasked to compel landlords adhere to HUD Quality Standards, for a potentially "imminently dangerous condition" in a NC tax credit rental dwelling.

31) In two separate privately owned senior rental dwellings the Plaintiff experienced potentially imposing consequences of water intrusion, with the possibly and reality of mold infestation.

32) Given the totality of the manner in which local governments give priority to low wealth seniors in rental dwellings, the Plaintiff was repeatedly denied equal protection as senior in Charlotte Mecklenburg from mold infestation exacerbating the Plaintiff's wellness (life) given her specific health complexities related to the aging process itself, further accompanied by her compromised immune system.

*Re- Allegations in this Civil Complaint for Negligence and Violations of the 14th Amendment to the US Constitution " to Life, Property and Pursuit of Happiness, Unalienable Rights) actionable as a Monell Claim under 42 U.S.C. 1983*

The Plaintiff re-alleges that her medical prognosis is "uncertain" due to her inability to detox from the pathogenic mycotoxins in her body directly related to the mold spores detected scientifically in her living environment.

"Conventional" medical treatment protocols have not improved the Plaintiff health, by treating only those symptoms defined in terms of conventional diagnoses without addressing the underlying causative prevailing diagnosis for mold mycotoxicosis, the proximate cause for the Plaintiff's immense suffering.

These owners, landlords, operate without local government impunities, or interventions, to assure fit and safe places for habitation to seniors in private rental dwellings.

The Plaintiff's "quality of life" has been substantially diminished from lack of permanent housing, financial devastation impacting meeting her basic needs and compromised credit

worthiness, leaves the Plaintiff without any safeguards for unalienable rights to life, property and the pursuit of happiness afforded her by "substantiative" due process and equal protection as a disabled senior under the 14th Amendment to the US Constitution.

The deprivation of the Plaintiff's rights was directly attributable to the widely held housing custom for "healthy homes" in North Carolina, City of Charlotte and Mecklenburg County.

## IV. Relief Sought From Local Governments

The Plaintiff has never filed a civil rights complaint and does not have any like complaints or monetary requests for relief pending in any Court.

The Plaintiff makes a demand for judgment in this Monell Claim, 42 U.S.C. 1983 as listed in the Conclusions below.

Compensatory totaling
City of Charlotte & Mecklenburg County

Pain, Suffering and Emotional Distress totaling
City of Charlotte & Mecklenburg County

False and Misleading Advertisement: Claim #5 totaling $ To Be Determined
City of Charlotte & Mecklenburg County

Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC

➢ SUMMARY JUDGMENT PREFERABLE (and/or Mediation)

   $1,689,165.08 and Emotional Distress/Pain/Suffering $4,834,070.75 totaling

➢ INJUCTIVE RELIEF to Prospective Tenants in Building "C" to cease renting to seniors until the building is safe for occupancy (See Docket 1: Attachment 2: "Conclusions and Recommendations" in the stated Toxicology Report.

City of Charlotte (Municipal Government)

➢ SUMMARY JUDGMENT PREFERABLE (and/or Mediation)
$1,689,165.08 and Emotional Distress/Pain/Suffering $4,834,070.75 totaling
$5,800,884.90/2 $2,900,442.42  (MONELL CLAIM NOT INCLUDED)

➢ Injunctive Relief by the City of Charlotte to remaining Seniors in Building "C" by structural engineer to determine if the building has structural integrity given decades of flooding and resulting dampness and odorous smell of decomposing structural components in the building. And consistent with NC General Statues dampness is alleviated.

Mecklenburg County (Health Overseer)

➢ SUMMARY JUDGMENT PREFERABLE (and/or Mediation)
ONE HALF $5,800,884.90/2 totaling $2,900,442.42

➢ Injunctive Relief by Mecklenburg County (Environmental Health) to assure that the

vulnerable county citizens are safe and in "healthy homes" given the complexities of aging and not plagued with unknown breathing issues, mold allergies and mold toxicity from poor air quality. The toxicologist for this complaint, Dr. Saghir, recommends that Building "C" be evacuated until such time as the building is deemed safe pursuant to the certification of the building's structural integrity.

*The Plaintiff defers monetary compensation for non-compensatory expenses until such time as mediation commences against one/both Defendant owners, for NC Golf Homes of Locust Valley IV LLC pursuant to Rule Misjoinder of    parties)

## Conclusions

The Plaintiff asserts that a prima facie showing construed plausibility for a negligence (duty of care, breach, general and specific causation) personal injury claim and plausible Section 1983 Monell Claims (under Color of Law, deprivation of constitutional rights, harm to the Plaintiff from deprivation and abridgment of the her unalienable rights were the proximate cause of, when on its face, the factual allegations, that are accepted as true, such that the Court can draw reasonable inference that the Defendants are culpable/liable and this extends to provide "factual heft" for each element in the causes for actions.

Given the "factual heft", for gross negligence against Senior Villages LLC and NC Golf Homes of Locust Valley IV LLC and for Section 1983, Monell claims against the local governments -City of Charlotte and Mecklenburg County, the Plaintiff believes that the Defendants dismissals pursuant to Rule 12(b)(6), for failing to state a claim which relief can be granted, is negated in this amended complaint. As such, the Plaintiff requests the Court "deny" the motions for dismissal by each Defendants with prejudice.

## Prayer of Relief

The Plaintiff humbly prays for the relief sought demand for relief from the defendants sought in the categorical sections listed.

| Monetary Requested 3:24-cv-950-FDW | | |
|---|---|---|
| | Senior Villages LLC Singly/Jointly NC Golf Homes of Locust Valley IV LLC | City of City Singly/Jointly Mecklenburg County |
| Breach of Contract | $ 966,814.15 | |
| Compensatory | $ 966,814.15 | $ 966,814.15 |
| Emotional Distress & Pain/Suffering (5) | $4,834,070.75 | $4,834,070.75 |
| Depraved Indifference (5) | $4,834,070.75 | |
| False Advertising | | TO BE DETERMINED |
| Monell Claim | | TO BE DETERMINED |
| Punitive | $5,000,000.00 | |
| **Total Monetary Relief** | **$19,502,212.24** | **$5,800,884.90** |

Further the Plaintiff humbly prays to the Court for injunctive relief as requested to prevent harm to other unsuspecting seniors seeking occupancy in Building "C" in the rental structure at 1705 Queen City Drive, Charlotte, Mecklenburg County, North Carolina 28208.

And lastly, the Plaintiff seeks to be harmless from the mold infestation in her rental residential apartments as it is not conceivable, in part, that contributory negligence can be affixed to hidden mold spores the living environment. The mold inspector stated that this infestation was in no way attributable to the tenant.

Concluding, there was no stipulation in the lease as to whether the landlord or tenant was responsible for changing the HVAC vent filter. For the first seven years in Apartment #24, maintenance via Tony, who regularly inspected the unit and replaced the filter. Given the Plaintiff's prior history with Senior Villages Apartments, expectations from prior history, indicated that the landlord would continue to service the HVAC and changing the air filter.

## V. Closing and Certifications

### *The Plaintiff certifies that:*

(1)  is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

(2)  is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law.

(3)  the factual contentions have evidentiary support or, if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and,

(4)  the of Responses by the Plaintiff to the Defendants otherwise complies with the requirements of Rule 11.

### *The Plaintiff further stipulates sworn written testimony:*

This civil rights complaint is being executed as a declaration under penalty of perjury that the undersigned Plaintiff *pro se* has reviewed the content of this document and that all the information is accurate to the best of Plaintiff's knowledge.

_____

Signature of Plaintiff Dated March 6, 2026
Typed Legal Name of Plaintiff: Debra Ann Cauthen

_____

Printed Name Notary

_____

Signature Notary   and Date

Seal

### The Plaintiff certifies that:

(1)  is not being presented for an improper purpose,  such as to harass, cause unnecessary  delay, or needlessly  increase the cost of litigation.

(2)  is supported by existing law or by a nonfrivolous argument  for extending,  modifying,  or reversing existing law.

(3)  the factual contentions have evidentiary  support or, if specifically identified, will likely have evidentiary  support after a reasonable opportunity for further investigation  or discovery;  and,

(4)  the of Responses by the Plaintiff to the Defendants otherwise complies with the requirements of Rule 11.

### The Plaintiff further stipulates sworn written testimony:

This civil rights complaint is being executed as a declaration under penalty of perjury that the undersigned Plaintiff *pro se* has reviewed the content of this document and that all the information is accurate to the best of Plaintiff's knowledge.

_Debra Ann Cauthen_

Signature of Plaintiff Dated March 6, 2026
Typed Legal Name of Plaintiff: Debra Ann Cauthen

_Ada G. Urcuna_

Printed Name Notary

_Signature_  3/6/2026.

Signature Notary   and Date

Seal

[Notary seal: GARIELA VICUNA / NOTARY PUBLIC / MECKLENBURG COUNTY, NC]

Expires 8/2/2030